**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **LAW ENFORCEMENT HEALTH BENEFITS, INC.,** *on behalf of itself and all others similarly situated*, 2233 Spring Garden Street Philadelphia, PA 19130 *On behalf of itself and all others similarly situated,* | Civil Action No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| | **<u>JURY TRIAL DEMANDED</u>** |
| **MARK TRUDEAU** 2382 Club Rd. Columbus, OH 43221 | |

**MARK TRUDEAU**
2382 Club Rd.
Columbus, OH 43221

**HUGH O'NEILL**
17010 Kennedy Crossing Ct.
Wildwood, MO 63038

**STEPHEN WELCH**
15 Sunnybrook Rd.
Basking Ridge, NJ 07920

**ANGUS RUSSELL**
1366 John Anderson Drive
Ormand Beach, FL 32176

**DAVID CARLUCCI**
12 Hilltop Road
Norwalk, CT 06854

**J. MARTIN CARROLL**
9353 Surfbird Ct.
Naples, FL 34120

**PAUL R. CARTER**
Address to be determined

**DAVID NORTON**
8 Greenholm St., Apt. C
Princeton, NJ 08540

**CARLOS V. PAYA, M.D., PH.D.**
165 Collingwood St.
San Francisco, CA 94114

**BRYAN REASONS**
2 Linden Lane
Chatham, NJ 07928

**JOANN REED**
205 Tuttle Ave
Spring Lake, NJ 07762

**ANNE C. WHITAKER**
516 Crinian Drive,
Cary, NC 27513

**KNEELAND YOUNGBLOOD, M.D.**
4507 N. Lindhurst Ave.
Dallas, TX 75229

**MALLINCKRODT PLC**
3 Lotus Park, the Causeway
Staines-upon-Thames,
Surrey, TW18 3 AG

**MALLINCKRODT ARD, LLC,**
*Formerly known as*
**MALLINCKRODT ARD, INC.,**
*Formerly known as*
**QUESTCOR PHARMACEUTICALS, INC.;**
1425 U.S. Route 206
Bedminster, NJ 07921

**QUESTCOR INTERNATIONAL LTD.,**
**f/k/a/ AKASIA LTD.**
College Business & Technology Park
Cruiserath, Blanchardstown, Dublin 15, Ireland.

**ST OPERATIONS LLC**
675 James S. McDonnell Blvd
Hazelwood, MO 63042-2301

**MALLINCKRODT INTERNATIONAL
FINANCE SA**
3b, Boulevard Prince Henri, L-1724 Luxembourg,
Grand Duchy of Luxembourg

**MALLINCKRODT UK LTD**
Lotus Park, 3 The Causeway
Staines Upon Thames , TW18 3AG
United Kingdom

**MALLINCKRODT GROUP S.A.R.L**
Herikerberweg 238
Amsterdam 1101CM, Netherlands

**MALLINCKRODT LUX IP S.a.r.l.**
675 McDonnell Blvd
Hazelwood, MO 63042

**MALLINCKRODT PHARMA IP TRADING
UNLIMITED CO., f/k/a MALLINCKRODT
PHARMA IP TRADING DESIGNATED
ACTIVITY CO.,**
College Business & Technology Park Cruiserath,
Blanchardstown, Dublin 15, Ireland.

**ACTHAR IP UNLIMITED CO.
f/k/a ACTHAR IP**
College Business & Technology Park Cruiserath,
Blanchardstown, Dublin 15, Ireland.

**MALLINCKRODT ARD IP UNLIMITED CO.,
f/k/a MALLINCKRODT ARD IP LIMITED
CO.**
College Business & Technology Park
Cruiserath, Blanchardstown, Dublin 15, Ireland.

**MALLINCKRODT IP ULIMITED CO.**
College Business & Technology Park
Cruiserath  Blanchardstown
Dublin  15 Ireland

**MALLINCKRODT HOSPITAL PRODUCTS IP UNLIMITED CO.**
College Business & Technology Park
Cruiserath  Blanchardstown
Dublin  15 Ireland

**MALLINCKRODT PHARMACEUTICALS IRELAND, LTD,**
College Business & Technology Park Cruiserath,
Blanchardstown, Dublin 15, Ireland.

**SONORANT THERAPEUTICS LTD.,**
College Business & Technology Park
Cruiserath, Blanchardstown, Dublin 15, Ireland.

**THERAKOS EMEA LTD.,**
**f/k/a MALLINCKRODT SPECIALTY**
**PHARMACEUTICALS IRELAND, LTD.,**
**f/k/a QUESTCOR OPERATIONS LTD.,**
College Business & Technology Park
Cruiserath, Blanchardstown, Dublin 15, Ireland.

**MEH INC.**
701 S Carson St STE 200
Carson City, NV, 89701

**ST US HOLDINGS LLC**
675 James S. McDonnell Blvd
Hazelwood, MO 63042-2301

**MALLINCKRODT BRAND PHARMACEUTICALS**
675 McDonnell Blvd
Hazelwood, MO 63042

**ST US POOL LLC**
675 James S. McDonnell Blvd
Hazelwood, MO 63042-2301

**MALLINCKRODT US HOLDINGS, LLC**
675 McDonnell Blvd
Hazelwood, MO 63042

**MALLINCKRODT ARD HOLDINGS, INC.**
675 McDonnell Blvd
Hazelwood, MO 63042

**MALLINCKRODT EQUINOX FINANCE
LLC**
385 Marshall Ave
Webster Groves, MO 63119-1831

**PETTEN HOLDINGS INC.**
675 James S. McDonnell Boulevard
Hazelwood, MO 63042

**MALLINCKRODT PETTEN HOLDINGS B.V.**
Herikerberweg 238
Amsterdam 1101CM, Netherlands

**ST SHARED SERVICES LLC,
f/k/a MALLINCKRODT
PHARMACEUTICALS LTD.**
675 James S. McDonnell Blvd
Hazelwood, MO 63042-2301

**CIGNA HOLDING COMPANY**
900 Cottage Grove Road
Bloomfield, CT  06002

**CIGNA CORPORATION**
900 Cottage Grove Road
Bloomfield, CT  06002

**EXPRESS SCRIPTS HOLDING COMPANY;**
1 Express Way
St. Louis, MO  63121

**EXPRESS SCRIPTS, INC.;**
1 Express Way
St. Louis, MO  63121

**CURASCRIPT, INC.**
6272 Lee Vista Boulevard
Orlando, FL 32822

**CURASCRIPT SD**
255 Technology Park
Lake Mary, FL 32746

**PRIORITY HEALTHCARE CORP. AND
PRIORITY HEALTHCARE DISTRIBUTION,
INC.,** *doing business as*
**CURASCRIPT SD AND CURASCRIPT
SPECIALTY DISTRIBUTION SD,** *respectively*;
6272 Lee Vista Blvd.
Orlando, FL 32822

**ACCREDO HEALTH GROUP, INC.**
1640 Century Center Parkway
Memphis, TN  38134

**UNITED BIOSOURCE
CORPORATION** *now known as* **UNITED
BIOSOURCE LLC,** *a wholly owned subsidiary
of* **UNITED BIOSOURCE HOLDINGS, INC.**
920 Harvest Drive
Blue Bell, PA  19422

**ALIXPARTNERS, LLP,**
909 Third Avenue
New York, NY  10022

Defendants.

## TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ................................................................................................................1

JURISDICTION AND VENUE ....................................................................................................11

THE PARTIES................................................................................................................................12

PLAINTIFFS .................................................................................................................................12

DEFENDANTS .............................................................................................................................14

Mallinckrodt Business Lines.........................................................................................................14

Mallinckrodt Parent Entities .......................................................................................................146

Mallinckrodt Officers and Directors .............................................................................................14

Mallinckrodt Subsidiary Entities ..................................................................................................29

FACTUAL BACKGROUND .........................................................................................................42

RELEVANT MARKETS AND MONOPOLY POWER, ...............................................................60

CLASS ACTION ALLEGATIONS ...............................................................................................86

COUNT I
PLAINTIFF v. ALL DEFENDANTS
MAINTENANCE OF MONOPOLIZATION OF
THE ACTH MARKET (15 U.S.C. § 2)..........................................................................................90

COUNT II
PLAINTIFF v. ALL DEFENDANTS
ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE
RESTRAINT OF TRADE (15 U.S.C. § 1)......................................................................................93

COUNT III
PLAINTIFF v. ALL DEFENDANTS
STATE ANTITRUST LAW CLAIMS ............................................................................................96

COUNT IV
PLAINTIFF v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(c) .................................................................................................117

COUNT V
PLAINTIFF v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(a) .................................................................................................123

i

COUNT VI
PLAINTIFF v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(d)) ............................................................................124

COUNT VII
PLAINTIFF v. ALL DEFENDANTS
FRAUD .......................................................................................................................127

COUNT VIII
PLAINTIFF v. ALL DEFENDANTS
CONSPIRACY TO DEFRAUD/CONCERTED ACTION .........................................130

COUNT IX
PLAINTIFF v. MALLINCKRODT ENTITIES
UNJUST ENRICHMENT ...........................................................................................133

COUNT X
PLAINTIFF v. MALLINCKRODT OFFICERS AND DIRECTORS
UNJUST ENRICHMENT ...........................................................................................135

COUNT XI
PLAINTIFF v. CIGNA/EVERNORTH/EXPRESS SCRIPTS
UNJUST ENRICHMENT ...........................................................................................137

PRAYER FOR RELIEF ..............................................................................................139

JURY DEMAND .........................................................................................................140

## CLASS ACTION COMPLAINT

Plaintiff, the Law Enforcement Health Benefits, Inc. ("**LEHB**" or "**Plaintiff**"), by and through its undersigned counsel, on behalf of itself and a Class of similarly situated purchasers of H.P. Acthar Gel ("Acthar"), allege as follows:

## I. NATURE OF THE CASE

1.      LEHB brings this class action to end, once and for all, the ongoing, egregious, willful, fraudulent scheme, antitrust conspiracy and RICO enterprise by the Defendants named herein with respect to the manufacture, distribution, pricing, marketing, promotion and sale of Acthar, and the joint efforts to defraud Plaintiff and members of the Class of their day in Court.

2.      The Defendants have carried on this unlawful conduct since at least August 2007, when the principal Mallinckrodt entity in charge of the brand business entered into an antitrust scheme to limit the distribution and output of Mallinckrodt's flagship product, H.P. Acthar Gel, in order to raise the price to unconscionable levels.

3.      With the price fixed, the Defendants then conspired and agreed among themselves and with other named and unnamed co-conspirators (including professionals) to market, promote and sell Acthar for unapproved uses and doses to the detriment of patients and payors of Acthar.

4.      These unlawful schemes have gotten Mallinckrodt in trouble with the federal government, repeatedly, as discussed herein.

5.      In January 2017, the Federal Trade Commission filed a Complaint against Mallinckrodt for Injunctive and Other Equitable Relief in the United States District Court for the District of Columbia (the "**FTC Action**").  A true and correct copy of the Complaint in the FTC Action is attached hereto as Exhibit "A".  The FTC claimed Mallinckrodt was committing antitrust violations by its acquisition of the only competitor to Acthar, Synacthen, and its refusal

1

to bring Synacthen to market in the U.S. in competition with Acthar.

6. On January 18, 2017, the FTC and Mallinckrodt settled a settlement agreement with a stipulated permanent injunction and equitable monetary relief. *See* **Exhibit "B"** hereto. Importantly, the settlement agreement was signed by Defendant Mark Trudeau. *Id*. at 32. By this stipulated injunction, Mallinckrodt agreed to, *inter alia*, sub-license Synacthen to another party and to take certain additional steps to facilitate such sub-license.

7. On information and belief, Plaintiff alleges that the Defendants, collectively, has worked to prevent Synacthen being brought to market by a competitor, as intended by the stipulated injunction. The antitrust conduct continues.

8. Beginning in 2012, three current employees of Questcor first complained, then sued, in Qui Tam Complaints filed under seal in the United States District Court for the Eastern District of Pennsylvania (the "**DOJ Action**"). Attached hereto as **Exhibit "C"** is a true and correct copy of the Complaint filed by Charles Strunck and Lisa Pratta. Attached hereto as **Exhibit "D"** is a true and correct copy of the Complaint filed by Scott Clark. Attached hereto as **Exhibit "E"** is a true and correct copy of the combined Complaint filed by the three relators, in which the United States Department of Justice ("DOJ") intervened.

9. Rather than fight the claims, Mallinckrodt agreed to settle. In settling a portion of the claims in September 2019, Mallinckrodt agreed that at 12 of its employees were engaged in the unlawful conduct. Attached hereto as Exhibit "F" is the Settlement Agreement (with Exhibit "A" thereto listing the 12 employees).

10. Because this case seeks to challenge the Defendants' post-bankruptcy petition conduct involving the distribution, pricing, marketing, promotion and sales of Acthar, which practices are part of the settled DOJ Action involving an unlawful scheme of kickbacks to

doctors and the use of phony patient assistance programs, and by the settlement neither Mallinckrodt, its officers and directors, nor the Cigna/Evernorth entities have changed their unlawful conduct, the detailed unlawful conduct alleged on the DOJ complaints continues.

11.     Importantly, the United States Department of Justice ("DOJ") has decided to intervene in that lawsuit, a decision not made lightly, but has not mandated a change in Mallinckrodt's practices.

12.     On April 30, 2019, it was revealed publicly for the first time by CNN[1] that two whistleblowers (Strunck and Pratta, both former pharmaceutical sales representatives for Mallinckrodt, had sued the company years before for a "multi-tiered strategy" to boost sales by bribing doctors to prescribe the high-priced Acthar to their patients.  As described more fully in the whistleblower complaint (Exhibit "C"), Mallinckrodt's scheme involved "using valuable incentives, rewards and other forms of remuneration to induce health care providers to promote and prescribe H.P. Acthar in lieu of less expensive therapies that are equally more effective…".[2] According to Strunck and Pratta, there is a pervasive culture at Mallinckrodt designed to sell Acthar at all costs, and at its highest, most exorbitant cost.

13.     Separately, a different whistleblower (Scott Clark) sued Mallinckrodt in the United States District Court for the Eastern District of Pennsylvania on April 4, 2013, alleging a different aspect of Mallinckrodt's scheme to sell Acthar at high prices.  In case unsealed as part of the government's filing of a consolidated, amended pleading, former employee Scott Clark alleges that "Mallinckrodt designed supposed 'patient assistance' funds that paid copays for Acthar only and then funded them through 'donations', knowing its money would be used on

---

[1] https://www.cnn.com/2019/04/30/health/mallinckrodt-whistleblower-lawsuit-acthar/index.html

[2] See ¶ 3(i) of *Strunck, et al. v. Questcor Pharmaceuticals, Inc*. Complaint, publicly available at https://www.courtlistener.com/docket/14485864/strunck-v-questcor-pharmaceuticals-inc/.

Acthar copays to the exclusion of other drugs." *See* United States' Complaint in Intervention (Exhibit "E"), Dkt No. 2:13-cv-01776-BMS (E.D.Pa.) (BMS) at Document No. 57 ("***U.S. Complaint***") at ¶ 5. Such conduct is unlawful.

14.     As the federal government alleged:

> Mallinckrodt knew that the cost of Acthar would make it difficult to sell because there were cheaper, effective competitor drugs available to treat certain of its approved uses, namely acute exacerbations in multiple sclerosis, lupus and rheumatoid arthritis. Mallinckrodt intended to overcome this difficulty and did so by making the drug 'free' to patients by subsidizing their Medicare [and private] copayments. By doing so, Mallinckrodt could maintain the high price of Acthar to maximize its own sales revenues, but minimize the risk that the drug's high price would impede doctors and patients from using it.

*Id*. at ¶ 4 (brackets added).

15.     In testimony given under oath in the bankruptcy, Defendants Stephen Welch and Bryan Reasons both testified, as corporate designees, that the conduct at issue in these many complaints has not changed and continues post-bankruptcy.

16.     The United Stated Congress too has investigated the company on several occasions, and it issued a scathing report on its unlawful conduct in October 2020. *See* **Exhibit "G"** hereto. Defendant Mark Trudeau gave false testimony under oath before Congress about the reasons for Questcor's exorbitant price increase in 2007 (*ie*. "[t]o account for manufacturing investments and to stabilize its finances", and "to keep Acthar on the market"). *See* **Exhibit "H"** hereto.

17.     Lastly, Patients and payors have complained, and sued, to force the company to change its bad ways. In this Court, in April 2017, the City of Rockford sued.

18.     All these efforts have fallen on deaf ears. Mallinckrodt knows only one thing: money. And so it will take money – in the form of substantial compensation awarded by a jury

in this case – to get Mallinckrodt to listen.

19.     But it will take declaratory and injunctive relief entered by this Court to force the company to finally change.

20.     While some of the Defendants within the Mallinckrodt family of companies have filed for bankruptcy protection in Delaware Bankruptcy Court to avoid its debts incurred from its pre-petition (October 12, 2020) conduct, others have not.

21.     The Defendants named herein seek to continue their unlawful ways long after the bankruptcy is over, thus making an award declaratory and injunctive relief not only appropriate, but critical for the patients and third-party payors ("TPPs") who continue to struggle each day under the oppressive pricing imposed by Mallinckrodt for Acthar, with the necessary support of its co-conspirators at Cigna/Express Scripts.

22.     The company has arrogantly admitted that it has not changed its unlawful conduct.  And it has no intention of doing so through its chapter 11 corporate reorganization.

23.     That is why the LEHB has sued.

24.     A health benefits fund which serves those who serve and protect our citizens, for must now police Mallinckrodt, and prosecute its continuing bad conduct.

25.     Repeat offenders like Mallinckrodt must be prosecuted to the fullest extent of the law.

26.     While this case seeks declaratory and injunctive relief to arrest and abate Mallinckrodt's ongoing, willful and fraudulent conduct now and into the future, damages are sought only for the period of time **after** the filing of the bankruptcy petitions by the Mallinckrodt debtor entities on October 12, 2020.

27.     To be clear, the claims asserted herein could not have been commenced prior to

the "Petition Date" of October 12, 2020 because they seek relief only for post-petition conduct.

28.     Thus, these claims are neither stayed by operation of the automatic stay of Section 362 of the Bankruptcy Code, nor are they affected by the preliminary injunction issued by the Bankruptcy Court in December 2020 as to claims against certain present and former Express Scripts subsidiary entities who have contractual, mutual indemnity with certain debtors.

29.     This case involves Acthar, which has two National Drug Codes, NDC Nos. 63004-8710-01 and 63004-7731-01, by reason of Defendants' previous unlawful conduct involving fraud on the federal Medicaid program and violations of the False Claims Act (which claims are being settled for $260 million),

30.     Acthar is, and has been for decades, the only therapeutic ACTH product sold in the United States.  Mallinckrodt is the sole provider in the U.S. of approved ACTH drugs.

31.     Thus, LEHB brings this case on behalf of all similarly-situated third party payors and their beneficiaries who paid for Acthar, except those expressly excluded from the Class (like institutional payors with direct, contractual relationships with Defendants).  These excluded parties were not harmed like LEHB and other members of the Class; instead, many benefitted by Mallinckrodt's unlawful conduct as it raised the revenues paid to such entities from the higher prices for Acthar created by Defendants unlawful schemes and conduct continuing today.

32.     The scheme involved Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. ("Questcor"), its parent company, Mallinckrodt plc (collectively "**Mallinckrodt**") and related "**Mallinckrodt Parents**" and "**Mallinckrodt Brand Subsidiaries**" (defined below), its officers and directors, as well as Mallinckrodt's exclusive agent for the delivery of Acthar, the "**Cigna/Evernorth**" entities consisting of Express Scripts Holding Company and Express Scripts, Inc., including their two (2) current wholly-owned subsidiaries,

CuraScript, Inc., doing business as CuraScript, SD., and Accredo Health Group, Inc. ("Express Scripts" or "ESI"), now owned by Defendant Cigna Corporation ("**Cigna**") and renamed "**Evernorth**"), and one former subsidiary, United BioSource, as well as Mallinckrodt's restructuring consultant, AlixPartners, LLP ("AlixPartners"). The scheme alleged herein seeks to maintain and enhance Mallinckrodt's monopoly power in the U.S. market for adrenocorticotropic hormone (ACTH) drugs in violation of federal and state antitrust laws.

33. Mallinckrodt manufactures, markets, distributes and sells H.P. Acthar, NDC Nos. 63004-8710-01 and 63004-7731-01 ("Acthar"). Acthar is the only therapeutic ACTH product sold in the United States. Mallinckrodt is the sole provider in the U.S. of approved ACTH drugs.

34. Accordingly, in conjunction with limiting Acthar distribution and raising the prices for Acthar in 2007, Mallinckrodt embarked on a marketing scheme designed to incentivize sales of Acthar at the new high prices. Patients and TPPs, like Plaintiff, have had no choice but to pay the high prices charged by the Mallinckrodt Defendants and the Express Scripts Entities, under the guidance and direction of Mallinckrodt's Board members and senior corporate officers, with the restructuring consultant, Alix Partners.

35. Mallinckrodt vastly expanded its direct-to-consumer selling of Acthar by expanding its sales force, including creating a team of "medical science liaisons" or "MSLs". The MSLs were highly trained specialists in the Acthar treatments who worked with other Mallinckrodt sales representatives to create a network of Key Opinion Leaders ("KOLs"). These KOLs were leading specialists in their respective medical fields whom Mallinckrodt identified as being potentially influential on other doctors. These KOLs were paid handsomely to join with Mallinckrodt's MSLs and sales representatives as "spokes-doctors", promoting Acthar to other medical providers and delivering Mallinckrodt's false, misleading and deceptive promotional

messages about the safety, efficacy and value of Acthar in relation to other cheaper, safer, and equally or more effective treatments.  As a result, thousands of new patients have been prescribed Acthar for unapproved uses and doses in the treatment of diseases in neurology, nephrology and rheumatology, among others.  And TPPs, like Plaintiff, have been forced to pay the exorbitant prices charged by Defendants.

36.     Mallinckrodt acquired its Acthar monopoly in 2001 when Questcor purchased Acthar from Aventis for $100,000.  By 2014, when Mallinckrodt purchased Questcor, the value of that Acthar monopoly was $5.9 billion—the price paid for the single-product company.

37.     This case does not seek to challenge the lawfulness of Mallinckrodt's monopoly. It seeks to challenge the lawfulness of Mallinckrodt's post-bankruptcy petition exercise of its monopoly power by taking actions to maintain and enhance that monopoly power in violation of the antitrust laws from October 12, 2020 (the date Mallinckrodt filed its bankruptcy petition) to the present.

38.     The issue is not whether Mallinckrodt possessed monopoly power for Acthar.  It is whether its actions in contracting with the agent of its leading customers, Express Scripts, and in acquiring the only competitive product in the marketplace, Synacthen, constitute unlawful efforts to retain, maintain and enhance Mallinckrodt's monopoly power over Acthar in the ACTH market *after* it filed its Petition in Bankruptcy Court.

39.     LEHB alleges that Mallinckrodt not only has maintained such power as part of its restructuring effort, but it has enhanced such power by valuing Synacthen as virtually worthless, transferring the intellectual property for Synacthen to a subsidiary entity with no intention to maximize such property rights, and refusing to bring this synthetic competitor to Acthar to market in the United States.

40.     Synacthen sells in other parts of North America, including Canada, and overseas. However, to discourage U.S. based Acthar purchasers from seeking to purchase Synacthen over the Canadian border, Mallinckrodt and its officers and directors named herein authorized and implemented a strategy to raise and fix the price of Synacthen to exorbitant levels on par with increases in the prices Acthar, and then charging patients and TPPs at such exorbitant levels.  By so acting, without any legitimate business justification (in terms of costs, risks or other reasonable basis), Defendants maintained and enhanced the Mallinckrodt monopoly over the Acthar franchise and excluded competition in the market for ACTH drugs.

41.     Acthar is a "specialty pharmaceutical".  It is not sold in retail pharmacies, nor is it distributed through wholesalers to retail pharmacies, as with many prescription drugs.  Instead, it is distributed only through "specialty pharmacies" ("SPs").

42.     One of the largest SPs in America was Cigna/Evernorth's CuraScript, Inc. (n/k/a Accredo Specialty Pharmacy) which Cigna/Evernorth has owned since 2004. Other major SPs are owned by CVS/Caremark, Humana (Rightsource) and Cigna (Tel-Drug).

43.     In 2007, Mallinckrodt decided to embark on a "new strategy" and it changed its distribution of Acthar.  Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt decided to limit Acthar distribution exclusively through Cigna/Evernoth's Accredo, and select other SPs.  In effect, Mallinckrodt contracted with the agent of its leading customers in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly.

44.     Immediately after signing the exclusive agreement, Mallinckrodt and Cigna/Evernorth, through Curascript SD, agreed to raise the price of Acthar from $1,980 to over $27,927.80 per vial.  As a result, Mallinckrodt was able to charge inflated prices for Acthar to

Express Scripts' clients.

45. Make no mistake about it, the price of Acthar was raised and fixed by both Mallinckrodt and Express Scripts. The June 2007 contract signed between the parties contained express language giving Curascript the power to deny Mallinckrodt any price increase. It never has done so.

46. Mallinckrodt has confirmed, in the context of its chapter 11 bankruptcy proceedings, that the exclusive distribution agreement with Cigna/Evernorth's Curascript remains in effect. It has had amended at least 12 times, but the operative language in paragraph 5(c) has not changed. Thus, Mallinckrodt and its co-conspirators at Cigna/Evernorth retain exclusive control over the price of Acthar. They refuse to lower the price, despite their ability to do so, because they are making too much money to ever do so, absence a court order or jury verdict.

47. The above-described conduct violates federal and state antitrust laws, federal RICO, state consumer fraud laws, and common law fraud, negligent and intentional misrepresentation, conspiracy to defraud, aiding and abetting fraud and unjust enrichment. Specifically, Plaintiff and its beneficiary were charged more for Acthar after October 12, 2020 than they otherwise should have been charged due to a scheme of price fixing, monopolization, deception and kickbacks to doctors, which constitute violations of laws.

48. As a result of being overcharged for Acthar by the unlawful scheme alleged, Plaintiff brings this lawsuit to obtain declaratory and injunctive relief, in order to have the conduct of Defendants declared unlawful and to enjoin such unlawful conduct going forward to arrest the scheme and to prevent a recurrence of the overcharges. Plaintiff also seeks to recover money damages for overcharge payments it made, and members of the Class have made, and

continue to make, since October 12, 2020, up and through the day of trial. Finally, Plaintiff

seeks all attorneys' fees permitted by law and punitive damages for the Defendants' willful,

outrageous and reckless conduct.

## II.   JURISDICTION AND VENUE

49.     Plaintiff brings this action pursuant to the federal and state antitrust laws, federal

RICO, the consumer protection laws of various states, as well as the common law of fraud,

intentional misrepresentation, unjust enrichment and civil conspiracy of various states.

50.     Plaintiff brings this action pursuant to sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15(a) and 26, to recover treble damages, costs of suit, and reasonable attorneys' fees

for the Defendants' violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

51.     This Court also has subject matter jurisdiction over this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the Plaintiff and members of

the Class are diverse from the Defendants and over two-thirds of the Class is situated outside of

Illinois. Due to the exorbitant prices charged by Defendants for Acthar to the Class, the

aggregate amount in controversy far exceeds $5,000,000.

52.     Further, the Court has supplemental jurisdiction over the Plaintiff's state common

law and statutory claims pursuant to 28 U.S.C. § 1367 because these claims arise from the same

occurrence or transaction and are related to the Plaintiff's federal antitrust and RICO claims as to

form part of the same controversy.

53.     This Court has personal jurisdiction over the parties because the Defendants

conduct substantial business in this State, have had systematic and continuous contacts with this

State, and have agents and representatives that can be found in this State.

54.     The Court has jurisdiction over the Defendants because they have had sufficient minimum contacts with and/or have purposefully availed themselves of the laws and markets of the State of Illinois through, among other things, their conspiratorial communications between themselves and with others (including telephonic and electronic communications) and their distribution, marketing and sales of Acthar to the residents of Illinois.

55.     Venue is proper in this District because this case is related to another case filed in this Honorable District Court, *City of Rockford v. Mallinckrodt ARD, Inc., et al*., Civil Action No. 3:17-cv-50107, and the Defendants have continuously and systematically transacted business in this District and continued their unlawful conduct described herein in this District.

56.     Acthar is sold in interstate commerce and the unlawful activities alleged in this Class Action Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## III.    THE PARTIES

### A.  PLAINTIFFS

57.      Plaintiff, Law Enforcement Health Benefits, Inc. ("LEHB" or "Plaintiff"), is a non-profit organization, incorporated pursuant to the law of Pennsylvania, that provides medical insurance coverage and prescription, dental and vision benefits to approximately 8,000 police officers and their families.

58.     One such employee's wife has a serious medical condition, multiple sclerosis, for which Acthar was indicated as a treatment option for limited purposes of treating an acute exacerbation of disease (or flare).  However, this LEHB beneficiary has been prescribed Acthar for years, from 2018 through 2020, including into October 2020.  The patient continues to suffer from MS, and to be prescribed Acthar as a long-term, maintenance treatment option for it is not,

and has never been, indicated.

59.     This beneficiary received Acthar directly from Mallinckrodt's authorized agent, Express Scripts, pursuant to the ASAP program described below.  The Plaintiff, which pays the health care benefits of its beneficiaries, including specialty pharmacy drugs like Acthar, then paid for these administrations of Acthar.  The sum total of these prescriptions and payments is as follows:

| Year | Name | Net Payment | Quantity |
|------|------|-------------|----------|
| 2013 | ACTHAR | $ 31,207.08 | 5 |
| 2015 | ACTHAR | $ 34,714.68 | 5 |
| 2016 | ACTHAR | $ 104,144.04 | 15 |
| 2018 | ACTHAR | $ 316,590.00 | 40 |
| 2019 | ACTHAR | $ 860,924.00 | 110 |
| 2020 | ACTHAR | $ 151,656.00 | 20 |
|  |  | $ 1,499,235.80 |  |

60.     In 2020, up to and including October, after Mallinckrodt filed for bankruptcy, LEHB's beneficiary was prescribed Acthar for treatment of MS pursuant to the same 5-day, "pulse therapy" regimen developed by Mallinckrodt and approved by the Defendant officers and directors under the auspices of Dr. Staley Brod as the "Brod Protocol" as described below.  As a result, LEHB paid for Acthar, and continues to pay for Acthar, pursuant to the same, ongoing, fraudulent scheme and scheme outline herein.

61.     The LEHB brings this case on behalf of a Class of similarly-situated TPPs and their beneficiaries who continue to be prescribed Acthar and pay for Acthar pursuant to the same unlawful conduct described herein.  In other words, the conduct of the Defendants was not changed by the bankruptcy filing of Mallinckrodt.

62.     The members of the Class that continue to be affected by such unlawful conduct consist of Taft Hartley union funds, like LEHB, municipalities like the City of Rockford and

13

self-funded business and other payers. One example is a TPP known as the Washington Wholesalers Health and Welfare Fund ("Washington Wholesalers") located in Columbia, Maryland. During the period January 11, 2018 through April 28, 2020, Washington Wholesaler paid $805,297.73 for administrations of Acthar to its beneficiaries. These prescriptions were supplied by the Defendants through Cigna/Evernorth's Curascript SD to specialty pharmacies BriovaRx of Indiana and Optum specialty pharmacy. After October 12, 2020 (the date of Mallinckrodt's bankruptcy filing), the Washington Wholesalers paid an additional $41,618.02 per month for each of the three months of October, November and December, demonstrating that the Defendants' unlawful price fixing and other conduct has continued unabated. The dates of payment are October 13, 2020, November 10, 2020, and December 29, 2020, respectively, and the payments were split between the fund (which paid 90% of the bill, or $37, 456.22) and the beneficiary (who paid 10% of the bill, or $4,161.80).

### B. DEFENDANTS

### Mallinckrodt Business Lines

63.     The Mallinckrodt enterprise operates two separate businesses.

64.     The "**Specialty Brands**" business, operated by various entities within the Mallinckrodt family of companies, conducts its global manufacturing operations in Dublin, Ireland, and has its principal U.S. offices in Bedminster Township, New Jersey, with a significant corporate administrative office in Hazelwood, Missouri near St. Louis. These are the same offices that Mallinckrodt ARD – the operating entity for Acthar distribution, marketing and sale -- uses as its corporate headquarters.

65.     The Mallinckrodt "**Specialty Generics**" business is primarily involved in the manufacture, distribution and sale of opioids, and is comprised of several non-defendants,

Mallinckrodt entities, Mallinckrodt LLC, Mallinckrodt Enterprises LLC, SpecGx Holdings LLC, SpecGx, , LLC and Mallinckrodt APAP LLC.

66.     This case concerns the Specialty Brands business and, in particular, the most significant and valuable brand, H.P. Acthar Gel ("**Acthar**").

### Specialty Brands Business

67.     Questcor Pharmaceuticals, Inc. ("Questcor") was acquired by Mallinckrodt on August 14, 2014 for $5.9 billion, after paying only $100,000 for Questcor's lone product 13 years earlier.  Following the acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt and its name was changed to Mallinckrodt ARD Inc.  Later, Mallinckrodt ARD Inc. became Mallinckrodt ARD LLC ("**Mallinckrodt ARD**").

68.     Mallinckrodt ARD is a biopharmaceutical company incorporated in California, with corporate offices located at 675 McDonnell Blvd., Hazelwood, Missouri and 1425 US 206, Bedminster, New Jersey.  For clarity, where necessary, the entity that existed prior to the Mallinckrodt acquisition is herein referred to as "Questcor".

69.     Mallinckrodt ARD is a California limited liability company, with a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. Mallinckrodt, plc acquired Questcor Pharmaceuticals, Inc, and filed an Agreement of Merger on August 14, 2014 with the California Secretary of State. With Mallinckrodt's acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt and on July 27, 2015 its corporate name was changed from Questcor Pharmaceuticals, Inc. to Mallinckrodt ARD Inc. On January 26, 2019, the Company filed a Conversion with the California Secretary of State, changing its name and company type to Mallinckrodt ARD, LLC.

70.     On October 12, 2020, Mallinckrodt ARD, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12551 On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

71.     At the time of the Mallinckrodt acquisition, Questcor's only product sold in the United States was Acthar.  As of the date of this Class Action Complaint, Mallinckrodt continues to manufacture, distribute and sell Acthar directly to patients, exclusively through Cigna/Evernorth, by a program known as the "Acthar Support and Access Program" ("ASAP") described below.

72.     Defendant, Mallinckrodt plc ("**Mallinckrodt plc**"), is an Irish public limited company, with its corporate headquarters in Staines-upon-Thames, United Kingdom.  Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG.

73.     Mallinckrodt plc and Mallinckrodt ARD, as the owners and operators of the Mallinckrodt Specialty Brands business, are collectively referred to as "**Mallinckrodt**".

**1.  Mallinckrodt Parent Entities**

74.     Defendant, Mallinckrodt plc is an Irish public limited company ("**Mallinckrodt plc**"). The company was incorporated on January 9, 2013, and registered as a new company with the Companies Registration Office (CRO) of Ireland on September 1, 2013 with a Company Number of 522227.  Mallinckrodt plc maintains a principal place of business at 3 Lotus Park, The Causeway, Staines-Upon-Thames, Surrey TW18 3AG, United Kingdom.

75.     On October 12, 2020, Mallinckrodt plc, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12522. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by several of its wholly-owned subsidiary entities and is now jointly administered under Case No. 20-12522.

76.     Defendant, Mallinckrodt International Finance S.A., Inc. is a public limited liability company (société anonyme) and operating company ("**MIFSA**"), incorporated under the laws of the Grand Duchy of Luxembourg and wholly-owned subsidiary of Mallinckrodt, plc.  The company was incorporated on November 16, 2012, and registered with the Luxembourg Trade and Companies Register on April 30, 2013 under the number B172865.  It maintains a registered office at 3b, Boulevard Prince Henri, L-1724 Luxembourg, Grand Duchy of Luxembourg.

77.     As Mallinckrodt conceded in its bankruptcy filing, MIFSA "is the direct or indirect parent of all of the Debtors in these cases as well as the non-Debtor affiliates" named herein.  Case No. 20-12522, Dkt. No. 969 at 2.

78.     MIFSA is the original borrowing and issuing entity for Mallinckrodt debt. It is the holder of parental debt guarantees and holds a substantial foreign cash pool funded, in large part, by the marketing and sales Acthar by Mallinckrodt ARD.  The movement of monies into and out of the MIFSA "cash pool" is demonstrated by MIFSA's

79.     On October 12, 2020, MIFSA voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12540. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

17

80. Mallinckrodt UK Limited is a public limited liability company and operating company ("**Mallinckrodt UK**"), incorporated on June 23, 1986 under the laws of the United Kingdom, and is wholly-owned subsidiary of Mallinckrodt, plc. It maintains a registered office in Surrey, United Kingdom. It maintains a principal place of business at Lotus Park, 3 The Causeway Staines Upon Thames , TW18 3AG United Kingdom.

81. On October 12, 2020, Mallinckrodt UK voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey. On October 14, 2020, the case was administratively consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

82. Mallinckrodt Group S.a.r.l. ("**Mallinckrodt Group Sarl**") is a Luxembourg company and wholly-owned subsidiary of Mallinckrodt, plc. The company was registered on September 10, 2012 with a RCS file number of B171811 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, Mallinckrodt Group S.a.r.l, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12527. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522

83. Mallinckrodt plc is the sole owner of MIFSA, Mallinckrodt UK and Mallinckrodt Group Sarl, which are collectively referred to herein as "**Mallinckrodt Parents**". Dkt. No. 969 at 2.

### 2. **Mallinckrodt Officers and Directors**

84. Mark Trudeau ("Trudeau") is an adult individual and resident of 2382 Club Rd.

Columbus, OH 43221. He is currently President and Chief Executive Officer of Mallinckrodt plc and serves on its Board of Directors. Trudeau has been President and CEO of Mallinckrodt plc since June 2013.

85. Trudeau has served on the Board of Directors since June 2013 and after Questcor was acquired by Mallinckrodt in August 2014. As a result, he has direct, personal knowledge of, and complicity in, Mallinckrodt's unlawful conduct.

86. Hugh O'Neill ("O'Neill") is an adult individual and resident of 17010 Kennedy Crossing Ct. Wildwood MO 63038. He is currently the Executive Vice President and Chief Commercial and Operations Officer at Mallinckrodt plc. O'Neill was formerly the President of Mallinckrodt ARD in charge of all Specialty Brands operations since Mallinckrodt acquired Questcor and Acthar in 2014. At all times material hereto, Mr. O'Neill reported to Trudeau. (Falcone 234)

87. Stephen Welch ("Welch") is an individual and resident of 15 Sunnybrook Rd. Basking Ridge, New Jersey 07920. He is currently the Chief Transformation Officer at Mallinckrodt plc and Chief Financial Officer for Specialty Generics businesses.

88. Bryan Reasons ("Reasons") is an individual and resident of 2 Linden Lane, Chatham New Jersey 07928. He is the current President of Mallinckrodt ARD, as well as several other Specialty Brands entities. Reasons serves on the Board of Directors of Mallinckrodt plc.

89. Angus Russell ("Russell") is an adult individual and resident 1366 John Anderson Drive Ormand Beach, Florida. He is currently the Chairman of the Board of Directors of Mallinckrodt plc.

90. Mr. Russell has been a Mallinckrodt Director since May 2018 (predating the Mallinckrodt acquisition of Questcor), and the Chairman since August 2014, so he is intimately

familiar with the company's fraudulent conduct for which it has been prosecuted by the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years he has served as Chairman of the Board, Mr. Russell has done nothing to change Mallinckrodt's bad behavior. Instead, he gladly received payments of $473,460 as "Director Fees" in the year prior to the October 2020 bankruptcy filing (D.I. 944 at 25), likely to buy his continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

91.     All such fees (and other compensation) should be disgorged by Mr. Russell as he was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye toward) unlawful Acthar conduct which created the fund of money out of which his ill-gotten fees and other compensation were paid.

92.     Mr. Russell has served on the Board of Directors of Questcor from June 2013 until Questcor was acquired by Mallinckrodt in August 2014. As a result, he has direct, personal knowledge of, and complicity in, Mallinckrodt's unlawful conduct.

93.     David Carlucci ("Carlucci") is an adult individual and resident of 12 Hilltop Road Norwalk, Connecticut. He currently serves on the Board of Directors of Mallinckrodt plc.

94.     Mr. Carlucci has been a Mallinckrodt Director since June 2013, so he is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the

nearly 8 years he has served as a member of the Board, Mr. Carlucci has done nothing to change Mallinckrodt's bad behavior. Instead, he gladly received payments totaling $328,863 as "Director Fees" in the year prior to the October 2020 bankruptcy filing (D.I. 944 at 27), likely to buy his continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

95. All such fees (and other compensation) should be disgorged by Mr. Carlucci as he was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye toward) unlawful Acthar conduct which create the fund of money out of which his ill-gotten fees and other compensation were paid.

96. J. Martin Carroll ("Carroll") is an adult individual and resident of 9353 Surfbird Ct. Naples, Florida 34120. He currently serves on the Board of Directors of Mallinckrodt plc.

97. Mr. Carroll has been a Mallinckrodt Director since June 2013, so he is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years he has served as a member of the Board, Mr. Carroll has done nothing to change Mallinckrodt's bad behavior. Instead, he gladly received payments totaling $344,604 as "Director Fees" in the year prior to the October 2020 bankruptcy filing (D.I. 944 at 28), likely to buy his continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

98. All such fees (and other compensation) should be disgorged by Mr. Carroll as he was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye

toward) unlawful Acthar conduct which create the fund of money out of which his ill-gotten fees and other compensation were paid.

99.     Paul R. Carter ("Carter") is an adult individual whose residence is currently unknown. He currently serves on the Board of Directors of Mallinckrodt plc.

100.     Mr. Carter has been a Mallinckrodt Director since May 2018, so he is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years he has served as a member of the Board, Mr. Carter has done nothing to change Mallinckrodt's bad behavior. Instead, upon information and belief, he gladly received payments as "Director Fees" in the years prior to the October 2020 bankruptcy filing (D.I. 944 at 28), likely to buy his continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

101.     All such fees (and other compensation) should be disgorged by Mr. Carter as he was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye toward) unlawful Acthar conduct which create the fund of money out of which his ill-gotten fees and other compensation were paid.

102.     David Norton ("Norton") is an adult individual and resident of 8 Greenholm St. Apartment C. Princeton, New Jersey. He currently serves on the Board of Directors of Mallinckrodt plc.

103.     Mr. Norton has been a Mallinckrodt Director since September 2017, so he is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by

22

the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years he has served as a member of the Board, Mr. Norton has done nothing to change Mallinckrodt's bad behavior. Instead, he gladly received payments totaling $344,604 as "Director Fees" in the year prior to the October 2020 bankruptcy filing (D.I. 944 at 26), likely to buy his continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

104.    All such fees (and other compensation) should be disgorged by Mr. Norton as he was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye toward) unlawful Acthar conduct which create the fund of money out of which his ill-gotten fees and other compensation were paid.

105.    Carlos V. Paya, M.D., Ph.D. ("Pava") is an adult individual and resident of 165 Collingswood St. San Francisco, California 94114 . He currently serves on the Board of Directors of Mallinckrodt plc.

106.    Dr. Paya has been a Mallinckrodt Director since May 2019, so he is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years he has served as a member of the Board, Dr. Paya has done nothing to change Mallinckrodt's bad behavior. Instead, he gladly received payments totaling $340,854 as "Director Fees" in the year prior to the October 2020 bankruptcy filing (D.I. 944 at 25), likely to

23

buy his continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

107.     All such fees (and other compensation) should be disgorged by Dr. Paya as he was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye toward) unlawful Acthar conduct which create the fund of money out of which his ill-gotten fees and other compensation were paid.

108.     JoAnn Reed ("Reed") is an adult individual and resident of 205 Tuttle Ave, Spring Lake, New Jersey 07762.  She currently serves on the Board of Directors of Mallinckrodt plc.

109.     Ms. Reed has been a Mallinckrodt Director since June 2013, so she is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs.  Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years she has served as a member of the Board, Ms. Reed has done nothing to change Mallinckrodt's bad behavior.  Instead, she gladly received payments of $351,102 as "Director Fees" in the year prior to the October 2020 bankruptcy filing (D.I. 944 at 25), likely to buy her continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

110.     All such fees (and other compensation) should be disgorged by Ms. Reed as she was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye toward) unlawful Acthar conduct which create the fund of money out of which her ill-gotten fees and other compensation were paid.

111. Anne C. Whitaker ("Whitaker" ) is an adult individual and resident of 516 Crinian Drive, Cary, North Carolina 27513. She currently serves on the Board of Directors of Mallinckrodt plc.

112. Ms. Whitaker has been a Mallinckrodt Director since May 2018, so she is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years she has served as a member of the Board, Ms. Whitaker has done nothing to change Mallinckrodt's bad behavior. Instead, she gladly received payments of $330,360 as "Director Fees" in the year prior to the October 2020 bankruptcy filing (D.I. 944 at 25), likely to buy her continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

113. All such fees (and other compensation) should be disgorged by Ms. Whitaker as she was unjustly enriched and improperly compensated for sanctioning (or turning a blind eye toward) unlawful Acthar conduct which create the fund of money out of which her ill-gotten fees and other compensation were paid.

114. Kneeland Youngblood, M.D. ("Youngblood") is an adult individual and resident of 4507 N. Lindhurst Ave. Dallas, Texas 75229. He currently serves on the Board of Directors of Mallinckrodt plc. He is a member of Mallinckrodt's Governance and Compliance Committee.[3]

115. Dr. Youngblood has been a Mallinckrodt Director since June 2013, so he is intimately familiar with the company's fraudulent conduct for which it has been prosecuted by

---

[3] https://www.mallinckrodt.com/about/board-of-directors/kneeland-youngblood/

the federal government repeatedly, investigated by the U.S. Congress several times and sued by qui tam relators and private plaintiffs. Yet, despite all this objective evidence of Mallinckrodt's unlawful practices in relation to its distribution, pricing, marketing and sale of Acthar, in the nearly 8 years he has served on the Board, Dr. Youngblood has done nothing to change Mallinckrodt's bad behavior. Instead, he gladly received payments of $330,360 as "Director Fees" in the year before the October bankruptcy filing (D.I. 944 at 29), likely to buy his continued silence and complicity in the continuing unlawful conduct of Mallinckrodt in relation to Acthar.

116.    The continuing unlawful conduct of Mallinckrodt and its co-conspirators at Cigna/Evernorth is expressly known by, approved by, sanctioned and/or not expressly rejected and admonished by the corporate officers and directors of Mallinckrodt, namely, Defendants, President and CEO Mark Trudeau ("Trudeau"), Senior Executives Hugh O'Neill ("O'Neill"), Stephen Welch ("Welch"), and Bryan Reasons ("Reasons"), Chairman of the Board Angus Russell ("Russell"), and Board members David Carlucci ("Carlucci"), J. Martin Carroll ("Carroll"), Paul R. Carter ("Carter"), David Norton ("Norton"), Carlos V. Paya, M.D., Ph.D. ("Paya"), JoAnn Reed ("Reed"), Anne C. Whitaker ("Whitaker"), Kneeland Youngblood, M.D. ("Youngblood").

117.    As a result, the current officers and directors of Mallinckrodt, and its Debtors-in-possession and Non-Debtor entities, continue to violate the law by not changing Mallinckrodt's unlawful practices which have been in place since the Questcor acquisition in August 2014.

118.    The individual Board members and executives here were fully aware of, and approved of, the strategic business decisions which have led to the continuation of unlawful conduct in relation to Acthar.

26

119.    For instance, in 2016, the Board and executive Defendants named here were directly involved in the Mallinckrodt strategy to separate Acthar from BioVectra's core business, and spin off BioVectra as part of "Project Lobster Tail", which entailed stripping off the Acthar "active pharmaceutical ingredient ("(API") intellectual property ("IP") and manufacturing function from BioVectra (Mallinckrodt's wholly-owned API manufacturing facility purchased at the same time as Synacthen as part of Mallinckrodt's antitrust scheme to suppress competition in the ACTH market) and then re-locating both the IP and API manufacturing overseas to Mallinckrodt foreign subsidiaries, like MPIL (the principal brands operating and manufacturing entity), MPL (providing commercial support for MPIL) and the Mallinckrodt IP Entities all described hereinbelow.

120.    Questcor purchased BioVectra in 2013 at the same time as Synacthen as part of its scheme to suppress competition by taking control of the only supplier of Acthar's API and prohibiting and excluding samples for use by potential competitors in developing generic competitor equivalents for Acthar – a major threat to the Acthar monopoly and price fixing scheme.  At the time, Questcor described the acquisition as follows:

> On January 18, 2013, we completed our acquisition of BioVectra Inc. As a result of this acquisition**, we have greater control over the manufacturing and quality of the active pharmaceutical ingredient, or API, in Acthar**.
>
> BioVectra is a supplier of contract manufacturing services to the global pharmaceutical and biotechnology industry. BioVectra manufactures API's, chemical intermediates, and bioprocessing reagents, and is our manufacturing partner for the API in our H.P. Acthar® Gel (repository corticotropin injection). BioVectra is proficient in synthetic organic chemistry, natural extraction of bioactive compounds, PEGylation and conjugation chemistry, and fermentation of chemical and biologic molecules.

Questcor 2013 10K, EX 99.1 at "BioVectra Segment".

121.    Having acquired control over the exclusive supply of Acthar's API, along with the only synthetic competitor to Achar, Synacthen, Mallinckrodt was in a position to forestall

and prevent competition to its Acthar monopoly and price fixing scheme.  Indeed, at the December 12-13, 2012 Board meeting

122.    Then, Mallinckrodt sold BioVectra in December 2019, with the approval of the Board and at the direction of Alix Partners, to complete this aspect of the unlawful scheme, in order to shield these important Acthar assets from competition and from creditors, like the patients and payors of Acthar (including LEHB).

123.    As discussed during the September 21-22 Mallinckrodt Board meeting, held at the Ritz Carlton in London (and attended by Defendant-executives Trudeau, O'Neill and Welch, as well as Chairman Russell and Board members Carroll, Reed, Youngblood and others), existing the Specialty Generics business (especially the opioids business) and moving Acthar's IP and manufacturing to Ireland – and out of the immediate reach of the U.S. regulators, courts and creditors – was intended to separate the most important Mallinckrodt asset, Acthar, and protect it from the scrutiny of regulators, courts and creditors.  This strategy was expressly intended to "optimize to risk mitigation for Acthar".

124.    The sales results for Acthar that year were "eye popping" in relation to the other drug sales, driving home to the Defendant executives and Board members the need to jettison the opioid business and maximize returns on the Specialty Brands business, especially Acthar sales.

125.    Trudeau made sure that the Board "appreciate[d] how much thinking" the executive management team (including Trudeau, O'Neill and Welch) had "done on [the] exit strategy" for extracting Mallinckrodt from the opioid business dragging down the Specialty Brands business in general, and Acthar in particular.  Multiple members of the Board "affirmed" such strategy.

126.    Chairman Russell and others identified as a "risk" of the company allowing too

much money to accumulate in Mallinckrodt ARD, and the need to "reallocate" the "eye popping" sales revenues form Acthar around the Mallinckrodt corporate organization and structure. Specifically, "efforts were underway" in 2016 "to mitigate risks and maximize opportunities" through "internal allocation" with "shared services". Such allocation of Acthar revenues around the various Mallinckrodt subsidiaries was intended to manage the "trouble with declines" in Specialty Generics in order to "make the bottom line look better" across the Mallinckrodt business. Thus, from the earliest days of the Acthar acquisition by Mallinckrodt, the corporation "stole from Peter to pay Paul", taking from the self-described "cash cow" that was Acthar to fund declines and losses in other aspects of the Mallinckrodt business.

## Mallinckrodt Subsidiary Entities
## Mallinckrodt IP Entities

127. Defendants, Mallinckrodt Pharma IP Trading Unlimited Company, is an Irish private unlimited company and wholly-owned subsidiary of MIFSA ("**Mallinckrodt Pharma IP**"). The company was incorporated on September 21, 2015 and registered as a new company with the Companies Registration Office (CRO) of Ireland under the name Mallinckrodt Pharma IP Trading Designated Activity Company on the same day, with a Company Number of 568588. The company maintains a principal place of business at College Business & Technology Park Cruiserath, Blanchardstown, Dublin 15, Ireland.

128. On May 27, 2020, the company filed a re-registration of company type and transitioned to Mallinckrodt Pharma IP Trading Unlimited Company. On that same date, the exact same filing (a D20 form re-registering from a Limited Company to an Unlimited Company) was also done with regards to the company's subordinate entities, co-defendant Mallinckrodt ARD IP Unlimited Company and non-defendant Mallinckrodt Hospital Products IP Unlimited Company.

129.    On October 12, 2020, Mallinckrodt Pharma IP voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12559. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

130.    Defendant, Acthar IP Unlimited Co., is an Irish private unlimited company, and wholly-owned subsidiary of Mallinckrodt Pharma IP ("**Acthar IP**").   The company was incorporated on September 26, 2014 and maintains a principal place of business at College Business & Technology Park Cruiserath, Blanchardstown, Dublin 15, Ireland.

131.    On October 12, 2020, Acthar IP Unlimited Co. voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey.  On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

132.    Defendant, Mallinckrodt ARD IP Unlimited Company, is an Irish private unlimited company, and wholly-owned subsidiary of Acthar IP ("**Mallinckrodt ARD IP**"). The company was incorporated on September 17, 2015 and registered as a new company with the Companies Registration Office (CRO) of Ireland under the name Acthar IP on April 26, 2014 with a Company Number of 550246.

133.    On October 12, 2020, Mallinckrodt ARD IP voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12549. On October 14, 2020, the

case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

134.    Defendant, Mallinckrodt IP Unlimited Co., is an Irish private unlimited company, and wholly-owned subsidiary of Mallinckrodt Pharma IP ("**Mallinckrodt IP**").  The company was incorporated on April 1, 2014 and maintains a principal place of business in Dublin, Ireland.

135.    On October 12, 2020, Mallinckrodt IP voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey.  On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

136.    Defendant, Mallinckrodt Hospital Products IP Unlimited Co., is an Irish private unlimited company, and wholly-owned subsidiary of Mallinckrodt IP ("**Mallinckrodt Hospital Products IP**").  The company was incorporated on April 1, 2014 and maintains a principal place of business in Dublin, Ireland

137.    On October 12, 2020, Mallinckrodt Hospital Products IP voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey.  On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

138.    Defendant, Mallinckrodt Pharmaceuticals Ireland LTD, is an Irish private limited operating company and wholly-owned subsidiary of MIFSA ("**MPIL**"). The company was incorporated on August 20, 2014 and registered as a new company with the Companies Registration Office (CRO) of Ireland on the same day, with a Company Number of 548294.  It

maintains a principal place of business at College Business & Technology Park Cruiserath, Blanchardstown, Dublin 15, Ireland.

139. It is believed and therefore averred that Mallinckrodt created MPIL to manage aspects of its specialty brands business, including the sale of Acthar and Synacthen. As part of that function, MPIL handled the calculation and payment of royalties owed to Aventis Pharmaceuticals under the 2001 acquisition agreement. Aventis was entitled to be paid, and was paid 1% of the adjusted net sales of Acthar.

140. Executives of MPIL were routinely involved in the day-to-day activities and decision-making involving the U.S. sales of Acthar, including the marketing and promotion of Acthar. As a result, MPIL was an active participant in the alleged unlawful conduct at issue in the Acthar Plaintiffs' cases.

141. On October 12, 2020, MPIL voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12562. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

142. On June 10, 2020, a little more than four months before it filed for bankruptcy, MPIL received from another Defendant-Debtor, Mallinckrodt ARD LLC the sum of $561,654,617 as a purported "Intercompany - Commercial Supply Chain Re-Establishment" payment, and another "Intercompany Trade" payment in the amount of $10,075,323. These payments resulted in Mallinckrodt ARD reporting a substantial reduction in gross revenue, from $1,110,064,724 (in 2018) and $952,707,262 (in 2019), to just $41,472,782 in the first 9 months of 2020, just prior to the bankruptcy filings.

143.    Defendant, Sonorant Therapeutics, LTD, is an Irish private, limited, non-operating (as of December 2020) company and wholly-owned subsidiary of Mallinckrodt Pharmaceuticals ("**Sonorant Therapeutics**"). The company was incorporated on April 24, 2019 and registered as a new company with the Companies Registration Office (CRO) of Ireland on the same day, with a Company Number of 648696.  It maintains a principal place of business at College Business & Technology Park Cruiserath, Blanchardstown, Dublin 15, Ireland.

144.    On October 12, 2020, MIFSA, the parent of Sonorant Therapeutics, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. Mallinckrodt PLC's case has been assigned to the Honorable John T. Dorsey, and was consolidated with the concurrent Chapter 11 proceedings filed by several subsidiary entities and is now jointly administered under Case No. 20-12522. Sonorant Therapeutics did not itself file for bankruptcy and in all filings within that consolidated matter, Sonorant Therapeutics is listed as a Non-Debtor and Non-Obligor entity.

145.    Sonorant Therapeutics was to be the new name of Mallinckrodt once the generic product line (which include the opioid business) was sold off.  It was to be based in Bedminster, New Jersey, the location of the Mallinckrodt ARD brand business in the United States.

146.    While the spinoff of the generics business was to have been completed by the second half of 2019, creating two companies – one focused on generic products and based in St. Louis (under the new name "Mallinckrodt Inc.") and the other focused on specialty brand products and based in Bedminster (under the new name "Sonorant Therapeutics PLC") – the spinoff never happened.

147.     Instead, in February 2020, Mallinckrodt "contemplated a surgical, specialty Generics-only chapter 11 filing." Dkt. No. 128 at ¶ 17.  Debtors abandoned that approach in favor of a bankruptcy of both the generics business and portions of the specialty brands business.

148.     Defendant, Therakos EMEA Limited is an Irish private, limited, operating company and wholly-owned subsidiary of Mallinckrodt Pharmaceuticals ("**Therakos EMEA**"). The company was incorporated on September 11, 2013 and initially registered as a new company with the Companies Registration Office (CRO) of Ireland under the name Questcor Operations, Ltd on the same day, with a Company Number of 532615 ("**Questcor Operations**").

149.     On May 18, 2015, the Company registered a Name Change with the CRO, changing its name to Mallinckrodt Specialty Pharmaceuticals Ireland, Limited ("**Mallinckrodt Specialty Pharmaceuticals**").

150.     On September 24, 2019, the Company registered another Name Change with the CRO, changing its name to Therakos EMEA, Limited and maintains a principal place of business at College Business & Technology Park Cruiserath, Blanchardstown, Dublin 15, Ireland.

151.     On October 12, 2020, Mallinckrodt Pharmaceuticals, the parent of Therakos, EMEA, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware.  Mallinckrodt PLC's case has been assigned to the Honorable John T. Dorsey, and on October 14, 2020, was consolidated with the concurrent Chapter 11 proceedings filed by several subsidiary entities and is now jointly administered under Case No. 20-12522.

152.     Therakos EMEA did not itself file for bankruptcy and in all filings within that consolidated matter, Therakos EMEA is listed as a Non-Debtor and Non-Obligor entity.

**Mallinckrodt UK Entities**

153. In the United Kingdom, Mallinckrodt created three new subsidiary holding companies on the same day, June 17, 2014. Each subsidiary stood in a vertical relationship to MIFSA as follows: MIFSA's direct subsidiary, Mallinckrodt ARD Holdings Limited, was parent to MUSHI UK Holdings Limited, which was parent to Mallinckrodt Enterprises UK Limited as follows:

| MIFSA |
| --- |
| Mallinckrodt ARD Holdings Limited (UK) |
| MUSHI UK Holdings Limited (UK) |
| Mallinckrodt Enterprises UK Limited (UK) |

154. Each subsidiary was incorporated under the laws of the United Kingdom with the same principal place of business at Surrey, United Kingdom.

155. Mallinckrodt ARD Holdings Limited, is a United Kingdom private limited company and wholly-owned subsidiary of MIFSA. The company was formed on June 17, 2014 under the name MIFSA UK Limited, with a company number of 09090452 ("**Mallinckrodt ARD Holdings Ltd**.").

156. On September 18, 2014, it is believed the company changed its name to Mallinckrodt ARD Holdings, Limited and maintains a registered office address of 3 Lotus Park, The Causeway, Staines Upon Thames, England TW18 3AG.

157. On October 12, 2020, Mallinckrodt ARD Holdings, Ltd. voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12546. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

158.    MUSHI UK Holdings Limited, is a United Kingdom private limited company and wholly-owned subsidiary of Mallinckrodt ARD Holdings, Ltd.  The company was formed on June 17, 2014 ("**MUSHI UK**").  It is not named as a defendant here because there is no evidence presently that it received Acthar money.  However, Plaintiff reserves the right to amend this Complaint to name MUSHI UK in the future.

159.    On October 12, 2020, MUSHI UK voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

160.    Mallinckrodt Enterprises UK Limited, is a United Kingdom private limited company and wholly-owned subsidiary of MUSHI UK.  The company was formed on June 17, 2014 ("**Mallinckrodt Enterprises UK**"). It is not named as a defendant here because there is no evidence presently that it received Acthar money.  However, Plaintiff reserves the right to amend this Complaint to name Mallinckrodt Enterprises UK in the future.

161.    On October 12, 2020, Mallinckrodt Enterprises UK voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522. Mallinckrodt Lux IP Sarl is a Luxembourg company and wholly-owned subsidiary of Mallinckrodt plc. ("**Mallinckrodt Lux**").

162.    Mallinckrodt Lux received and transfer over $1.1 billion.

163.

**Mallinckrodt US Brand Entities**

164. In the United States, Mallinckrodt created an extensive, vertically integrated structure under MIFSA, as the parent corporation, for its Specialty Brands business. The direct subsidiary of MIFSA in the U.S. was MEH, Inc., a Nevada corporation ("**MEH**"). Both the generics and specialty brands businesses were incorporated as subsidiaries to MEH.

165. Mallinckrodt Equinox Finance LLC, f/k/a Mallinckrodt Equinox Finance Inc.("**Mallinckrodt Equinox**") is a Delaware company and wholly-owned owned subsidiary of MEH and Mallinckrodt, plc. The company was incorporated on September 12, 2017 under the name Mallinckrodt Equinox Finance Inc with a file number of 6540739. At some point, the company changed its entity status to a Limited Liability Company and currently maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, ST Operations LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12523. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522

166. Defendant, ST Shared Services LLC ("**ST Shared Services**") is a Delaware Limited Liability Company and wholly-owned subsidiary of Mallinckrodt, plc. The company was formed on July 2, 2019 with a file number of 7497395 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, ST Shared Services LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12557. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

167.     Defendant, ST Operations, LLC ("**ST Operations**") is a Delaware Limited Liability Company and wholly-owned subsidiary of Mallinckrodt, plc. The company was formed on February 3, 2020 with a file number of 7833101 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, ST Operations, LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12555. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

168.     Petten Holdings, Inc. ("**Petten**")is a Delaware corporation and wholly-owned subsidiary of Mallinckrodt, plc. The company was incorporated on December 6, 2018 with a file number of 7181352 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, Petten Holdings, Inc, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12547. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522

169.     Mallinckrodt Petten Holdings BV ("**Mallinckrodt Petten**") is a Netherlands corporation and wholly-owned subsidiary of Mallinckrodt, plc. The company has an Establishment number of 000026164515 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. Despite the ongoing Chapter 11 bankruptcy proceeding of its parent company and several fellow subsidiary entities in Delaware being administered under Case No. 20-12522, Mallinckrodt Petten Holdings BV has been alleged to be a non-debtor entity.

170.    Defendant, ST US Holdings LLC ("**ST US Holdings**") is a Nevada Limited Liability Company and wholly-owned subsidiary of Mallinckrodt, plc. The company was initially incorporated on November 8, 2006 under the name Mallinckrodt US Holdings, Inc., with a Nevada Business ID Number of NV20061715285. On September 9, 2020, the company filed Articles of Conversion to change their name to ST US Holdings, LLC and their company type to a Limited Liability Company with a new Nevada Business ID Number of NV20201887199 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, ST US Holdings LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12560. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

171.    Defendant, Mallinckrodt Brand Pharmaceuticals LLC ("**Mallinckrodt Brand Pharma**") is a Delaware Limited Liability Company and wholly-owned subsidiary of Mallinckrodt, plc. The company was formed on January, 5, 2001 with a file number of 3340685 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, Mallinckrodt Brand Pharmaceuticals LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12554. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

172.    Defendant, Mallinckrodt US Holdings LLC ("**Mallinckrodt US Holdings**") is a Delaware Limited Liability Company and wholly-owned subsidiary of Mallinckrodt, plc. The

company was formed on December, 20, 2012 with a file number of 5214842 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, Mallinckrodt US Holdings LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12578. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

173.     Defendant, ST US Pool LLC ("**ST US Pool**") is a Delaware Limited Liability Company and wholly-owned subsidiary of Mallinckrodt, plc. The company was formed on February 4, 2020 with a file number of 7834956 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, ST US Pool LLC, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12563. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

174.     Defendant, Mallinckrodt ARD Holdings, Inc. ("**Mallinckrodt ARD Holdings**") is a Delaware Corporation and wholly-owned subsidiary of Mallinckrodt, plc. The company was incorporated on July 25, 2014 with a file number of 5575164 and maintains a principal place of business at 675 McDonnell Blvd Hazelwood, MO 63042. On October 12, 2020, Mallinckrodt ARD Holdings, Inc, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. The case has been assigned to the Honorable John T. Dorsey and was given the Case No. 20-12543. On October 14, 2020, the case was consolidated with the Chapter 11 proceedings filed by Mallinckrodt, plc and is now jointly administered under Case No. 20-12522.

175. Defendant Questcor International, LTD is an Irish private limited company and wholly-owned subsidiary of Mallinckrodt, plc. The company was initially registered as a new company with the Companies Registration Office (CRO) of Ireland under the name Akasia, Limited on June 7, 2013, with a Company Number of 528629. On October 22, 2013, the Company registered a Name Change with the CRO, changing its name to Questcor International, Limited and maintains a principal place of business at College Business & Technology Park Cruiserath, Blanchardstown, Dublin 15, Ireland. On October 12, 2020, Mallinckrodt PLC, of which Questcor International, LTD is a wholly-owned subsidiary, voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware. Mallinckrodt PLC's case has been assigned to the Honorable John T. Dorsey, and was consolidated with the concurrent Chapter 11 proceedings filed by several subsidiary entities and is now jointly administered under Case No. 20-12522. Questcor International, LTD did not itself file for bankruptcy and in all filings within that consolidated matter, Questcor International, LTD is listed as a Non-debtor and Non-obligor entity.

### The Cigna/Evernorth/Express Scripts Entities

176. Defendants Cigna Corporation ("Cigna") purchased Express Scripts, Inc. and Express Scripts Holding Company, both Delaware Corporations with their principle executive offices located at 1 Express Way, Saint Louis, Missouri 63121. Cigna renamed Express Scripts "Evernorth" in September 2020. Collectively, Cigna, Evernorth, Express Scripts, Inc. and Express Scripts Holding Company (collectively "ESI" or Express Scripts") are referred to as "Cigna/Evernorth".

177. Defendant CuraScript, Inc., *d/b/a* CuraScript, SD, *f/k/a* CuraScript Pharmacy, Inc., ("CuraScript") is a wholly-owned subsidiary of Cigna/Evernorth. CuraScript was acquired

by Express Script in January 2004, and its operation was expanded when Express Scripts

acquired Priority Healthcare Corporation ("Priority") in October 2005. The combined Priority

and CuraScript became one of the nation's largest specialty pharmacy and distribution

companies with more than $3 billion in annual revenue.

178. CuraScript's corporate headquarters are located at 255 Technology Park, Lake

Mary, Florida 32746. This is the same address patients are required to mail any revocation of the

broad authorization granted by patients to Mallinckrodt and Cigna/Evernoth via the Acthar Start

Form. CuraScript is Mallinckrodt's exclusive specialty pharmacy distributor for Acthar.

179. Defendant Accredo Health Group, Inc. ("Accredo") is a wholly-owned subsidiary

of ESI. Accredo became a wholly-owned subsidiary of Medco Health Solutions, Inc. ("Medco")

on August 18, 2005, months before Express Scripts acquired Priority, and then became part of

Express Scripts when it acquired Medco in 2012.

180. Accredo is a Delaware corporation with its corporate headquarters at 1640

Century Center Parkway, Memphis, Tennessee 38134. Accredo also has operations in

Warrendale, Pennsylvania, Corona, California, Greensboro, North Carolina, Orlando, Florida,

Indianapolis, Indiana, and Nashville, Tennessee.

181. Defendant United BioSource Corporation ("UBC") is a Delaware corporation

with its corporate headquarters at 920 Harvest Drive, Blue Bell, Pennsylvania 19422. When the

initial Class Action Complaint in the related case of City of Rockford and Acument Global

Technologies, Inc. v. Mallinckrodt ARD, Inc., formally known as Questcor Pharmaceuticals,

Inc., et al., United States District Court for the Northern District of Illinois, Civil Action No.

3:17-cv-50107 ("Rockford case") was filed on April 6, 2017 (as well as the First Amended Class

Action Complaint in the Rockford case on October 9, 2017), of which Plaintiff was a class

member, UBC was a wholly-owned subsidiary of Express Scripts. UBC was acquired by Express Scripts in 2012 as part of the Medco merger.

182. On November 27, 2017, ESI announced that it sold UBC to Avista Capital Partners, a private equity firm. As of the date of this filing, Plaintiffs do not know if the sale has been completed.

183. UBC is described as Mallinckrodt's "agent" on the ASAP form which Mallinckrodt employs exclusively to operate the ASAP program and to manage ESI's exclusive distribution, sales and reimbursement of Acthar by its 3 operating arms, CuraScript, Accredo and ESI.

184. AlixPartners, LLP ("AlixPartners") is a Delaware corporation with its corporate headquarters at 909 Third Avenue, New York, NY 10022. Upon information and belief, Mallinckrodt hired AlixPartners as a consultant for its bankruptcy and restructuring, and thus, AlixPartners is an active participant and decisionmaker in the willful continuation of Mallinckrodt's antitrust conduct.

185. Mallinckrodt and its officers and directors, Cigna/Evernorth and AlixPartners are collectively referred to herein as "Defendants", as appropriate.

186. The Defendants' acts alleged in this Class Action Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

## CLAIMS NOT STAYED OR ENJOINED

187. As stated above, because the claims in this case concern only prescriptions of and payments for Acthar made only after October 12, 2020, the claims represent "post-petition" claims

43

not subject to the automatic stay of the bankruptcy. Similarly, the claims for post-petition conduct of the Mallinckrodt entities in bankruptcy (*ie.* the "**Debtors**") are not barred by the bankruptcy stay.

188. Specifically, LEHB, the Washington Wholesalers and other TPPs have made, and continue to make, payments for Acthar pursuant to the same unlawful conduct at issue in this Complaint.

189. As a result, their claims for declaratory and injunctive relief, and damages (including exemplary, statutory, treble and punitive damages) will not be satisfied until the jury in this case decides them, and awards such damages to Plaintiff and the Class of Acthar purchasers.

## FACTUAL BACKGROUND

190. "I have a Cadillac in my refrigerator." That is how one Acthar patient named Sharon Keller described an unused 5-ml vial of the medication sitting in her kitchen refrigerator.

191. The sad and unfathomable program of how a 65 year-old brand medication could rise in price from $40 per vial in 2001, to $40,840.80 per vial by 2015, raising that value of the brand from $100,000 to $5.9 billion, is a story emblematic of the most egregious fraud and monopolistic conduct in U.S. history by a prescription drug company.

192. The issue in this case is how Mallinckrodt achieved such a startling outcome and how it seeks to continue this outcome after its contrived bankruptcy filing.

193.

## Relevant History of Acthar Development, its Distribution and Pricing

194. Acthar was approved by the Food and Drug Administration ("FDA") in 1952 for over fifty conditions, ranging from alcoholism, poison ivy, and radiation sickness to nephrotic syndrome. Over time, with additional evidence-based requirements for prescription drugs, the

list was winnowed to the fewer, present-day nineteen indications.

195.     Acthar is adrenocorticotropic hormone ("ACTH"), which causes the body to produce cortisone and other steroid hormones.  Two Mayo Clinic researchers, Drs. Philip Hench and Edward Kendall, developed the treatment, which won them the Nobel Prize for medicine at the time it was developed.  Acthar was developed by Armour Pharmaceutical Company.  As described by the Seventh Circuit in *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 145-46 (7th Cir. 1960):

> In a human being, . . . (ACTH) appears in the anterior lobe of the pituitary gland located at the base of the brain. When the human body is under stress or attacked by certain diseases, control centers in the brain excite the pituitary, and the pituitary secretes ACTH. In the blood stream the ACTH thus secreted is carried to the adrenal glands situated in the human body above the kidneys. As the ACTH hits the outer wall of the adrenal glands, it stimulates the adrenals to produce a set of chemical substances such as steroids, including the hormones, cortisone and hydrocortisone.
>
> The cortisone hormones then act in the tissues of the body to suppress inflammations and allergic reactions. ACTH thus is used to relieve such conditions as rheumatoid arthritis and allergies. ACTH does not, itself, directly attack disease. However, it stimulates the adrenals which produce more than twenty-eight steroids, and these hormones attack the diseased tissues. When the human body itself does not supply sufficient ACTH, pharmaceutical ACTH can fill the gap.

196.     By the 1960s, injectable ACTH medications faced a variety of competing products. *See id.* at 145 ("Both Armour and Wilson manufacture and sell gelatin-ACTH preparations . . . . Gelatin-ACTH now constitutes more than 80% [o]f all forms of ACTH products sold by Armour and Wilson.  Other companies . . . produce similar products").

197.     For the majority of the drug's lifespan, however, generic corticosteroids, such as prednisone, effectively treated the majority of the indications for which Acthar was approved.  That factor tended to limit the market for Acthar to treating infantile spasms ("IS") which was

originally an "off-label" indication. Consequently, because of the limited, off-label market for Acthar, by 2001, the drug was priced at $40 per vial and accounted for less than a million dollars of revenue for Aventis Pharmaceuticals, Inc. ("Aventis"), the then-owner.

198.     In 2001, Questcor acquired Acthar from Aventis for only $100,000, but in 2014 Mallinckrodt acquired Questcor for $5.9 billion.

199.     Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS"). IS a serious condition in infants, but one with an annual patient population of less than 2,000 children per year. However, Acthar was not originally approved by the FDA to treat IS, further limiting its value. A few years later, the IS indication was approved by the FDA, and orphan drug status was granted.

**Acthar Distribution: Mallinckrodt Adopts a "New Strategy" to Restrict Acthar Distribution to Maintain and Enhance its Monopoly Power over Acthar**

200.     Acthar is a specialty pharmaceutical distributed directly to patients, like the beneficiaries of the Plaintiff and the Class in this case.

201.     For decades, Acthar was distributed to any doctor, hospital, wholesaler or specialty pharmacy who requested the drug to treat seriously ill patients. After Questcor acquired the rights to Acthar, it initially maintained that broad distribution network.

202.     However, on July 2, 2007, Mallinckrodt restricted its distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to just Express Scripts, the agent of its largest customers. Mallinckrodt's announcement stated, **"[e]ffective August 1, 2001, Acthar…will be available exclusively through Specialty Pharmacy Distribution**. Acthar Gel will no longer be available from traditional pharmaceutical wholesalers or retail pharmacies." *See* July 2, 2017, "Urgent Product Alert H.P. Acthar Gel" (attached to the Rockford Amended Complaint filed in this Court at Exhibit "B"). All distribution would now be

46

done exclusively through CuraScript. "[A]ll new Acthar Gel prescriptions should be submitted to the Acthar Support & Access Program." *Id.* All aspects of Acthar distribution were handled by Express Scripts.

203. The goal of this "new strategy" was to lock patients into receiving Acthar through one distribution channel controlled by Mallinckrodt and Express Scripts, and to ensure prescription distribution and payment through one source, Express Scripts. Mallinckrodt has maintained this exclusive arrangement with Express Scripts since 2007 up through the present. Throughout this time, title, dominion and risk for Acthar remains with Mallinckrodt.

204. Mallinckrodt manages its exclusive arrangement with Express Scripts through a program known as the "Acthar Support & Access Program" or "ASAP." This program is structured so that Mallinckrodt ships Acthar directly to patients and receives payment directly from the associated third party payors.

205. Once the patient (or their physician) contacts Mallinckrodt for a prescription of Acthar, they are directed to UBC. Otherwise, patients and/or their providers contact UBC directly, as directed by the Acthar Start Form. UBC then serves as the "HUB" for Mallinckrodt and Express Scripts. It confirms the patient's insurance coverage or other source of payment, and then arranges for Acthar to be delivered directly to the patient by CuraScript.

206. The process, which is laid out in a form provided by Mallinckrodt, the "Acthar Start Form", requires patient, physician and payor authorization before Mallinckrodt agrees to ship Acthar to patients via ESI/CuraScript. The Acthar Start Form consists of 3 sections: (1) a section requiring signature by the "HCP" (or health care professional); (2) a patient authorization requiring signature by the "patient or legal representative"; and (3) information form concerning Acthar indications and usage. The required signature of the patient authorizes "Mallinckrodt and

its agents" to do a number of things in relation to the prescription and distribution of Acthar. It further authorizes Mallinckrodt and its agents, "including Mallinckrodt reimbursement support personnel and United BioSource Corporation ("UBC") or any other operator of the Acthar Support Access Program on behalf of Mallinckrodt (collectively, 'Designated Parties')" to provide Acthar and receive payment, among other things.

207.    Specifically, the patient authorizes Mallinckrodt, UBC, "or any other operator" of ASAP on behalf of Mallinckrodt, "collectively ('Designated Parties'), to provide certain services to [the patient], including reimbursement and coverage support, patient assistance and access programs, medication shipment tracking, and home injecting training." In other words, the patient directly authorizes Mallinckrodt and its agents to ship Acthar to them directly via CuraScript, and authorizes payment by both the patient and any third party payor prior to obtaining the medication. So, the patient authorizes ESI to bill the payor for Acthar.

208.    Similarly, the physician must "authorize[ ] United BioSource Corporation ("UBC"), the current operator of the Acthar Support and Access Program ("Program"), and other designated operators of the program, to perform a preliminary assessment of benefit verification for this patient…". The physician also "agree(s) that the designated specialty pharmacy receive this prescription via a designated third party, the Program and that no additional confirmation of receipt of prescription is required by the designated specialty pharmacy."

209.    The interaction of all four (4) elements of Express Scripts' functions on behalf of Mallinckrodt are described below.

210.    Express Scripts is the largest buyers' agent for pharmaceuticals in the United States. Express Scripts has substantial buying power as a result of its representation of the largest number of buyers in the pharmaceutical marketplace.

211.    Express Scripts styles itself as a "pharmacy benefit manager" or "PBM", but it does more than simply process claims for prescriptions filled at retail pharmacies.  In addition to "retail pharmacy claims processing, formulary management, utilization management and home delivery pharmacy services", Express Scripts offers "specialty services that deliver . . .  high-cost injectable, infused, oral or inhaled drugs," and "compliance programs, . . . drug therapy management programs, [] data analysis, and [] distribution services."[4]  Acting "either directly or through its subsidiaries", Express Scripts acts as a direct pipeline from a pharmaceutical manufacturer to the patient, facilitating the direct distribution of a prescription drugs from the factory to the patient's home.

212.    Express Scripts is able to act as a manufacturer's direct distributor of specialty drugs to patients because it provides what it calls "<u>integrated</u> specialty services."  (emphasis in original).[5]  As one Express Scripts' executive put it "we're family."  These integrated services include a PBM (ESI), a specialty pharmacy distributor (CuraScript), and a specialty pharmacy provider (Accredo).

213.    Express Scripts coordinates all of these functions through its so-called pharmaceutical support services unit, UBC.  UBC acts as a "'hub,' that serves as a centralized point of contact for [] patients [] and prescribers"[6] by "[w]orking hand-in-hand with Express Scripts' specialty pharmacy and specialty distribution organizations, Accredo and CuraScript [],"[7] to coordinate delivery of and reimbursement for specialty pharmaceuticals.

---

[4] Express Scripts Holding Company Annual Report on Form 10-K for the Fiscal Year Ending December 31, 2012.

[5] https://curascriptsd.com/corporate-overview

[6] http://www.ubc.com/services/loyalty/reimbursement-patient-assistance

[7] http://www.ubc.com/about/about-ubc

214.    In total, UBC operates "an integrated service model that involves UBC . . . manag[ing] multiple system applications that support one product.  [UBC's] services include the UBC coordinating center, nurse coordination . . . product fulfillment through Accredo and wholesale fulfillment through CuraScript[].  When a patient is prescribed [a specialty] medication, the doctor sends a referral to the Reimbursement Hub. [UBC's] team serves as the liaison among doctors, patients, and insurance companies as [UBC] . . . navigate[s] the coverage process.  [UBC] . . . ensure[s] a smooth transition from enrollment through shipment of the medication."

215.    Part of the reimbursement hub process is coordination with ESI's CuraScript, which acts as an "integrated delivery network" connecting patients to manufacturers through "end-to-end distribution services."[8]  Simply put, CuraScript is similar to a FedEx, DHL, or UPS for specialty prescription drugs.  CuraScript advertises that it is "recognized by the manufacturing community as [] a reliable partner in the management of brands" through CuraScript's "integrated specialty services," which deliver medications to patients "alongside sister organizations Accredo and UBC."[9]

216.    To facilitate these end-to-end distribution services, UBC coordinates CuraScript's activities with Accredo, which provides so-called specialty pharmacy services.  By acting as the hub, UBC ensures that a patient whose pharmacy benefits are managed by ESI can get a specialty medication delivered to him or her by coordinating direct shipment through CuraScript and Accredo and direct payment through ESI.  "As one UBC executive has explained "if UBC is the Hub and Accredo is the [specialty pharmacy] . . . we can send the patient's prescription over

[8] https://curascriptsd.com/Rare-Disease-Specialty-Distribution-Program

[9] https://curascriptsd.com/supplier-relations

to Accredo, and they will not have to duplicate any of our efforts, which another pharmacy would be compelled to do because of risk. Accredo trusts us."

217. Accredo provides specialty pharmacy and related services for patients with certain complex and chronic health conditions. Accredo's staff is comprised of a team of specialty-trained pharmacists, nurses, patient care advocates, social workers and insurance coordinators whom, among other things, "handle everything about" a patients' medications and/or specialty therapy.

218. Along with UBC, Accredo provides: (a) support to orphan and ultra orphan patient populations; (b) HUB employees to navigate insurance requirements, like prior authorizations, for patients and prescribers; (c) clinicians who are available 24/7 to address patient concerns and provide guidance on mitigating adverse events; (d) reimbursement HUB specialists to steer patients to funding solutions, and (e) an integrated solution allowing patients to start therapy twice as fast.

219. In simple terms, through UBC's coordination with Accredo, CuraScript, and ESI, Express Scripts delivers a prescription drug directly from the manufacturer to the patient, removing all impediments to delivery and payment, whether medical, logistical or financial.

220. With respect to Acthar, Mallinckrodt has a contract with UBC to coordinate the delivery of Acthar through what it has called the ASAP Program. Beginning with its July 2, 2007 announcement, Mallinckrodt directed physicians to prescribe Acthar through the ASAP program. *See* Rockford Complaint Exhibit "B". In this announcement, Mallinckrodt directed physicians that "all new Acthar [] prescriptions should be submitted to the [ASAP program]." Prescriptions are submitted to the ASAP program through the "Acthar Start Form." *See* Exhibit "A". This form authorizes UBC to coordinate reimbursement with ESI and direct the

prescription to a "designated specialty pharmacy." This designated specialty pharmacy is Accredo.

221. Part of UBC's activities involve coordinating the shipment of Acthar from CuraScript through Accredo to the patient. Indeed, in order to revoke UBC's authorization to perform these services, the patient must mail a letter to CuraScript's address in Florida. Plaintiff's patient beneficiary here provided a similar authorization to UBC for shipment from CuraScript.

222. The Acthar distribution arrangement between Express Scripts and Mallinckrodt is illustrated in the following two figures. In Figure 1, the distribution arrangement is described in aggregate.



**Figure 1**

223. Figure 2, below, illustrates how Acthar is prescribed, authorized, distributed and paid for through Express Scripts. Payment flows are represented by green arrows traveling from payor and patient to Mallinckrodt, while product flows are represented by black chevrons

flowing from Mallinckrodt to the patient. Although these payments pass through Express Scripts, payment flows and products flows are ultimately aligned between Mallinckrodt and UBC, Express Scripts' reimbursement hub, through a contract with Mallinckrodt to operate the ASAP program, which ostensibly operates to confirm the medical necessity of the prescription (by Accredo), to arrange payment (to ESI or CVS Caremark) for shipment (from CuraScript) of Acthar to patients. CuraScript has a contract with Mallinckrodt to ship Acthar. Through these contractual arrangements, Acthar travels from Mallinckrodt directly to the patient, and payments are channeled back to Mallinckrodt.

224. The patient, on the other hand, has prescription insurance coverage through his or her health plan. In this case, Plaintiff had the health plan that covered its employee. The health plan has a contract with ESI, which requires ESI to collect payments for the price of Acthar.

225. By these arrangements, Acthar product flows directly from Mallinckrodt through Express Scripts to the patient, while the money flows directly from the patient and payor through Express Scripts back to Mallinckrodt.



**Figure 2**

226.    Wielding both the largest collection of patients in the United States and a direct shipment channel for specialty drugs, Express Scripts is in a unique position to negotiate the most competitive, discount prices for specialty drugs in the United States.  This bargaining power has allowed Express Scripts to push back against attempts by pharmaceutical drug manufacturers to charges inflated prices for drugs above the actual market value of the drugs.

227.    Mallinckrodt leveraged and enhanced its monopoly power by limiting the distribution of its sole specialty drug to just one specialty pharmacy distributor, CuraScript, and employing as its agents, ESI's Accredo and UBC, along with CuraScript, to coordinate all aspects of the distribution and sales of Acthar: from prescription by the physician, to direct home delivery to the patient, to direct reimbursement by the payor.  This allowed Mallinckrodt to raise its prices tenfold initially, and nearly double in the ensuing years.

228.    Mallinckrodt Executive Vice-President, Steve Cartt, admitted "'[w]e did some market research,' . . . [t]alking to physicians and others about pricing 'gave us some comfort that

54

the [new] strategy would work, and physicians would continue to use the drug, and payers would pay' . . . . 'The reality was better than we expected.' " *See* Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008 (titled The Middleman's Markup in New York Print Ed.).

## Acthar Pricing

229.    Mallinckrodt acquired the rights to Acthar from Aventis in 2001.  At acquisition, the end payor price of a vial of Acthar was approximately $40.00.  After acquisition, Mallinckrodt raised the per vial, end payor price of Acthar to approximately $748.00.  From 2001 until Mallinckrodt executed its new strategy in 2007, the end payor price of Acthar grew to $1,980.00.

230.    When Mallinckrodt implemented its new strategy on August 27, 2007, the end payor price of Acthar rose to a staggering $27,922.80 – a 1,310% increase in the span of a month, and a 69,707% increase from the time Mallinckrodt acquired the drug.

231.    Until Mallinckrodt obtained FDA approval for the IS indication, the price of Acthar remained stable.  However, in 2011, Mallinckrodt increased the price of Acthar 5% on January 3, 2011, another 5% on June 1, 2011, and executed a third price increase on December 27, 2011.  In 2012, Acthar's end payor price was $34,150.00.

232.    Near in time to Mallinckrodt plc's $5.9 billion acquisition of Questcor, in 2014, the price of Acthar rose to $40,840.80.  Under Mallinckrodt plc's stewardship, the end payor price of Acthar rose in 2016 to $42,942.60, and to $43,658.40 in 2017.

233.    Since the acquisition of Acthar in 2001, the end payor price of Acthar has grown 109,046% reflecting the precipitous rise in the value of the Acthar assets from $100,000 in 2001 to $5.9 billion in 2014 – a 5,899,900% increase in value. The dramatic increase in value of the

Acthar assets, coupled with the durable and repeated ability to raise the price of Acthar, underscore the monopoly power wielded by Mallinckrodt in the ACTH market. Mallinckrodt's tactics described in this Complaint, however, reflect Mallinckrodt's willingness to undertake actions to maintain and grow its monopoly in the ACTH market, in violation of the antitrust laws.

234.    Furthermore, since Mallinckrodt's filing of its bankruptcy petition, it has not changed anything with regard to the price of Acthar, and so its violations continue to the present.

### The Views of Express Scripts' Chief Medical Officer, Dr. Steve Miller, on Express Scripts' Market Power

235.    Beginning in 2007, Express Scripts became the exclusive agent of Mallinckrodt for the distribution of Acthar.  *See* Freudenheim*, supra* at ¶ 94.  When Mallinckrodt chose to increase the price of this 50-plus year old medication, Express Scripts did not push back. Instead, when confronted with the 2007 price increase, ESI's Chief Medical Officer Steve Miller stated that "[t]he increase was a manufacturing decision.  I can't comment on it."  *Id*.

236.    The circumstances demonstrate why Dr. Miller chose to stay silent in the face of Express Scripts' decision to join Mallinckrodt in overcharging payors for Acthar.

237.    By the time the Plaintiff's beneficiary was prescribed Acthar in 2018, Express Scripts was handling each and every aspect of Acthar distribution through the above-described functions.  CuraScript was the exclusive specialty pharmaceutical distributor, Accredo was the specialty pharmacy provider, and UBC coordinated both the product and money flows through the ASAP Program.  As Mallinckrodt's exclusive agent, Express Scripts had no interest in lowering the price for Acthar because it was making money off all aspects of its exclusive arrangement with the manufacturer.  In other words, by helping Mallinckrodt maintain and enhance its monopoly power in the ACTH market, Express Scripts along with Mallinckrodt

realized greater profits at the expense of payors, like Plaintiffs.

238.     In the spring of 2017, ESI's Senior Vice President, Supply Chain and Specialty Pharma, Everett Neville, stated "I don't think [Acthar is] a very great [drug] – it's a pretty poor drug with a very limited need and certainly [Express Scripts Chief Medical Officer, Dr,] Steve[Miller] could comment."  He went on to say "I think [Dr. Miller] and I both would agree, and **I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value**."  (emphasis added).  Mr. Neville went on to state that he "personally told [Mallinckrodt's] management team that their drug is hugely overpriced and that he "know[s] [Dr. Miller] has as well."  Confidential Transcript of Conference Call between Citigroup Healthcare Team and Express Scripts Management, May 19, 2017.

239.     In the same public setting, Dr. Miller stated, "[i]f you look at the data, the indications for the drug are . . . in the compendium, it's listed under a lot of indications, its real use should be very, very limited.  It's an old drug.  There's better products in the marketplace and so we're going to continue to be very vigilant in our utilization management."

240.     Despite this express acknowledgment by Express Scripts' Chief Medical Officer, in the weeks and months following Mallinckrodt's settlement with the FTC, Express Scripts has not acted or made any efforts to contain costs or provide a reasonable alternative for Acthar.

241.     Dr. Miller, Express Scripts Chief Medical Officer, has articulated the power of Express Scripts in the prescription drug marketplace to extract lower prices for its customers, using its tremendous buying power and influence.  He has made all of the following public comments:

> "When I joined the company, we represented 12 million members.
> We're at 85 million today.  That gives us extraordinary sway in the
> marketplace.  If you think about any other aspect of health care, no

one else has that many lives that they can represent."[10]

"We have tremendous scale, which allows us to get the best deals for our plan sponsors from both the pharmaceutical manufacturers and also the pharmacies. If any pharmacy chain ever becomes too large, we're able to move our patients and … get the lowest cost."[11]

"I think that because of the continued escalation of cost, you need a PBM now more than ever. And what a best-in-class PBM like Express Scripts does really ensure is great health outcomes and more affordable costs."[12]

"Pharma has shown that they feel very emboldened with their pricing power. We're using our clout in the marketplace to really tamp these down for our clients."[13]

"There are pharma companies that recognize this is in their best interest," he says. "They, like us, want to get to a sustainable marketplace. They know if they're overcharging for drugs that have very little efficacy, that puts them in a competitive disadvantage."[14]

"Discussions to control costs have never been more important, as recent estimates put global drug spend at $1.5 trillion by 2021,

---

[10] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

[11] *Business Insurance*, "Q&A: Dr. Steve Miller, Express Scripts Holding Co.," by Shelby Livingston, May 22, 2016, http://www.businessinsurance.com/article/00010101/STORY/305229991/Q&A-Dr-Steve-Miller,-Express-Scripts-Holding-Co

[12] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

[13] *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases," by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07/express-scripts-looks-to-limit-drug-price-increases/

[14] *Medical Marketing and Media*, "Express Scripts' Steve Miller Takes on Drug Industry in Pricing Battle," by Jaimy Lee, February 1, 2015, http://www.mmm-online.com/payersmanaged-markets/express-scripts-steve-miller-takes-on-drug-industry-in-pricing-battle/article/460559/

according to data from Quintiles IMS Holding. Yet sometimes, in the drug pricing debate, blame is placed on one part of the drug distribution system when, in fact, all of us – pharmaceutical companies, pharmacy benefit managers (PBMs), policymakers and payers – have a role to play in achieving better affordability and accessibility for medicine. As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with our industry partners to make that possible."[15]

"…[I]t is incumbent upon the pharmacy benefits managers to more forcefully illustrate the critical role we play in making medicine more affordable and accessible. For example, we partnered with a drug maker who was willing to lower the price of its hepatitis C drug. In doing so, we were able to provide 50,000 patients affordable access to this medication."[16]

"The biggest problem is not new expensive drugs but repricing old ones, and not just ones being purchased by Martin Shkreli or Valeant. 'You have no new research. You have no innovation. You have nothing but increased drug prices."[17]

"We are constantly trying to be vigilant and chase the bad actors out of the marketplace."[18]

242.    Through such statements, Express Scripts acknowledged its strong influence on

---

[15] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017, http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110 550.html

[16] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017, http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110 550.html

[17] *Forbes, Pharma & Healthcare*, "Solving Pharma's Shkreli Problem," by Matthew Herper, January 20, 2016, https://www.forbes.com/sites/matthewherper/2016/01/20/solving-pharmas-shkreli-problem/#6dcce78c6be3

[18] The New York Times, "Specialty Pharmacies Say Benefit Managers Are Squeezing Them Out," by Katie Thomas, January 9, 2017, https://www.nytimes.com/2017/01/09/business/specialty-pharmacies-say-benefit-managers-are-squeezing-them-out.html

pharmaceutical markets.  The striking feature of the current circumstance is that Express Scripts has not asserted its influence to effectuate lower prices for Acthar.

243.    While acknowledging the "value" of the medication does not warrant its high prices, Express Scripts has facilitated, rather than forestalled, Mallinckrodt's desire for ever growing profits by "repricing" an "old drug".

244.    With Acthar, "[y]ou have nothing but increased drug prices," due in large part to Express Scripts' decision to withhold its market power to effectuate cost containment through lower prices.

### Mallinckrodt Acts to Protect its Acthar Monopoly and to Enhance its Restriction of Competition in the ACTH Market

245.    As described above, in 2013, Mallinckrodt acquired BioVectra and Synacthen, in aid of its scheme of violated the antitrust laws.

### THE MALLINCKRODT SYNACTHEN ACQUISITION

246.    Since 2007, Acthar has represented 98% or more of Mallinckrodt's revenue. Acthar was so important to Questcor that its then-CEO, Don Bailey told investors it "is basically a single product company."

247.    Through its exorbitant price increases, Mallinckrodt was able to grow its revenue from Acthar sales from less than $1 million in 2001 to $798.9 million in 2013.  Much of this increase occurred between 2011 and 2013 when Mallinckrodt's revenues increased $218.2 million to $798.9 million.

248.    However, by 2013, Mallinckrodt had identified a competitive threat.  Novartis AG ("Novartis") had developed Synacthen Depot (cosyntropin depot) ("Synacthen"), a synthetically derived ACTH medication, which, like Acthar, could be injected intra-muscularly.  While it was used outside the United States, it was not yet approved by the FDA for use in the United States.

Recognizing that the entry of Synacthen in the U.S. market for ACTH drugs would threaten its exercise of its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009.  It failed.

249.    As of 2013, Novartis agreed to sell Synacthen to Retrophin, Inc., which at the time was helmed by Mr. Shkreli.  Mr. Shkreli founded Turing (the maker of Daraprim) after he departed Retrophin.

250.    When faced with a competitive threat to its monopoly, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had been offered by three competitors, including Retrophin.  Retrophin had agreed to buy Synacthen for $16 million.  Upon learning of this imminent threat, Mallinckrodt acted to protect and enhance its monopoly power by licensing Synacthen for a minimum of $135 million from Novartis. It licensed the U.S. exclusive rights to Synacthen from Novartis, not to bring this viable synthetic alternative to Acthar to market, but to eliminate the nascent competitive threat posed by an independently owned Synacthen.

251.    These actions allowed Mallinckrodt to maintain and enhance its monopoly power in the ACTH market.  The Synacthen acquisition had the purpose and effect of suppressing competition and allowing Mallinckrodt to continue to raise prices for Acthar, which it did.

252.    From 2013 through 2017, Mallinckrodt raised the price of Acthar from $36,144 to $43,658.

### RELEVANT MARKETS AND MONOPOLY POWER, AND THE FTC COMPLAINT AGAINST MALLINCKRODT

253.    The supracompetitive and exorbitant prices that Mallinckrodt charges for Acthar, and its limitations on distribution through the entry into an exclusive distribution arrangement with Express Scripts in 2007, are direct evidence of Mallinckrodt's monopoly power and actions

61

to maintain and enhance such monopoly power, in violation of the antitrust laws. That Acthar holds a dominant share of the relevant market for ACTH drugs in the United States shows Mallinckrodt's monopoly power by indirect evidence.

254. The relevant product market is the sale of ACTH drugs, dominated by just one product, Acthar. The geographic market is the United States. In this market, Mallinckrodt is the single seller, and the third party payors are the leading buyers.

255. That market is and has been characterized by significant barriers to entry.

256. There are no medical or reasonably available substitutes for Acthar. The only potential substitute was Synacthen, which Mallinckrodt purchased the rights to from Novartis in 2013, only to shelve the product rather than seek to bring it to market in the United States.

257. On January 18, 2017, the Federal Trade Commission ("FTC") sued Mallinckrodt, alleging that Mallinckrodt exercised, and continues to exercise, monopoly power in the United States in the sale of Acthar. *See generally*, Complaint for Injunctive Relief and Other Equitable Relief ("FTC Complaint") at Exhibit "A."

258. The FTC alleged that such purchases "extinguished a nascent competitive threat to [Mallinckrodt's] monopoly." FTC Complaint, ¶ 1.

259. At all relevant times material to this case, Mallinckrodt possessed monopoly power—the ability to profitably raise price significantly above competitive levels without losing significant sales—in the relevant product market. None of the vast price increases taken by Mallinckrodt between 2007 and the present have caused a significant loss of sales. To the contrary, Mallinckrodt's sales have increased during that time.

260. Mallinckrodt has repeatedly and profitably raised Acthar's price from the time it acquired the product for $100,000 in 2001 from Aventis to the present. Mallinckrodt has been

able to raise prices unchecked, as set forth above, and achieve corresponding revenue growth to more than $1 billion.

261.    Mallinckrodt has encountered no competitive constraints on its ability to repeatedly increase Acthar's price and, by extension, its revenue and profit margins. Mallinckrodt does not set the price of Acthar in reference to the price of any of the other drugs that are prescribed to treat the same indications that Acthar treats.  Acthar is priced significantly higher than non-ACTH drugs used to treat the same indications, except for IS.

262.    Indeed, one Mallinckrodt executive commented that the price for Acthar "was chosen by looking at the prices of other specialty drugs and estimating how much insurers and employers would be willing to bear."  Mallinckrodt took "some comfort that the strategy would work, and physicians would continue to use the drug, and payers would continue to pay."  In fact, according to Mallinckrodt, "reality was better than expected."

263.    In its Annual Report on Form 10-K for the Fiscal Year ended December 31, 2007, Questcor illustrated the effect of its monopolization strategy on its "5 Year Cumulative Total Return", illustrating a 290% return between 2006 and 2007 as follows:



Comparison of 5 Year Cumulative Total Return*
Among Questcor Pharmaceuticals, Inc.,
the Amex Composite Index
and the Nasdaq Pharmaceutical Index

COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN*
Among Questcor Pharmaceuticals, Inc., The AMEX Composite Index
And The NASDAQ Pharmaceutical Index

|  | Cumulative Total Return* | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 |
| QUESTCOR PHARMACEUTICALS, INC. | 100.00 | 75.51 | 54.08 | 106.13 | 151.02 | 588.78 |
| AMEX COMPOSITE INDEX | 100.00 | 143.18 | 175.20 | 215.26 | 257.04 | 299.37 |
| NASDAQ PHARMACEUTICAL INDEX | 100.00 | 144.89 | 160.46 | 160.65 | 163.42 | 154.46 |

* $100 invested on 12/31/02 in stock or index-including reinvestment of dividends. Fiscal year ended December 31.

This stock performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

264. FDA approval is required to market pharmaceuticals to U.S. consumers. As a result, drugs sold outside of the United States are not viable competitive alternatives for U.S. consumers, even in the event of a significant price increase for ACTH drugs available in the United States.

265. Acthar has a 100% share of the market for ACTH drugs in the United States. No other ACTH drug is FDA-approved for therapeutic use.

266. The United States ACTH market is characterized by high barriers to entry. Developing a long-acting, depot-injection formulation of a drug product containing ACTH (natural or synthetic) that is stable, safe, and effective would require significant time, cost, and effort, with no guarantee of success. The requirements for entry include sourcing the active pharmaceutical ingredient, formulating a sustained-release depot-injection formulation, scaling

64

production to clinical scale, and successfully conducting clinical trials necessary for FDA approval. Defendant Trudeau assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic." Transcript of Conference Call to discuss acquisition of Questcor Pharmaceuticals, Apr. 7, 2014.

267.    Former CEO Don Bailey also claimed that one of the barriers to entry is the Acthar drug formulation. While Acthar is a biologic extraction of porcine pituitaries, Bailey claimed, "[i]t's an undisclosed composition, so that's a trade secret." He also claimed "[t]he manufacturing process is also a trade secret. It's complex, it's unique, and we own all elements of the manufacturing process. …The composition of Acthar that comes out of the manufacturing process is tied to the process, so if you don't know the process you can't figure out what's actually in Acthar."

268.    If what the former CEO was saying was that Questcor enjoyed a natural monopoly, that does not necessarily imply the absence of market constraints. These constraints can come from a new competitive product or from a dominant buyer on the other side of the market. Both of these factors are relevant here.

### Mallinckrodt Engaged in Anticompetitive Conduct By Acquiring the Only Competitor Drug, Synacthen, Keeping of the U.S. Market and Inflating the Prices in Canada

269.    Synacthen posed a threat to Mallinckrodt's ACTH drug monopoly, so Questcor intervened at the time when other firms were attempting to acquire the U.S. rights to Synacthen from Novartis. Questcor submitted a bid that included substantially more guaranteed money than the other bidders had offered, effectively ending the bidding process. By acquiring Synacthen, Questcor eliminated the possibility that another firm would develop it and compete

against Acthar.

270. Synacthen constituted a nascent competitive threat to Questcor's ACTH drug monopoly, notwithstanding the uncertainty that Synacthen, a preclinical drug, would be approved by the FDA.

271. For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly.

272. When Questcor first decided to pursue an "orphan drug" (*i.e.*, high) pricing model for Acthar, it recognized the potential threat Synacthen posed to Acthar's revenue growth.

273. Nevertheless, in 2007, it adopted and pursued the above-described "new strategy", consolidating Acthar distribution to just one distributor and streamlining its control over sales and distribution through the implementation of ASAP. These functions were consolidated in one significant company, Express Scripts.

274. In 2009, Questcor approached Novartis about acquiring Synacthen. At that time, Questcor continued to view Synacthen as a possible future competitor, especially given the increasing prices Questcor was commanding for Acthar. Unsuccessful in that initial attempt, Questcor continued to monitor the competitive threat from Synacthen.

275. Then in 2012, Questcor again concluded that Synacthen posed a more immediate threat to Acthar if Synacthen was approved for sale in the United States.

276. By 2013, Questcor feared that if another company were to acquire Synacthen and obtain FDA approval, it could undermine its business model.

277. On information and belief, as long as Questcor believed no other firm was seeking to bring Synacthen to the United States, Questcor did not make further attempts to acquire it. Indeed, just months before Questcor began pursuing the acquisition of Synacthen, top Questcor

officials questioned whether Synacthen would provide any affirmative value to Questcor.

### Other Bidders Planned to Use Synacthen to Challenge Acthar's Monopoly

278.     Unbeknownst to Questcor at the time, Novartis decided in late 2011 to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States, along with the marketing rights for Synacthen in over thirty-five other countries where the drug was already approved and sold. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

279.     It is alleged that each of the three firms planned to develop Synacthen for IS and to use Synacthen to compete directly with Acthar.  With this indication, each firm expected to capture a significant share of the U.S. ACTH market from Questcor by pricing Synacthen below Acthar's prices.  Having the requisite pharmaceutical expertise and financing, the three firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. ACTH market.

### The Value of the Synacthen Assets

280.     The Synacthen assets and related rights provide a proven formulation for a long-acting, depot-injection drug containing synthetic ACTH.  The drug product manufactured using the Synacthen formulation has been safely and effectively used to treat patients suffering from IS and other conditions worldwide for decades.  The Synacthen assets would therefore facilitate commercializing a synthetic ACTH therapy in the United States.

281.     The asset package being sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug

product and the manufacturing process.

282.     In possession of the Synacthen assets, a buyer would not need to create a synthetic ACTH drug formulation *de novo*, nor would it need to develop from scratch the manufacturing and testing protocols necessary for production of the drug product.

### Questcor Disrupted the Synacthen Bidding Process

283.     It is alleged that, on October of 2012, Questcor learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis to develop it to compete with Questcor for the U.S. ACTH market.  Questcor immediately reached out to Novartis, signed a confidentiality agreement with Novartis, and submitted a confidential offer for the purchase of Synacthen.

284.     Novartis negotiated with the three alternative bidders in parallel with Questcor. By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar. At the point where those negotiations left off, each company exchanged deal terms with Novartis and submitted formal offers.  The offers by the three alternative bidders were comparable in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. sales of Synacthen.

285.     Unlike the three alternative bidders, Questcor had only incomplete plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. Retrophin ultimately prevailed in the bidding war with a bid of $16 million.

286.     However, on June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements").  By the Agreements,

Questcor gained the exclusive rights to develop, market, and sell Synacthen in the United States and over thirty-five other countries. Under the Agreements, Questcor is obligated to pay a minimum of $135 million, and likely will pay $300 million to Novartis for Synacthen.

287. In other words, Questcor swept in at the eleventh hour to overpay—at least 8 times more than the market had determined—for the only immediate competitive threat to its monopoly for Acthar. Despite paying this amount, they did not seek FDA approval to bring the product to market.

**The Lawsuit Between Retrophin and Questcor for Questcor's Antitrust Violations**

288. In January 2014, Retrophin sued Questcor for antitrust violations in the United States Federal District Court for the Central District of California. *See* Retrophin, Inc., v. Questcor Pharmaceuticals, Inc., CV-14-00026-JLS (C.D.Cal) ("Retrophin Complaint") (attached to the Rockford Complaint at Exhibit "C"). (To the extent relevant to Plaintiff's Complaint, the averments of antitrust conduct interposed by Retrophin are incorporated by reference herein).

289. In the Retrophin Complaint, Retrophin claimed,

"[i]n June of 2013, plaintiff Retrophin was poised to challenge Questcor's monopoly. It had negotiated an agreement to purchase from Novartis AG ("Novartis"), the rights to sell in the US a product called Synacthen. ...

Retrophin planned to obtain FDA approval to sell Synacthen in the US and compete head to head against Questcor by dramatically undercutting Questcor's price for Acthar. It had negotiated and was ready to sign an agreement to purchase the US rights to Synacthen from Novartis. The signing was scheduled for June 11, 2013. The signing of the agreement was so imminent that a press release had been prepared to announce the deal.

On June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor swept in and acquired the rights to Synacthen. In doing so, it preserved and entrenched its ACTH monopoly in US and eliminated the competitive threat posed by Retrophin's acquisition of Synacthen. There was no procompetitive aspect of

69

Questcor's acquisition of Synacthen.

Retrophin Complaint, ¶¶ 4-6, at Exhibit "C" to the original Rockford Complaint (Dkt. No. 1-3, filed 04/07/17).

290.    The FTC apparently agreed with Retrophin's assessment.

291.    Nevertheless, the government, in its 2017 FTC complaint, mirrored Retrophin's 2014 allegations that Questcor engaged in anticompetitive conduct in violation of the antitrust laws.

292.    Mallinckrodt chose to settle the Retrophin lawsuit for $15.5 million, slightly less than the $16 million Retrophin bid to purchase Synacthen from Novartis.

**Mallinckrodt's Acquisition of Synacthen Harmed Competition**

293.    Mallinckrodt's strategy to protect its monopoly power in the market for ACTH drugs was successful.  But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price.  With the acquisition of Synacthen, Mallinckrodt was able to thwart an imminent threat to its Acthar monopoly and thereby harmed competition.

294.    Mallinckrodt claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the similarities between the two drugs, any therapeutic indication that Mallinckrodt was to pursue for Synacthen could easily have been pursued for Acthar.

295.    Fourteen months after acquiring Synacthen, Mallinckrodt acquired Questcor for $5.9 billion.  The vast majority of Questcor's value was attributable to Acthar and Synacthen.

296.    However, despite its claims, Mallinckrodt has not brought Synacthen to market for any indication.  Instead, it keeps Synacthen off the market to protect its monopoly power and

high prices for Acthar.

## Mallinckrodt settles with the FTC

297.    On January 18, 2017, the FTC announced that Questcor and its parent
Mallinckrodt agreed to pay $100 million to settle FTC charges that Questcor and Mallinckrodt
violated antitrust laws when Questcor acquired the rights to Synacthen from Novartis in 2013.

298.    According to FTC Chairwoman Edith Ramirez, "Questcor took advantage of its
monopoly to repeatedly raise the prices of Acthar, from $40 in 2001 (when it acquired the rights
to sell Acthar for $100,000) to more than $34,000 per vial today – an 85,000 percent increase."

299.    The brunt of these monopoly prices was borne by self-funded payors, like
Plaintiffs, located throughout the country, whose employees and beneficiaries who were at the
mercy of Mallinckrodt and treated with Acthar.

300.    From the time it sought FDA approval for the treatment of IS, Mallinckrodt has
raised the price of Acthar to over $43,000.

301.    Questcor claimed that these exorbitant price increases were in response to
demand.  But its former Chief Executive Officer, Don Bailey, acknowledged in 2009 that "we
only have about 800 patients a year.  It's a very, very small – tiny – market."  Consequently, the
limited use of the product did not justify an over 58,000% price increase from acquisition until
2009.

302.    Since the Acthar market for the treatment of IS was so limited, Questcor sought to
expand its use.  By 2012, Acthar was prescribed for Medicare recipients 3,387 times.  To
Medicare alone, this represented a cost of $141,500,000 in 2012.

303.    Quantified another way, Dr. William Shaffer, a neurologist in Greeley, Colorado
who was the highest prescriber of Acthar in 2012, wrote only 78 prescriptions for the drug, but

71

the prescribed Acthar cost Medicare $4,000,000.

304.    Acthar represented 98% or more of Questcor's sales and revenue from sales since 2007.  Its manipulation of the market has resulted in a 266% increase in revenue year-over-year from 2011 to 2013.  Total net sales for Questcor in 2011 were $218.2 million, $509.3 million in 2012, and $798.9 million in 2013.  In each of those years, Acthar represented at least 95% of Questcor's net sales – over $1.45 billion in revenue.

305.    In the words of former CEO Don Bailey "Questcor is basically a single-product company."  But, by flexing its monopoly power, Questcor has been able to raise Acthar prices and increase revenue from Acthar in a "tiny market" from less than $1 million for fiscal 2001 to $799 million for fiscal 2013 - a nearly 80,000% increase.  It did so in conjunction with Express Scripts.

306.    Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed ESI's competitive pressure in the marketplace to cause Acthar prices to be lower.  Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present.

<strong>Mallinckrodt's marketing and sales scheme</strong>

307.    Since at least 2014, when Mallinckrodt acquired Questcor, Defendant O'Neill directed and continued the strategy for the company's use of KOLs to promote and sell Acthar for unapproved uses and doses.

<strong><u>THE QUI TAM WHISTLEBLOWER COMPLAINT AGAINST MALLINCKRODT</u></strong>

308. On April 30, 2019, it was revealed publicly for the first time by CNN[19] that two whistleblowers, both former pharmaceutical sales representatives for Mallinckrodt, had sued the company years before for a "multi-tiered strategy" to boost sales by bribing doctors to prescribe the high-priced Acthar to their patients. CNN reported that the United States Department of Justice ("DOJ") had intervened in a false claims act action brought by two former employees of Mallinckrodt.

309. The intervention actually took place the month before, on March 6, 2019, but the case was sealed at the time. *See Plaintiff Under Seal v. Defendant Under Seal*, Civil Action No. 12-CV-0175-BMS, E.D.Pa., at Dkt. No. 55. The government's decision to intervene, a relatively rare occurrence, was done after the government conducted its own extensive investigation of the claims by the former employees and concluded that the allegations are credible.

310. One of the cases, known as *U.S. ex. Rel. Charles Strunck and Lisa Pratta*, was filed in 2012 by Charles Strunck, New York-based former Multiple Sclerosis ("MS") Sales Specialist for Questcor with responsibility for the Connecticut market, and Lisa Pratta, a New Jersey-based Acthar neurology specialist for both Questcor and Mallinckrodt (collectively, the "Relators"). Strunck worked from September 2010 through August 2011, while Pratta worked from September 2010 through June 2017.

311. As described more fully in the *Strunck & Pratta Complaint*, Mallinckrodt's scheme involved "using valuable incentives, rewards and other forms of renumeration to induce health care providers to promote and prescribe H.P. Acthar in lieu of less expensive therapies that are equally more effective…". *Strunck & Pratta* Cmplt. at ¶ 3(i). According to Strunck and Pratta, there is a pervasive culture at Mallinckrodt designed to sell Acthar at all costs.

---

[19] https://www.cnn.com/2019/04/30/health/mallinckrodt-whistleblower-lawsuit-acthar/index.html

312.    Separately, a different whistleblower sued Mallinckrodt in the same Philadelphia Court on April 4, 2013, alleging a different aspect of Mallinckrodt's scheme to sell Acthar at high prices.  In a case unsealed as part of the government's filing of a consolidated, amended pleading, former employee Scott Clark alleges that "Mallinckrodt designed supposed 'patient assistance' funds that paid copays for Acthar only and then funded them through 'donations', knowing its money would be used on Acthar copays to the exclusion of other drugs."  *See* United States' Complaint in Intervention, Dkt No. 2:13-cv-01776-BMS (E.D.Pa.) (BMS) at Document No. 57 ("***U.S. Complaint***") at ¶ 5.  Such conduct is unlawful.

313.    As the federal government has alleged:

> "Mallinckrodt knew that the cost of Acthar would make it difficult to sell because there were cheaper, effective competitor drugs available to treat certain of its approved uses, namely acute exacerbations in multiple sclerosis, lupus and rheumatoid arthritis. Mallinckrodt intended to overcome this difficulty and did so by making the drug 'free' to patients by subsidizing their Medicare [and private] copayments.  By doing so, Mallinckrodt could maintain the high price of Acthar to maximize its own sales revenues, but minimize the risk that the drug's high price would impede doctors and patients from using it."

*Id*. at ¶ 4 (brackets added).

314.    As reported by CNN, and as averred in their *Qui Tam* Complaint, the Relators allege that Mallinckrodt has engaged in a long—standing scheme to bribe doctors to prescribe Acthar at the exorbitant, inflated prices detailed herein.  They claim there was a "culture" at Mallinckrodt designed to sell Acthar at all costs, from lying to the FDA to offering bribes to doctors.

315.    Importantly, Mallinckrodt has not denied the allegations.  Instead, Mallinckrodt claims the conduct alleged is a "legacy matter" involving Questcor and its conduct prior to Mallinckrodt's acquisition.

316.    However, Relator Pratta, who worked at both Questcor and Mallinckrodt after the 2014 acquisition, has alleged that the conduct continues at Mallinckrodt.

317.    In a conference call with investors held May 7, 2019, CEO Mark Trudeau publicly stated that the company has reserved for the settlement of the Relators' case and is actively pursuing settlement which he stated is "likely to resolve sooner than later".

318.    In fact, Mallinckrodt has resolved the marketing aspects of the DOJ claim, by paying $15.4 million to settle earlier this month.

319.    The conduct alleged by Relators involved kickbacks to doctors in the form of free Acthar, as well as active concealment by Mallinckrodt of the conduct for years.

320.    For this reason, Washington Wholesalers did not know and could not have known about such unlawful conduct until the earliest date of April 30, 2019, when the *Qui Tam* complaint was unsealed.  As a result, Plaintiff's claims stated herein premised upon the unlawful conduct revealed by the Relators' case are timely.

321.    Plaintiff had no way of knowing that Mallinckrodt was paying doctors in Connecticut thousands of dollars to prescribe Acthar to their patients.

322.    The kickback scheme involved the promotion of Acthar to treat disease states for which Acthar was not the "gold standard", as in the case of IS, and for treatments that were not covered by the Acthar label.

323.    Mallinckrodt vastly expanded its direct-to-consumer selling of Acthar by expanding its sales force, including creating a team of "medical science liaisons" or "MSLs". The MSLs were highly trained specialists in the Acthar treatments who worked with other Mallinckrodt sales representatives to create a network of "Key Opinion Leaders" or KOLs. These KOLs were leading specialists in their respective medical fields whom Mallinckrodt

identified as being potentially influential on other doctors. These KOLs were paid handsomely to join with Mallinckrodt's MSLs and sales representatives as "spokes-doctors", promoting Acthar to other medical providers and delivering Mallinckrodt's false, misleading and deceptive promotional messages about the safety, efficacy and value of Acthar in relation to other cheaper, safer, and equally or more effective treatments. As a result, thousands of new patients have been prescribed Acthar for unapproved uses and doses in the treatment of diseases in neurology, nephrology and rheumatology, among others. TPPs, like Plaintiff, have been forced to pay the exorbitant prices charged by Defendants.

324.    LEHB, like other TPPs who have sued in state courts,[20] were harmed by Mallinckrodt's conduct. Specifically, Plaintiff paid for Acthar at the inflated prices charged by Defendants as a result of the scheme alleged herein.

325.    In the case of Plaintiff's beneficiaries, they have been prescribed Acthar for months to treat adult disease, not IS. As a result of Mallinckrodt's promotional effort, instead of treating Plaintiff's beneficiaries for acute exacerbations, or flare-ups, it is believed and therefore averred that they have been treated with Acthar as maintenance medication for months. Thus, Plaintiff was forced to pay hundreds of thousands of dollars for Acthar more than it should have paid.

326.    The conduct revealed by the Relators goes to the manner in which Mallinckrodt and Cigna/Express Scripts were able to convince doctors to prescribe the high-priced Acthar, after the Defendant' conspired and agreed to raise the prices and maintain the prices at artificial

---

[20] One such TPP is the International Union of Operating Engineers Local 542 ("IUOE Local 542") based in Fort Washington, Pennsylvania. IUOE Local 542 sued Mallinckrodt and UBC in the Court of Common Pleas for Montgomery County, Pennsylvania in May 2018. In December 2018, the Pennsylvania court denied the defendants' preliminary objections (the equivalent of a motion to dismiss in this court).

levels. The conduct involved systematically promoting and marketing Acthar for unapproved off-label uses, including the diseases for which Plaintiff's beneficiaries were prescribed Acthar.

327. The scheme involved compensating sales representatives thousands of dollars to promote the sale of Acthar for unapproved uses and doses, to benefit Mallinckrodt and the sales reps. Sales representatives have been paid tens of thousands of dollars for such promotional efforts. As detailed in the Relators' complaint, one sales representative was paid a $124,000 bonus in the second quarter of 2011, including $75,000 for just one month. Others received bonuses of $110,000 and $80,000 in the same period.

328. The compensation of sales reps was directly tied to sales growth, a growth that was possible by expanding the approved uses for Acthar which had a narrow, limited market of patients.

329. Mallinckrodt employed a team of MSLs, like Sagar Shah responsible for New York and New Jersey, who were directed by Nikki Mutschler to join with sales specialists, like Strunck, Pratta and Clark, to promote the sale of Acthar for unapproved uses. Several MSLs are believed to have had responsibility for Acthar sales in Connecticut as part of their charge for the "northeast", including Yuliya Kreychman (nephrology), Christy Thompson (rheumatology) and Giovanni Passiatore (neurology).

330. In Connecticut, the Regional Manager in charge of Acthar sales was John Stabile. Stabile directed the efforts of Connecticut-based sales representatives, Ted Madru, who was in charge of Hartford, and Anthony Luongo, who was in charge of New Haven. Relator Strunck also was responsible for Acthar sales in Connecticut.

331. Stabile has been directly implicated in the fraudulent scheme alleged by Relators Strunck and Pratta, as he was the Regional Manager for Pratta in New Jersey.

77

332.    Specifically, Relators have produced direct evidence of Stabile employing speaker programs, and payments to doctors for such programs, as a form of kickback to incentivize the doctors to prescribe Acthar to their patients at the inflated prices set by Defendants.  Indeed, Stabile emailed Pratta about "cleaning up the database" of authorized speakers by substituting one doctor for another who was not prescribing enough Acthar.  They allege that "John Stabile looked at how many referrals [*i.e.*., sales of Acthar] the speakers have written in the year and also how many times the doctor was used for Health Care Provider and Patient programs." Relator Complaint at ¶ 158.

333.    Relators allege the following based on their personal knowledge and experience:

> Paying doctors to give these off-label promotional presentations to peers and patients is a common and broadly accepted practice at Questcor because the primary focus is on growing market share at all costs.  Not coincidentally, most doctors who agree to prescribe H.P. Acthar are rewarded with speaker training and dollars.

Relator Complaint at ¶ 157.

334.    Relators attach to their Complaint "an extensive list of 'speakers' trained on H.P. Acthar, including several who reside and practice in Connecticut.  Relator Complaint at ¶ 156 and Exhibit L.  Only discovery of Mallinckrodt will reveal the extent to which Stabile's conduct in directing Connecticut-based MSLs and sales representatives led to kickbacks to Connecticut doctors, like the doctors who treated Plaintiff beneficiaries, in exchange for Acthar prescriptions.

335.    Relator Pratta states that "on March 7, 2014, John Stabile directed Lisa Pratta to go see Dr. Raval and '*give him more talks so he will give us more referrals.  A referral for each talk*.'"  Relator Complaint at ¶ 63.  The quid-pro-quo is undeniable: a kickback of speaker fees for Acthar prescriptions.

336.    An example of kickbacks being used in Connecticut provided by Relators is as

follows:

> Drs. Alice Rusk and Walter Camp (Stamford/Greenwich, CT)
> prescribed a five day course of treatment with H.P. Acthar for at
> least two patients after having been entertained with monthly
> lunches and a 'meet-the-expert DVD presented by Dr. Brod.

Relator Complaint at ¶ 162.  They also state that doctors' office staff were "bribed" to arrange

meetings between Acthar sales representatives and the doctors:

> Among the offices at which Relator Strunck was directed to, and
> did, use retail gift cards to facilitate the off-label promotion of H.P.
> Acthar was the office of Drs. Alice Rusk and Walter Camp
> (Stamford/Greenwich, CT).  Their practice treats predominantly
> Government Program beneficiaries, and Questcor's improper
> promotions induced Drs. Rusk and Camp to prescribe a five-day
> course of treatment with H.P. Acthar for at least two patients who
> were suffering from acute exacerbations of MS.

Relator Complaint at ¶ 171.

337.    Relators also have produced direct evidence of the Connecticut Regional Manager

Stabile directing the unlawful kickback to doctors through the provision of free samples as

"starter" vials, not for indigent patients who could not afford the medication [who would

otherwise be directed to Patient Assistance Programs ("PAP") like those run by NORD, but for

any new patient who walks in the door, even those with prescription drug coverage supplied by

payors like Plaintiff.

338.    They attach to their Complaint an email dated January 3, 3014 in which Stabile

sends Relator Pratta five "starter vial forms" for use with a Dr. Katz in New Jersey.  Relator

Complaint at Exhibit N.

339.    Relators state that the Questcor program was "Prescribe One and Get One Free"

without limitation.  Relator Complaint at ¶ 217.  "The essence of the free vial program 90 is to

induce [doctors] which one free vial for each patient to get them started …".  Relator Complaint

at ¶ 219. "John Stabile advised Relator Pratta that one physician has used 100 free vials, but did not name the physician." Relator Complaint at ¶ 225.

340. To hide the fact that these promotional efforts were for unapproved, off-label uses, Mallinckrodt referred to such uses as "new indications."

341. The sales of Acthar for these "new indications" became a primary focus for Mallinckrodt and Cigna/Express Scripts, as they strived to grow their revenue to the more than $1 billion in sales it achieves each year for Acthar alone.

342. Mallinckrodt and Cigna/Express Scripts achieved such exponential growth, despite the price increases detailed herein, by providing valuable remunerations to doctors to induce and encourage them to prescribe Acthar for unapproved uses and doses.

343. As the Relators' Complaint reveals as to Mallinckrodt, and as Plaintiff alleges herein as to Cigna/Express Scripts and Mallinckrodt, Defendants engaged in such conduct in violation of the Connecticut laws by providing secret kickbacks to doctors throughout the country, including Connecticut, to get them to prescribe Acthar at exorbitant prices, which Plaintiff has been forced to pay, and continues to pay to this day. That is why Plaintiff seeks declaratory and injunctive relief against Defendants to end such practices.

### Leading "KOLs" are employed by Mallinckrodt in the Promotion of Acthar for the Treatment of "New" Indications

344. In order to effectuate their scheme and conspiracy fully, the corporate Defendants needed some help with the promotion of Acthar to physicians, especially in the medical fields where Acthar was not the preferred course of treatment. Indeed, Acthar was not approved by the FDA for the long-term treatment of most diseases for which Acthar had a narrow indication from its 1952 label. Such fields include nephrology syndrome and rheumatoid arthritis.

### Defendants target new diseases as a "potential new markets"

80

**to promote off-label sales of Acthar.**

345. Prior to 2011, Mallinckrodt had virtually no sales of Acthar for the treatment of either nephrology syndrome or rheumatoid arthritis. However, these numbers increased exponentially in the years that followed, largely due to Mallinckrodt's focused marketing effort, not any change in either the Acthar label or the demonstrated efficacy of the drug to treat these diseases.

346. As Express Scripts' 2018 Prior Authorization Policy acknowledged, "data and guidelines do not suggest that Acthar has a substantial role in therapy" for nephrotic syndrome, including iMN. Instead, "[f]urther data are needed before use in other areas [beyond IS and MS] can be recommended." *Id*. at 4 (brackets added).

347. To overcome this lack of data to support to use of Acthar to treat nephrotic syndrome and rheumatoid arthritis, and to support its marketing efforts in these areas, Mallinckrodt, with Cigna/Express Scripts direct assistance through its hub, engaged certain nephrologists and rheumatologists strategically situated throughout the country. These doctors became known as "Key Opinion Leaders" or "KOLs".

348. Defendants turned to KOLs initially to determine whether there was a viable potential market for Acthar with nephrologists and rheumatologists.

**Defendants engage KOLs for "white coat marketing" of Acthar**

349. This new marketing initiative into off-label promotion of Acthar for nephrotic syndrome was made possible by the "success of the new Acthar pricing strategy" by which "significant funds [were] now available for the first time to support Acthar-related research" by paying "KOLs to explore areas of mutual research interest." In other words, the profits realized by the implementation of Defendants' "new strategy" for Acthar in 2007 made it possible for

Defendants to pay doctors to serve as KOLs as part of their coordinated white coat marketing strategy into rheumatology, nephrology and other areas.

350.     The practice of "white coat marketing" was identified by the Office of Inspector General (OIG) of the federal government as a potential area of fraud and abuse as early as 1991. See, e.g., OIG Advisory Opinion No. 11-08, issued June 12, 2011, at 6 (citing 56 Fed. Reg. 35952, 35974 (July 29, 1991)).  As described in Advisory Opinion No. 11-08:

> The fraud and abuse risks are compounded where, as here, a physician or other health care professional is involved in the marketing activity – a practice sometimes referred to as "white coat" marketing.  White coat marketing is closely scrutinized under the anti-kickback statute because physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services – especially when marketing to their patients.  See, e.g., 56 Fed. Reg. 35952, 35974 (July 29, 1991).  Given the nature of these relationships, when physicians or other health care professionals market items and services to their patients, patients may have difficulty distinguishing between professional medical advice and a commercial sales pitch.

351.     In order to cultivate KOLs for its white coat marketing scheme, Mallinckrodt directed its sales force to make direct calls on rheumatologists and nephrologists to generate clinical data to support sustained use of Acthar for the treatment of such diseases.  Cigna/Express Scripts was able to monitor the activities of these KOLs for Defendants, and their success in unlawful promotion, through their hub.

352.     Mallinckrodt then began "[w]orking with KOLs who have expressed interest in generating such data" to support the off-label use of Acthar to treat rheumatoid arthritis or nephrotic syndrome.  This became a "major focus" for Mallinckrodt after it acquired Questcor.

353.     As part of Mallinckrodt's 2009 strategic overview for Acthar, created for the company in October 2008 by its Executive Vice President of Commercial Operations, Eldon

Mayer, Mallinckrodt identified nephrotic syndrome as the first new potential use for Acthar in terms of a potential new market for sales.

354.    Specifically, Mayer wrote as follows:

> **Identification of potential new markets for Acthar.** Also, in early 2008, Questcor began evaluating Acthar's current list of approved indications and exploring the worldwide published medical literature for ACTH. The process involved review of published literature as well as interviews with experts in each of the major labeled therapeutic areas.
>
> Nephrotic syndrome was identified as a specific disease having both high unmet need and published data demonstrating the efficacy of ACTH. In particular, it appeared from the limited published data that it had efficacy in certain subsets of nephrotic patients who were refractory to standard treatment protocols. Further, it was identified as being one of Acthar's current labeled indications. While the published data is entirely from European clinical sites, and involved synthetic ACTH (Synacthen Depot) rather than Acthar specifically, nephrologists interviewed felt it high likely that Acthar would generate the same favorable outcomes seen in these studies. Specifically, these benefits included both a remission of proteinuria and improved lipid profiles in patients with nephrotic syndrome due to membranous nephropathy. Nephrology KOLs interviewed generally had no awareness of this data, and those that were aware were completely unaware of Acthar availability as the only ACTH-based therapeutic in the US. Discussions with KOLs subsequently found that there is a significant population of nephrotic patients that do not adequately respond to traditional therapies, namely a commonly used steroid/cytoxic drug cocktail know (sic) as the Ponticelli Regimen, or second-line treatments Cellcept and Cytoxan.

355.    Significant to Mallinckrodt's later acquisition of Synacthen, the studies Defendants examined in deciding to expand the Acthar marketing effort into nephrology were exclusively the European studies of Synacthen showing its efficacy in treating the disease overseas.

356.    As part of the 2009 strategic review, Mallinckrodt decided to "conduct[] initial exploration of [the] nephrology opportunity" by "[e]xpanding exploration of the nephrology

opportunity through identification of, and delivery of introductory calls on, key nephrologists involved in treating nephrotic syndrome."

**Plaintiff's Payments for Acthar in Pennsylvania for Long-Term MS Treatments**

357. Throughout the relevant time period, as described above, Plaintiff has provided health and related welfare benefits, including but not limited to prescription drug benefits, to its eligible participants and beneficiaries through a contractual arrangement with Independence Blue Cross. During the relevant time period, Plaintiff has provided prescription drug benefits for its eligible participants and beneficiaries. At the time, and through the present when its beneficiaries were prescribed Acthar, Plaintiff's prescription drug benefits were administered by FutureScripts, which was Independence Blue Cross' contracted PBM.

358. Plaintiff was harmed with an ascertainable loss cognizable under Pennsylvania consumer fraud law because it was charged and paid an artificially inflated and fixed price for the Acthar based upon the inflated prices for Acthar, as set by Mallinckrodt and Cigna/Evernorth.

359. The Acthar was supplied directly to Plaintiff's beneficiary by Curascript, pursuant to its ongoing exclusive agreements with Mallinckrodt.

360. The payments made by Plaintiff were sent to its PBM, which then routed the payments to Express Scripts, the exclusive distributor of Acthar and Mallinckrodt's designated, exclusive agent, and then on to Mallinckrodt.

**Fraudulent transfers of Acthar revenues out of Mallinckrodt ARD to other Mallinckrodt Entities to Defraud Acthar Plaintiffs in the Class.**

361. Mallinckrodt's most profitable drug, by far, is Acthar.

362. That means the Mallinckrodt ARD is Mallinckrodt's most valuable entity.

363. However, for reasons that have not been made public, Mallinckrodt moved the

billions of dollars generated in Acthar revenue out of Mallinckrodt ARD and to other Mallinckrodt Defendant entities named herein.

364.    In the last years for which data is available, Mallinckrodt ARD generated the following revenues form the sales of Acthar, funded by Plaintiff and the Class: 2018 ($1,110,064,724), 2019 ($952,7070,262) and for the first nine months of 2020 ($41,472,782).

365.    Why such a dropoff in reported revenues for ARD?  In anticipation of bankruptcy, and the substantial claims of Plaintiff and the Class (including the post-petition claims at issue in this case), the monies were re-routed to other Defendant entities.

366.    On information and belief, such moves were done to defraud the Plaintiff and the Class from being properly compensated in this lawsuit under the laws in which Plaintiff and the Class have sued.

367.    It is believed that Mallinckrodt moved up to $14 billion in revenues between and among Mallinckrodt entities, both prior to bankruptcy and thereafter, in an effort to defraud creditors like Plaintiff and the Class for their post-petition, administrative claims, as well as proper compensation for their claims after April 30, 2021, which it's the administrative claims bar date established by the bankruptcy court.

368.    Specifically, the following moves are questionable, and are believed and averred to have been done fraudulently, to defraud Plaintiff and the Class.

      a.  Between June 15, and September 10, 2020, Mallinckrodt ARD move $66 million to Questcor International Ltd.

      b.  In the summer of 2020, MPIL moved hundreds of millions of dollars.  It received $561 million from Mallinckrodt ARD on June 10, 2020 and re-routed such monies to other Defendant entities.

      c.  On July 8, 2020, in conjunction with the deal cut with general unsecured noteholders to sign on to a pre-petition Restructuring Support Agreement, Mallinckrodt Equinox moved $2.4 billion – roughly half was sent to

Mallinckrodt Enterprises, a Specialty Generics company (believe to be for the benefit of the opioid claimants) and the other half to Petten Holdings, Inc. the former owner of the nuclear medicine business which Mallinckrodt sold in 2016. Then, $827 million was moved by Petten Holdings to Mallinckrodt Petten Holdings in the Netherlands, a defunct entity with no assets or operations.

369. These and other moves by Mallinckrodt were done with the intent to enrich the other Debtors in bankruptcy to fund Mallinckrodt's priorities, as well as Non-Debtor entities to benefit parties as yet unknown, but certainly not Plaintiff and the Class.

## **CLASS ACTION ALLEGATIONS**

370. Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and other similarly-situated persons and entities, and their beneficiaries, in Illinois and throughout the country. The proposed Class includes:

All third party payors and their beneficiaries in the United States and its Territories that paid for Acthar from October 12, 2020 through April 30, 2021 and from May 1, 2021 through the present.

Excluded from the above Class are: (a) Defendants and any entity in which Defendants have a controlling interest, and their legal representatives, offices, directors, assignees and successors, (b) any co-conspirators with Defendants, (c) any Medicare Advantage Organization ("MAU"), their representatives, assignors, assignees or related entities, and (d) the States of Alaska, Maryland, New York, Texas and Washington.

### *Numerosity*

371. The proposed Class consists of potentially hundreds of public and private payors in the proposed Class located throughout Illinois and the United States, based on the fact that Mallinckrodt has sold thousands of vials of Acthar in each quarter over the last few years alone. Thus, the Class is so numerous that joinder of all of its members is impractical.

372. Despite the size of the Class, its members are easily identifiable, as each patient

was required by Defendants since October 12, 2020 to fill out an Acthar Start Form (Exhibit "A" hereto) which forms were returned to, and have been maintained by, Express Scripts and/or UBC. As a result, the records needed to identify the members of the Class are in the hands of the Defendants.

<em>Typicality</em>

373.     Plaintiff's claims are typical of the claims of the Class, in that the representative Plaintiff is an entity who, like other Class Members, paid for Acthar at the inflated prices due to the unlawful conduct of the Defendants. Plaintiff, like all similarly-situated Class members, is damaged and sustained or continues to sustain economic injuries in the form of overcharges by the misconduct of the Defendants, because it paid higher prices than it would have paid absent Defendants' improper actions.

<em>Adequacy of Representation</em>

374.     Plaintiff can and will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interest that conflicts with or is antagonistic to the interests of the Class.

375.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex actions, including antitrust, RICO and consumer fraud class actions.

<em>Commonality</em>

376.     The factual and legal bases for the Defendants' misconduct are common to Class members and represent a common thread of antitrust racketeering and consumer fraud resulting in injury to Plaintiff and the Class. Common questions of law and fact in this case include, but are not limited to, the following:

        a.   whether the Defendants artificially inflated the prices of Acthar;

87

b.  whether Plaintiff and the Class have been and/or continue to be overcharged and thus damaged by paying artificially inflated prices for Acthar as a result of the unlawful conduct of Defendants;

c.  whether the Defendants have been and continue to be unjustly enriched by their unlawful conduct;

d.  whether the Defendants defrauded and/or continue to defraud Plaintiff and the Class;

e.  whether the Defendants engaged and/or continue to engage in a conspiracy and/or concerted conduct in deceiving and defrauding Plaintiff and the Class about Acthar and Acthar pricing, and concealing the truth about their unlawful conduct in colluding to artificially inflate the prices of Acthar;

f.  whether Defendants had and/or continue to have a monopoly in the market for ACTH drugs;

g.  whether Mallinckrodt exercised and/or continues to exercise monopoly power with respect to Acthar;

h.  whether Defendants took and/or continue to take actions to maintain and enhance Mallinckrodt's monopoly power in the ACTH market;

i.  whether Defendants unlawfully impaired or impeded and/or continue to impair or impede competition in the market for ACTH drugs;

j.  whether Defendants engaged and/or continue to engage in anticompetitive conduct in order to disadvantage Mallinckrodt's competitors and maintain Mallinckrodt's monopoly power in the market for ACTH drugs;

k.  the effects of Mallinckrodt's anticompetitive conduct on Acthar prices;

l.  whether Mallinckrodt formed the ASAP enterprise with Express Scripts for the purpose of carrying out the scheme to overcharge patients and payors for Acthar;

m.  whether Defendants used and/or continue to use the U.S. mails and interstate wire facilities to carry out an unfair ASAP scheme;

n.  whether the Defendants are liable to Plaintiff and the Class for statutory damages for conduct actionable under the Illinois Consumer Fraud and Deceptive Practices Act, and the antitrust and consumer protection laws of other states;

o.  whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief as to Defendants' conduct;

p.  whether Plaintiff and members of the Class are entitled to compensatory damages, and, if so, the nature of such damages;

q.  whether Plaintiff and members of the Class are entitled to statutory damages, including treble damages;

r.  the proper measure of damages; and

s.  whether Plaintiff and members of the Class are entitled to an award of punitive damages, reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit, and other appropriate relief under the circumstances of this case.

*Predominance*

377.    These questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive conduct in monopolizing and attempting to monopolize the ACTH drug market, and other conduct as more fully alleged herein.

*Superiority*

378.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

379.    The prosecution of separate actions by individual members of the Plaintiff Class would create a risk of inconsistent or varying adjudications with respect to individual members

of the Class. These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

380.    The Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

381.    Accordingly, class certification is appropriate under Rule 23(b)(1)(A), 23(b)(1)(B), 23(b)(2) and 23(b)(3).

**COUNT I**
**PLAINTIFF v. ALL DEFENDANTS**
**MAINTENANCE OF MONOPOLIZATION OF**
**THE ACTH MARKET (15 U.S.C. § 2)**

382.    Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

383.    Mallinckrodt has, and at all relevant times, had, monopoly power in the market for the sale of ACTH drugs in the United States. While the genesis of this monopoly power may be natural, since 2007 Mallinckrodt has acted and conspired with Express Scripts to maintain and enhance its monopoly power in the ACTH market.

384.    As described above, Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS"). IS a serious condition in infants, but one with an annual patient population of less than 2,000 patients per year. However, by 2015, Mallinckrodt was able to grow sales of Acthar to approximately $1.1 billion.

385.    In 2007, Mallinckrodt announced a "New Strategy" in order to maintain and enhance its monopoly. This new strategy could not have succeeded without the involvement of

Express Scripts as Mallinckrodt's exclusive agent.

## Anticompetitive Act 1: Restricted Distribution

386.    On July 2, 2007, Mallinckrodt decided to restrict distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to Express Scripts.  The goal of this strategy was to lock patients into receiving Acthar through one channel and prevent a competitive product from entering the market.

387.    When Mallinckrodt began its new strategy on July 16, 2007, it established the ASAP Program.  *See* Rockford Complaint Exhibit "B". July 2, 2007 Urgent Product Alert H.P. Acthar Gel.  The ASAP Program allowed Mallinckrodt to limit its direct distribution of the drug to the patient to just one avenue, through Express Scripts.  Mallinckrodt entered an exclusive arrangement with Express Scripts to provide Acthar directly to patients, and to receive payments for Acthar directly from patients.  *See* Freudenheim, *supra.*

388.    Express Scripts was Mallinckrodt's exclusive agent to operate the ASAP Program. Through ASAP, UBC facilitated all aspects of Acthar's distribution and payment as Mallinckrodt's exclusive agent.  UBC's utilized Express Script's pharmacy arrangement services (Accredo), specialty drug distribution (CuraScript) and direct billing and payment (ESI) functions to allow Mallinckrodt to maintain and enhance its monopoly power in the ACTH market.

389.    Mallinckrodt has willfully maintained its monopoly power in the ACTH drug market through its exclusive arrangement with Express Scripts from 2007 through 2017.  Having Express Scripts as its exclusive agent, Mallinckrodt was able to raise its prices tenfold initially, and nearly double in the ensuing years.

## Anticompetitive Act 2: The Synacthen Acquisition

390. By 2013, Mallinckrodt had identified a competitive threat to its monopoly power, despite its exclusive arrangements with Express Scripts. When Novartis decided to sell Synacthen Depot to a competitor, Mallinckrodt acted to protect its monopoly. Recognizing that the entry of Synacthen to the ACTH market would threaten its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009, it was unable to do so.

391. When Novartis agreed to sell Synacthen to Retrophin in 2013, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had been offered by Retrophin. Retrophin had agreed to buy Synacthen for $16 million, Mallinckrodt paid $135 million. It licensed the U.S. rights to Synacthen from Novartis, but did not bring this viable synthetic alternative to market. Instead, it acted only to eliminate the nascent competitive threat to its monopoly posed by an independently owned Synacthen.

392. This conduct contributed to Mallinckrodt's maintenance of monopoly power. Both anticompetitive acts – the exclusive arrangement with Express Scripts and the Synacthen acquisition had the purpose and effect of suppressing rather than promoting competition in the ACTH market. Mallinckrodt was able to raise prices at will.

393. Mallinckrodt used its enhanced monopoly power to inflate the prices of Acthar as set forth herein. Today the prices stand at over $43,000.

394. The challenged conduct caused Plaintiff and the Class to pay artificially inflated prices for Acthar in the ACTH drug market.

      a. The specific Anticompetitive Acts 1 and 2 set forth above have been continued and repeated by these Defendants after the filing of Mallinckrodt's bankruptcy petition and is therefore actionable as illegal post-petition conduct.

395. There is no procompetitive justification for the conduct of Mallinckrodt and

Express Scripts. Rather these two companies combined to lock Acthar into a restricted distribution model, overseen by the ASAP program, to ensure enhanced monopoly profits for both of them. The Synacthen acquisition only prevented competition, and preserved the enhanced monopoly power Mallinckrodt enjoyed due to Express Scripts' collusion.

**Plaintiff is a Direct Purchaser of Acthar Harmed by
Defendants' Anti-Competitive Conduct**

396.    The Plaintiff has been directly injured in its business and property by reason of Mallinckrodt's unlawful monopolization in concert with Cigna/Evernorth/Express Scripts and AlixPartners. Plaintiff's injuries consist of paying higher prices to purchase Acthar than it would have paid absent the conduct of Defendants. Plaintiff's injuries are the type of harm the antitrust laws were designed to prevent and flow from which makes Defendants' conduct unlawful.

397.    The product ships from Mallinckrodt's agent directly to the patient. Payments flow directly from Plaintiff back to the Defendants, for the benefit of Mallinckrodt.

398.    Plaintiff is also a direct purchaser because of the conspiracy between Defendants, as Plaintiff is a direct purchaser from co-conspirators.

399.    As described herein Defendants' acts and practices constitute monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT II
PLAINTIFF v. ALL DEFENDANTS
ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE
RESTRAINT OF TRADE (15 U.S.C. § 1)**

400.    Plaintiff hereby incorporates by reference the averments of the foregoing

paragraphs as if fully set forth herein and further allege as follows.

401.    As set forth above, Mallinckrodt has entered into exclusive agreements with the agent for its largest customers, Express Scripts.  These agreements preserved and extended Mallinckrodt's monopoly power, and allowed Defendants to raise the prices for Acthar to Express Scripts' clients, including Plaintiff.

      a.    These exclusive agreements set forth at length and in detail above continue on a post-petition basis and further, continue to damage and harm the Plaintiff and the Class as set forth more fully above.

## The Role of Cigna/Evernorth/Express Scripts in the Specialty Drug Market

402.    The maintenance of Mallinckrodt's monopoly over the ACTH market would not be possible without its agreement in restraint of trade with Express Scripts.

403.    Express Scripts is the largest buying agent of pharmaceuticals in the country.  It has substantial buying power as a result of its position as the largest representative of pharmaceutical purchasers.

404.    ESI has developed a consolidated network of specialty pharmaceutical management, distribution and reimbursement that creates a direct pipeline between the manufacturer and the patient.  Express Scripts operates a specialty pharmaceutical distributor, a specialty pharmacy, and a reimbursement HUB, all of which operate in service of the specialty drug manufacturer concomitantly with ESI's service as a pharmacy benefit manager for health plans and patients.

405.    Because ESI represents more than 80% of pharmaceutical buyers in the United States, it has the unique position to push back against high pharmaceutical prices, especially specialty drugs like Acthar.  Express Scripts has demonstrated its ability to wield its market

power to effectuate lower costs for high priced specialty drugs.

406.    The example of Turing's Daraprim is stark in that Express Scripts has produced a comparable drug for $1.  Instead of the $750.00 per pill charged by Turing, Express Scripts charges its clients $1.  Instead of one year's course of treatment costing $361,000, it costs less than $100.

### Express Scripts' Agreement with Mallinckrodt to Fix Prices for Acthar

407.    In 2007, when Express Scripts entered its exclusive arrangement with Mallinckrodt's predecessor Questor, it did not push back against Questcor's decision to raise prices.  Instead, when confronted with the price increase, Dr. Miller asserted that "[t]he increase was a manufacturing decision.  I can't comment on it."  *Id*.

408.    There was no legitimate business justification on the part of Express Scripts to agree to charge the inflated end payor prices set by Questcor to its clients, but it so agreed.

409.    By 2015, Express Scripts contracted with Plaintiff to be its exclusive agent for specialty drugs, including Acthar.  But Express Scripts accepted the inflated end payor prices set by Mallinckrodt, and included them in the ESI PBM Agreement with Plaintiff.

410.    As a result, Express Scripts conspired and agreed with Mallinckrodt to fix and charge artificially inflated prices for Acthar to Express Scripts clients, like Plaintiff.

411.    At all relevant times, Mallinckrodt's exclusive agreements with Express Scripts assisted Mallinckrodt in: (a) effectively excluding less expensive, potentially superior competitive products from the ACTH drug market; (b) maintaining Mallinckrodt's dominant market share and monopoly power in the ACTH drug market; (c) maintaining prices at artificially high levels for Acthar; and (d) otherwise reaping the benefits of its Mallinckrodt's enhanced monopoly power.

412.    There is no procompetitive justification for the conduct of either Mallinckrodt or Express Scripts.

413.    Plaintiff has been injured in its business and property by reason of the alleged collusion and conspiracy between Mallinckrodt and Express Scripts, its exclusive agent, which had the purpose and effect of raising and stabilizing inflated prices for Acthar.  Express Scripts facilitated, enabled, assisted, and furthered Mallinckrodt's substantial foreclosure and exclusion of competition and monopolization of the ACTH drug market.

414.    Plaintiff's injuries consist of paying higher prices to purchase Acthar than it would have paid absent the unlawful conduct of Defendants.  Plaintiff's injuries are the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

415.    Defendants' acts and practices constitute anti-competitive agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT III**
**PLAINTIFF v. ALL DEFENDANTS**
**STATE ANTITRUST LAW CLAIMS**

416.    Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

a.   With respect to the individual Defendant Board Members, all twelve (12) can be individually responsible as a matter of well-settled Pennsylvania law for their knowing participation in the anti-competitive events set forth in detail

above. In the Commonwealth of Pennsylvania, the Pennsylvania Supreme Court has clearly articulated that principals of a company, including its board of directors, can be responsible for a company's illegal conduct to the extent that the individual defendants participated in the illegal actions.

b. In fact, the Supreme Court has also held that intentional and knowing inaction can be sufficient to support a participation theory liability against corporate officers.

c. Under the participation theory, a court may impose liability upon the individual board of directors in their role as actors as opposed to as owners or directors of the corporate entity. Furthermore, such liability is not predicated upon a finding that the corporation is a sham and a mere alter ego of the individual corporate officer; instead, liability attaches where the record establishes the individual's participation in the tortious activity.

417. In the event the Court finds the Acthar purchases of Plaintiff were indirect as to Mallinckrodt, they remain direct as to Cigna/Evernorth/Express Scripts, and Plaintiff's aforesaid federal antitrust claims may be maintained against the Defendants. In such event, alternatively, Plaintiff and the Class seek relief as indirect purchasers as allowed by state and federal law. Under federal antitrust law, as indirect purchasers, Plaintiff and the Class are allowed to seek an injunction against all Defendants for their anticompetitive conduct.

418. Under the statutory and decisional law of the states identified below, Plaintiff and the Class are also permitted to seek damages as indirect purchasers against Defendants, including but not limited to the laws of Pennsylvania where the patients covered by Plaintiff reside and were treated.

419.     Plaintiff sets forth the following allegations in this state law-related section such that each and every allegation as to the factual basis for the violation of the law of one state, no matter where it appears, is incorporated by reference as support for the violation of the law of every state identified herein.  Plaintiff also incorporates the preceding factual allegations of antitrust conduct by the Defendants.

420.     Pennsylvania:  The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, et seq. ("UTPCPL"), makes illegal any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  73 P.S. § 201-3.  Further, Pennsylvania common law principles with regard to antitrust litigation hold that an unreasonable restraint of trade is unlawful.

421.     Plaintiff is a person pursuant to the UTPCPL.  Plaintiff has been injured as a result of the Defendants' conduct in violation of Pennsylvania law, and hereby seeks damages.

422.     The UTPCPL authorizes any person, including natural persons, corporations, trusts, partnerships, incorporated and unincorporated associations, and any other legal entities to seek an injunction, damages, costs, and reasonable attorneys' fees to prevent and ameliorate the anticompetitive conducted described herein. Plaintiff has purchased or reimbursed the costs of multiple administrations of Acthar distributed by Defendants directly to Plaintiff's beneficiaries for their personal, family or household use and purpose. Because Plaintiff's beneficiaries paid only minimal co-pays, Plaintiff paid the bulk of the inflated prices of Acthar directly to Defendants.

423.     The acts and practices described herein demonstrate that Defendants acted unlawfully within the meaning of the UTPCPL such that Plaintiff may be awarded up to three times its actual damages sustained, and such additional relief as deemed necessary or proper.

These damages consist of, *inter alia*, the difference between the true price of Acthar before Mallinckrodt engaged with Express Scripts beginning in 2007 to artificially inflate the "average wholesale price" of Acthar, as required by contract to be charged, and the inflated prices of Acthar charged to Plaintiff from October 12, 2020 to the present.

424.    Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Pennsylvania law, and hereby seek damages.

425.    Arizona: The Arizona Uniform Antitrust Act, A.R.S. § 44-1401, et seq., makes unlawful any "contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce" and confers standing to persons and political subdivisions as indirect purchasers to bring an action for damages, injunctive relief, and attorneys' fees and costs.  A.R.S. §§ 44-1402, 1408.

426.    Plaintiff brings this action on behalf of all third party payors ("TPP"), cities, towns, municipalities, and any other state political subdivision (collectively, "municipality") that has paid and continues to pay for prescriptions of Acthar.  The TPP purchasers of Acthar in Arizona have standing as a class to seek relief against Defendants for their scheme to fix the price of Acthar at supracompetitive levels and maintain Mallinckrodt's monopoly power.

427.    Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Arizona law, and hereby seek damages.

428.    Arkansas: The Arkansas Deceptive Trade Practices Act forbids "[d]eceptive and unconscionable trade practices." A.C.A. § 4-88-107(a). It makes illegal "any [] unconscionable, false, or deceptive act or practice in business, commerce, or trade." A.C.A. § 4-88-107(a)(10). Courts have recognized a private right of action for indirect purchasers in antitrust actions.  The improper use of economic leverage qualifies as one such unconscionable business practice.

429.     Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Arkansas law, and hereby seek damages.

430.     California: California's antitrust law, the Cartwright Act, prohibits combinations between two or more persons to "[a]gree in any manner to keep the price of [a product] . . . at a fixed or graduated figure," or to "[e]stablish or settle the price of any [product] . . . , so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of [the product]." Cal. Bus. & Prof. Code § 16720(e)(2)-(3).  Price-fixing is considered a business practice that, due to its pernicious effect on competition and lack of any redeeming virtue is conclusively presumed to be unreasonable and, therefore, illegal without elaborate inquiry as to the precise harm it has caused or the business excuse for its use.

431.     California TPPs and municipalities are persons within the meaning of Section 16750 and 16702.

432.     As alleged in greater detail herein, California TPPs and municipalities suffered and continue to suffer economic injury due to Defendants' maintenance of monopoly prices.

433.     The facts alleged herein establish that California TPPs and municipalities were, and continue to be, injured in their property by paying exorbitant prices above what would be paid in a freely competitive market.

434.     Defendants created restrictions on trade and commerce through the creation of the exclusive arrangement for Acthar.

435.     Defendants agreed to raise the prices of Acthar.

436.     Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of California law, and hereby seek damages.

437. Florida: The Florida Deceptive and Unfair Trade Practices Act is designed to protect "the consuming public from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," and mandates that the act be liberally construed to promote that policy. F.S.A. § 501.202. Florida courts have interpreted this law "as a clear statement of legislative policy to protect consumers through the authorization of [] indirect purchaser actions." *Mack v. Bristol Meyers Squibb*, 673 So. 2d 100, 108 (Fla. 1st D.C.A. 1996).

438. As set forth herein, Florida municipalities and TPPs act as fiduciaries for their employees who receive prescription and health benefits through the TPP or municipality . As such, they are consumers within the meaning of Fla. Stat. § 501.203(7).

439. As consumers, Florida TPPs and municipalities have suffered, and continue to suffer, losses as a result of the anticompetitive conduct of Defendants. Therefore, Florida TPPs and municipalities may recover their actual damages and their attorneys' fees and costs.

440. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Florida law, and hereby seek damages.

441. Hawaii: Hawaii has declared unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," including one that seeks to "f]ix, control, or maintain, the price of any commodity" or engage in activities "with the result of fixing, controlling or maintaining its price." Haw. Rev. Stat. §§ 480-4(a)-(b).

442. In addition, Hawaii law provides that "indirect purchasers injured by an illegal overcharge shall recover [] compensatory damages, and reasonable attorney's fees."

443. Hawaii municipalities and TPPs are persons within the meaning of Haw. Rev. Stat. § 480-1.

444.     As articulated herein, Mallinckrodt possessed monopoly power in the ACTH market.  Acting in concert with Express Scripts, Mallinckrodt willfully enhanced its monopoly power by limiting the distribution of Acthar and acquiring Synacthen.  This conduct allowed Mallinckrodt to set the prices for Acthar far higher than the value of the product thus injuring Hawaii municipalities and TPPs.  Express Scripts agreed to charge these inflated prices to its clients.  Accordingly, Hawaii municipalities and TPPs are entitled to relief under Hawaii law.

445.     Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Hawaii law, and hereby seek damages.

446.     Illinois: 740 ILCS 10/7(2) authorizes any person, including municipalities, townships, and any other political subdivision to seek an injunction, damages, and reasonable attorneys' fees to prevent and ameliorate the anticompetitive conducted described herein.

447.     The acts and circumstances described herein demonstrate that Defendants acted willfully within the meaning of 740 ILCS 10/7(2), such that Plaintiff and the Class may be awarded treble damages.

448.     Plaintiff is a person within the meaning of 740 ILCS 10/7(2).

449.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Illinois law, and hereby seek damages.

450.     Iowa: The Iowa Competition Law prohibits the "attempt to establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing or maintaining prices."  Iowa Code § 553.5.

451.     Iowa Code § 553.12 authorizes any "person who is injured or threatened with injury" to sue to "[p]revent or restrain conduct. . . through injunction," to "[r]ecover actual damages resulting from" prohibited conduct, the costs of suit, and reasonable attorney fees.

102

Iowa Code § 553.12. When the prohibited conduct is willful, a person may recover twice their damages. Id.

452. Iowa TPPs and municipalities are persons within the meaning of Iowa Code § 553.3.

453. The facts and circumstances described herein demonstrate that Defendants acted willfully in their exclusive arrangement, injuring Iowa TPPs and municipalities through the maintenance and enhancement of monopoly prices for Acthar.

454. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Iowa law, and hereby seek damages.

455. Kansas: Kan. Stat. Ann. § 50-101 outlaws any "combination of capital, skill, or acts, by two or more persons" carried out for the purpose of restricting trade or commerce; increasing or reducing the price of goods; or preventing competition. Kan. Stat. Ann. § 50-101. In addition, "all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles" are unlawful under Kansas law. Kan. Stat. Ann. § 50-112. Under Kansas law, any person who has suffered a financial loss, "regardless of whether such injured person dealt directly or indirectly with the defendant" may sue. Kan. Stat. Ann. § 50-163(d)(2).

456. As described herein, Defendants entered into exclusive arrangements that raised and maintained monopoly prices for Acthar and restrained competitors from entering the ACTH market, causing Kansas municipalities and TPPs to continue to overpay for Acthar.

457. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Kansas law, and hereby seek damages.

458.    Massachusetts: Massachusetts' unfair and deceptive trade practices statute declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws, c. 93A, § 2(a). Massachusetts law allows both consumers and participants in trade or commerce to bring claims for actual damages, multiple recovery for willful violations and attorneys' fees for a prevailing plaintiffs.  *See* Mass. Gen. Laws, c. 93A, §§ 9, 11.  The Massachusetts Supreme Court "read[s] the language of G.L. c. 93A as a clear statement of legislative policy to" allow indirect purchasers to seek relief for antitrust conduct.  *Ciardi v. F. Hoffmann-La Roche, Ltd*., 436 Mass. 53, 66-67 (2002).

459.    Massachusetts TPPs and municipalities qualify as consumers or participants in trade in commerce within the meaning of Mass. Gen. Laws, c. 93A.

460.    Within respect to the injuries suffered by Massachusetts TPPs and municipalities only, the majority of the injurious conduct occurred within Massachusetts.

461.    As alleged in this Complaint, the facts and circumstances demonstrate that Defendants acted willfully within the meaning of Mass. G.L. c. 93A entitling Massachusetts TPPs and municipalities to multiple damages for the maintenance of the Acthar monopoly through their exclusive arrangement and the Synacthen acquisition.  Therefore, Massachusetts municipalities and TPPs are entitled to relief under Massachusetts law.

462.    Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Massachusetts law, and hereby seek damages.

463.    Michigan: The Michigan Antitrust Reform Act deems any "contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market [] unlawful."  MCLS § 445.772.  In addition, it prohibits the "establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or

commerce in a relevant market by any person, for the purpose of excluding or limiting

competition or controlling, fixing, or maintaining prices." MCLS § 445.773. It allows any

political subdivision or person "threatened with injury or injured . . . indirectly" to seek

injunctive or equitable relief, damages, interest, costs, and attorneys' fees for a violation of the

Act.

464. Michigan municipalities and TPPs are units of government or persons within the

meaning of MCLS § 445.771.

465. Defendants are persons within the meaning of MCLS § 445.771.

466. The facts and circumstances, as articulated in this complaint, demonstrate that

Defendants agreed to maintain and enhance Mallinckrodt's monopoly in the ACTH market

through their exclusive arrangement and the Synacthen acquisition. This conduct resulted in

Michigan municipalities and TPPs continuing to pay far more than they would in a competitive

market for Acthar. Therefore, Michigan municipalities and TPPs are entitled to relief under the

Michigan Antitrust Reform Act.

467. Plaintiff and the Class were, and continue to be, injured as a result of Defendants'

conduct in violation of Michigan law, and hereby seek damages.

468. Minnesota: Under Minnesota law, "[a] contract, combination or conspiracy

between two or more persons in unreasonable restraint of trade or commerce is unlawful."

Minn. Stat. § 325D.51. In addition, section 325D.53 prohibits the maintenance or use of

monopoly power to affect competition or control, fixe or maintain prices. *See* Minn. Stat ¶

325D.52. By law, "any person . . . injured directly or indirectly by a violation of [section

325D.51] shall recover three times the actual damages sustained, together with costs and

disbursements, including reasonable attorneys' fees." Minn. Stat. § 325D.57. "Minnesota

antitrust law expressly provides damages for indirect purchasers injured by antitrust violations." *Gordon v. Microsoft Corp.*, 2001 WL 366432, at *2 (Minn. Dist. Ct. Mar. 30, 2001); *see also, Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007).

469.    Acthar is a commodity within the meaning of Minn. Stat. § 325D.50.

470.    The exclusive arrangement between Mallinckrodt and Express Scripts represents a contract, combination, or conspiracy within the meaning of Minn. Stat. § 325D.50.

471.    Minnesota municipalities and TPPs are persons within the meaning of Minn. Stat. § 325D.50 with standing to seek relief from the anticompetitive practices of Mallinckrodt and the ESI Defendants.

472.    As described in this Complaint, Defendants agreed to maintain the supracompetitive prices of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Minnesota municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Minnesota municipalities and TPPs are entitled to relief under Minnesota law.

473.    Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Minnesota law, and hereby seek damages.

474.    Mississippi: Under Mississippi law trusts are unlawful, and this includes any "combination, contract, understanding or agreement" that would be inimical to public welfare and the effect of which would be . . . to restraint trade", including any "increase . . .  [on] the price of a commodity."  Miss. Code. Ann. §§ 75-21-1(a)-(c).

475.    Mississippi law allows any party injured by any aforementioned form of trust to

seek their full damages and a civil penalty of $500.00 per injury, no matter whether they are a direct or indirect purchaser. Miss. Code. Ann. § 75-21-9. As such Mississippi municipalities and TPPs have standing to sue under Mississippi law.

476. As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Mississippi municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, Mississippi municipalities and TPPs are entitled to relief under Mississippi law.

477. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Mississippi law, and hereby seek damages.

478. **Nebraska:** In Nebraska, the Junkin Act prohibits any "any "contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade of commerce" in Nebraska. R.R.S. Neb. § 59-801. The Nebraska Consumer Protection Act, in relevant part, duplicates the Junkin Act's analogues of the Sherman Act and states that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful . . . . Any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful." R.R.S. Neb. §§ 59-1602-1603. Indirect purchasers injured by price-fixing practices can sue for damages under both statutes, and recover the costs of suit and a reasonable attorney's fee. *See* R.R.S. Neb. § 59-821.

479. Nebraska municipalities are persons within the meaning of Section 59-822 and have such have standing under the Junkin and Consumer Protection Acts.

480.     As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Nebraska municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Nebraska municipalities and TPPs are entitled to relief under Nebraska law.

481.     Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Nebraska law, and hereby seek damages.

482.     Nevada: Nevada has declared several categories of activities that constitute a "contract, combination or conspiracy in restraint of trade, including price fixing, which consists of raising, depressing, fixing, pegging or stabilizing the price of any commodity or service." Nev. Rev. Stat. Ann. § 598A.060.  In addition, Nevada provides a right of action and treble damage remedy for "any person injured or damaged directly or indirectly" by an antitrust violation. Nev. Rev. Stat. Ann. § 598A.210.

483.     Nevada municipalities and TPPs have standing to seek relief under Nevada law.

484.     As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Nevada municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Nevada municipalities and TPPs are entitled to relief under Nevada law.

485.    Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Nevada law, and hereby seek damages.

486.    New Mexico:  The New Mexico Antitrust Act prohibits "[e]very contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within" New Mexico.  N.M. Stat. Ann. § 57-1-1.  Additionally, the statute expressly provides that indirect purchasers who are "threatened with injury or injured" have standing to assert a claim and "may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees." N.M. Stat. Ann. § 57-1-3(A).

487.    New Mexico municipalities and TPPs have standing to sue under the New Mexico Antitrust Act.  *See City of Sunland Park v. Macias*, 75 P.3d 816 (N.M. Ct. App. 2003).

488.    As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing New Mexico municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market.  Therefore, New Mexico municipalities and TPPs are entitled to relief under New Mexico law.

489.    Plaintiffs and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of New Mexico law, and hereby seek damages.

490.    New York: New York's Donnelly Act declares that every contract, agreement, arrangement or combination" that restrains, may restrain, or has for its purpose the restraint of competition, the free exercise of any commercial activity, or the performance of a service to be

unlawful.  N.Y. Gen. Bus. Law § 340(1). Among other provisions, the Donnelly Act specifically

extends protection to indirect purchasers.  *See* N.Y. Gen. Bus. Law § 340(6).  The statute also

provides that a successful plaintiff "shall recover threefold the actual damages sustained

thereby," as well as costs and attorneys' fees. N.Y. Gen. Bus. Law § 340(5).

491.    New York municipalities and TPPs have standing to sue under the Donnelly Act

because they are persons or political subdivisions within the meaning of N.Y. Gen. Bus. Law §§

340(5)-(6).

492.     As described in this Complaint, Defendants agreed to maintain the

supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug

and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these

supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing New York

municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a

competitive market.  Therefore, New York municipalities and TPPs are entitled to relief under

New York law.

493.    Plaintiff and the Class were, and continue to be, injured as a result of Defendants'

conduct in violation of New York law, and hereby seek damages.

494.    North Carolina: North Carolina's Monopolies, Trusts, and Consumer Protection

Act, N.C. Gen. Stat. §§ 75-1, et seq., declares any "conspiracy in restraint of trade or commerce"

illegal. N.C. Gen. Stat. § 75-1. To prevail under the Act, Plaintiffs must show: (1) defendants

committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that

plaintiff was injured thereby. *Stetser v. TAP Pharmaceutical Products, Inc*., 165 N.C. App. 1

(2004). "A trade practice is 'unfair' if it is immoral, unethical, oppressive, unscrupulous, or

substantially injurious to consumers").  The Act also provides standing for individual plaintiffs

(§ 75-16), which right was specifically extended to indirect purchasers in *Hyde v. Abbott Labs*., 123 N.C. App. 572, 584 (1996).

495. North Carolina municipalities and TPPs have standing as indirect purchasers.

496. As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing North Carolina municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, North Carolina municipalities and TPPs are entitled to relief under North Carolina law.

497. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of North Carolina law, and hereby seek damages.

498. North Dakota: The North Dakota Antitrust Act provides that, "[a] contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." N.D. Cent. Code § 51-08.1-02. The statute expressly provides a cause of action for indirect purchasers, who may obtain injunctive relief and recover damages. N.D. Cent. Code § 51-08.1-08.

499. North Dakota municipalities and TPPs have standing as indirect purchasers within the meaning of N.D. Cent. Code § 51-08.1-08.

500. As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing North Dakota

municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, North Dakota municipalities and TPPs are entitled to relief under North Dakota law.

501. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of North Dakota law, and hereby seek damages.

502. Oregon: Oregon's Antitrust Law declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce". Or. Rev. Stat. Ann. § 646.725. In addition, Oregon provides a right of action and treble damages for antitrust violation, "regardless of whether the plaintiff dealt directly or indirectly with the adverse party." Or. Rev. Stat. Ann. § 646.780(1)(a). In addition, indirect purchasers may recover "reasonable attorney fees, expert witness fees and investigative costs." Or. Rev. Stat. Ann. § 646.780(3)(a)-(b)(A)

503. Oregon municipalities and TPPs fall within the meaning of political subdivision and person as articulated in Or. Rev. Stat. Ann. § 646.780(1)(a), therefore they have standing to sue regardless if they are indirect purchasers.

504. As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Oregon municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, Oregon municipalities and TPPs are entitled to relief under Oregon law.

505. Plaintiff and the Class were, and continue to be, injured as a result of Defendants'

112

conduct in violation of Oregon law, and hereby seek damages.

506. Rhode Island: Rhode Island law declares "[e]very contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce" unlawful. R.I. Gen. Laws. Ann. § 6-36-4. That a person "has no dealt directly with the defendant" does not "bar or otherwise limit recovery". R.I. Gen. Laws Ann. § 6-36-12(g). Plaintiffs may obtain an injunction recovery treble damages, costs of suit, and a reasonable attorneys fee under Rhode Island law.

507. Rhode Island municipalities and TPPs may bring suit pursuant to section 6-36-11 because they are public bodies or persons within the meaning of section 6-36.3. *See* R.I. Gen. Laws Ann. §§ 6-36-3, 11(a).

508. As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Rhode Island municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, Rhode Island municipalities and TPPs are entitled to relief under Rhode Island law.

509. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Rhode Island law, and hereby seek damages.

510. South Dakota: The South Dakota antitrust statute declares unlawful, "[a] contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state S.D.C.L. § 37-1-3.1. Under the statute, any person injured directly or indirectly by an antitrust violation may sue for injunctive and equitable relief as well as to recover treble damages. S.D.C.L. §§ 37-1-14.3, 37-1-33.

511. South Dakota payors have standing to seek relief within the meaning of S.D.C.L. § 37-1-3.1.

512. As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing South Dakota municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, South Dakota municipalities and TPPs are entitled to relief under South Dakota law.

513. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of South Dakota law, and hereby seek damages.

514. Tennessee: The Tennessee Unfair Trade Practices Act declares unlawful and void "[a]ll arrangements, contracts, agreements, trusts or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article." Tenn. Code Ann. § 47-25-101. Persons injured may recover "the full consideration or sum… for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust." Tenn. Code Ann. § 47-25-106. *In Sherwood v. Microsoft Corp.*, 2003 WL 21780975, *29 (Tenn. Ct. App. July 31, 2003), the Tennessee Court of Appeal held that indirect purchasers have standing to bring an action under the Act to recover damages resulting from price-fixing. *See Freeman Indus. LLC v. Eastman Chem Co.*, 172 S. W.3d 512, 519 (Tenn. 2005).

515. Tennessee municipalities and TPPs have standing to sue within the meaning of Tenn. Code Ann. § 47-25-106. *See Metro. Gov't of Nashville & Davidson Cnty. v. Ashland Oil,*

*Inc.*, 535 F. Supp. 328 (M.D. Tenn. 1982).

516.    As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Tennessee municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Tennessee municipalities and TPPs are entitled to relief under Tennessee law.

517.    Plaintiff and the Class were injured, and continue to be injured, as a result of Defendants' conduct in violation of Tennessee law, and hereby seek damages.

518.    Utah: Utah law declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce".  Utah Code Ann. § 76-10-3104. Persons injured by such antitrust conduct may recover three times their damages in addition to an injunction, the costs of suit, and reasonable attorneys' fees.  *See* Utah Code Ann. § 76-10-3109(1).  Political subdivisions may recover actual damages in addition to in addition to injunctive relief, costs of suit, and reasonable attorney fee.  *See* Utah Code Ann. § 76-10-3109(3).

519.    Utah municipalities and TPPs are persons or political subdivisions within the meaning of Utah Code Ann. § 76-10-3109(1) and therefore have standing to obtain relief.

520.    As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Utah

municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, Utah municipalities and TPPs are entitled to relief under Utah law.

521. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Utah law, and hereby seek damages.

522. Wisconsin: The Wisconsin Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." Wis. Stat. Ann. § 133.03(1). Any person injured directly or indirectly by an antitrust violation may seek injunctive relief and recover treble damages. Wis. Stat. Ann. §§ 133.16, 133.18(1)(a).

523. Wisconsin municipalities and TPPs are persons within the meaning of Wis. Stat. Ann. § 133.02 and therefore have standing to seek relief.

524. As described in this Complaint, Defendants agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct is causing Wisconsin municipalities and TPPs to continue to pay prices for Acthar significantly greater than in a competitive market. Therefore, Wisconsin municipalities and TPPs are entitled to relief under Wisconsin law.

525. Plaintiff and the Class were, and continue to be, injured as a result of Defendants' conduct in violation of Wisconsin law, and hereby seek damages.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not

limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT IV**
**PLAINTIFF v. ALL DEFENDANTS**
**Violation of 18 U.S.C. § 1962(c)**

526.     Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows:

527.     Defendants are each "persons" within the meaning of 18 U.SC. § 1961(3), who each conducted the affairs of an association in fact enterprise affecting interstate commerce through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Plaintiff and the members of the Class are also persons.

528.     Each Defendant violated 19 U.S.C. § 1962(c) as follows:

a.   Mark Trudeau.  At all times relevant hereto, Trudeau participated in the wrongful conduct of Defendants as stated herein.

b.   Angus Russell.  At all times relevant hereto, Russell participated in the wrongful conduct of Defendants as stated herein.

c.   David Carlucci.  At all times relevant hereto, Carlucci participated in the wrongful conduct of Defendants as stated herein.

d.   J. Martin Carroll.  At all times relevant hereto, Carroll participated in the wrongful conduct of Defendants as stated herein.

e.   Paul R. Carter.  At all times relevant hereto, Carter participated in the wrongful conduct of Defendants as stated herein.

f.   David Norton.  At all times relevant hereto, Norton participated in the wrongful conduct of Defendants as stated herein.

g.   Carlos V. Paya, M.D., Ph.D.  At all times relevant hereto, Paya participated in

the wrongful conduct of Defendants as stated herein.

h.  JoAnn Reed.  At all times relevant hereto, Reed participated in the wrongful conduct of Defendants as stated herein.

i.  Anne C. Whitaker.  At all times relevant hereto, Whitaker participated in the wrongful conduct of Defendants as stated herein.

j.  Kneeland Youngblood, M.D.  At all times relevant hereto, Youngblood participated in the wrongful conduct of Defendants as stated herein.

k.  Hugh O'Neill.  At all times relevant hereto, O'Neill participated in the wrongful conduct of Defendants as stated herein.

l.  Stephen Welch.  At all times relevant hereto, Welch participated in the wrongful conduct of Defendants as stated herein.

m.  Mallinckrodt Entities.  At all times relevant hereto, the Mallinckrodt Entities participated in the wrongful conduct of Questcor and Express Scripts as stated herein.

n.  Cigna/Evernorth/Express Scripts entities. At all times relevant hereto, the Cigna/Evernorth/Express Scripts entities committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein. Cigna/Evernorth/Express Scripts entities' predicate acts were not limited to the allegations stated herein.

529.    These predicate acts of wire fraud and mail fraud occurred over the course of ten (10) years.

530.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Mallinckrodt  Trudeau, Russell, Carlucci, Carroll, Carter, Norton, Paya, Reed, Whitaker, Youngblood, O'Neill, Welch

and Reasons, Mallinckrodt, Cigna/Evernorth/Express Scripts, and other co-conspirators conducted the affairs of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of Defendants, including their directors, employees, and agents, which is manifested in the ASAP program (the "ASAP Enterprise").

531. The ASAP Enterprise was established to streamlined and cover-up the use of mail and wires to commit fraud so all Defendants could unfairly and illegally profit from the monopolistic and anti-competitive sale of Acthar.

532. The ASAP Enterprise was established in 2007 and is an ongoing and continuing business organization consisting of all of the Defendants and individuals associated for the common purpose of illegally profiting from the distribution, marketing, selling, purchasing, and administration of Acthar to Plaintiff and the Class, and deriving substantial profits from these activities.

533. The ASAP Enterprise through each Defendant individually and collectively engages in and affects interstate commerce because it engages in the following activities across state boundaries: the manufacture, distribution, marketing, sale, and/or purchase of Acthar, the transmission of ASAP program literature (including the Acthar Start Form at Exhibit "A" hereto), the operating of the ASAP program website, and the transmission and/or the receipt of invoices and payments related to the prescription and use of Acthar. Through these activities the ASAP Enterprise distributes Acthar to thousands of individual patients, including those receiving prescription drug benefits from the Plaintiff and the Class.

534. The ASAP Enterprise itself and through each Defendant individually and collectively functioned as a continuing unit as evidenced by the continuing coordination of activities between Defendants. There is a common communication network by which

Defendants shared and continue to share information on a regular basis for all times relevant to this lawsuit, but beginning at least in 2007 and continuing through the present. Typically, this communication occurred by use of the wires and mails, in which Defendants all agree to charge inflated prices for Acthar to Plaintiff and other Class members. These entities functioned as a continuing unit for the purposes of implementing the fraudulent scheme to inflate the prices of Acthar by and through ASAP. When issues arose during the fraudulent scheme, each agreed to take actions to hide the scheme and to continue its existence.

535. Defendants exerted control over the ASAP Enterprise, have associations with the ASAP Enterprise, and have directly or indirectly conducted or participated in the conduct of the affairs of the ASAP Enterprise in the following ways:

a. Mallinckrodt establishes the prices of Acthar through fraudulent conduct;

b. Defendants directly control the prices at which Plaintiff and the Class reimburse for Acthar;

c. Defendants directly control the ASAP Program materials and website which enroll patients in an exclusive distribution network for the administration of Acthar, allowing Mallinckrodt to conduct its unconscionable and unfair pricing of Acthar;

d. Defendants directly control the exclusive distribution network for Acthar through the ASAP Enterprise;

e. Defendants rely on their employees to promote the ASAP Program through the marketing alleged herein, through the mail and the wires; and

f. Defendants participate in the affairs of the ASAP Enterprise by using a fraudulent scheme to market and sell Acthar at inflated prices.

536. Defendants conducted and participated in the affairs of the ASAP Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1345, relating to wire fraud.

537. Mallinckrodt committed mail fraud when they utilized the mail and wires to

defraud patients and purchases including Plaintiff and the Class. Specific examples of the fraud

are, included but not limited to:

    a. Express Scripts explicitly advertises to all existing and prospective patients and payors that the ASAP Program would benefit them providing lower and affordable sales prices;

    b. Defendants misled, and continues to mislead, Plaintiff by fraudulently stating over the internet and through the mail that Plaintiff and the Class would receive affordable healthcare and contained costs of Acthar;

    c. Despite its explicit promises to the contrary, Express Scripts refuses to use its market strength and related bargaining power to convince Mallinckrodt to lower the price of Acthar, because Express Scripts was serving as Mallinckrodt's exclusive agent and conducting the ASAP Enterprise; and *inter alia*,

    d. Processing prescriptions via mail and the wire and receiving payments from Plaintiff.

538. Defendants' pattern of racketeering activity likely involves hundreds, if not

thousands, of separate instances of the use of the United States mail, private shipping services,

facsimiles, or interstate wires, including the internet, in furtherance of its fraudulent and unlawful

scheme. Each of these fraudulent mailing and interstate wire transmissions separately constitutes

a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these

violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §

1961(5) in which the Defendants intend to defraud Plaintiff and members of the Class.

539. By conducting the ASAP Enterprise via the fraudulent activities stated herein

through the mail and wires, the Defendants, individually and collectively, are engaging in a

repeated, fraudulent, and unlawful course of conduct constituting a pattern of racketeering.

540. Thousands of ASAP forms (like the one attached as Exhibit "A" to the Rockford

Complaint) were transmitted via facsimile to Express Scripts offices in multiple states.

Thousands more phone calls were conducted between physicians and patients with Express

Scripts, as directed by the ASAP form. Each of these fraudulent mailing and interstate wire transmissions separately constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Defendants intended to defraud Plaintiffs and members of the Class.

541. Mallinckrodt's and Express Scripts' violations and pattern of racketeering activity directly and proximately caused Plaintiffs harm insofar as Plaintiff paid inflated reimbursements and other payments for Acthar since October 12, 2020.

542. Likewise, the Class is harmed by Mallinckrodt's and Express Scripts' violations and pattern of racketeering activity by making similar inflated payments for Acthar.

     a. With respect to the individual Defendant Board Members, all twelve (12) can be individually responsible as a matter of well-settled Pennsylvania law for their knowing participation in the anti-competitive events set forth in detail above. In the Commonwealth of Pennsylvania, the Pennsylvania Supreme Court has clearly articulated that principals of a company, including its board of directors, can be responsible for a company's illegal conduct to the extent that the individual defendants participated in the illegal actions.

     b. In fact, the Supreme Court has also held that intentional and knowing inaction can be sufficient to support a participation theory liability against corporate officers.

     c. Under the participation theory, a court may impose liability upon the individual board of directors in their role as actors as opposed to as owners or directors of the corporate entity. Furthermore, such liability is not predicated

upon a finding that the corporation is a sham and a mere alter ego of the individual corporate officer; instead, liability attaches where the record establishes the individual's participation in the tortious activity.

543.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the costs of this suit, including reasonable attorneys' fees.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

### COUNT V
### PLAINTIFFS v. ALL DEFENDANTS
### Violation of 18 U.S.C. § 1962(a)

544.    Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows, specifically including those paragraphs set forth above where the legal responsibilities of the individual Defendants are set forth along with their individual and collective breaches of those responsibilities, along with the succinct legal analysis of why these individual Defendants are exposed to individual liability.

545.    Throughout the Class Period, Defendants continue to violate the RICO statute by using and investing income that was derived from a pattern of racketeering activity as described herein.  This income was used to acquire, establish, and/or operate the ASAP Enterprise in and affecting interstate commerce.

546.    The enterprise at issue is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of Defendants, including their directors, employees, and agents, which is manifested in the ASAP program (the "ASAP Enterprise").  The ASAP Enterprise is an ongoing

and continuing business organization consisting of both corporations and individuals associated for the common purpose of selling, purchasing, and administering Acthar to Plaintiff and their individual participants, and deriving profits from these activities. Defendants engaged in a pattern of racketeering activity described in greater detail herein.

547. Plaintiff and members of the Class have been directly and proximately injured in their property by the Defendants' use and investment of the racketeering income in the acquisition, establishment, and operation of the ASAP Enterprise. The injury to Plaintiff and the Class' businesses or property stemming from these violations has been realized by the over-payment for Acthar.

548. The use and investment of racketeering income by Defendants directly and proximately injured the Plaintiff and the Class in a manner than was distinct from the injury caused by the pattern of racketeering activity described herein.

549. By virtue of these violations of 18 U.S.C. § 1962(a), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the costs of this suit, including reasonable attorneys' fees.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT VI**
**PLAINTIFF v. ALL DEFENDANTS**
**Violation of 18 U.S.C. § 1962(d))**

550. Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

551. Defendants violated 18 USC § 1962(d) by conspiring to associate with a

racketeering enterprise, in violation of 18 U.S.C. § 1962(c). Mallinckrodt explicitly contracted with Express Scripts to have Express Scripts serve as Mallinckrodt's exclusive agent in the conduct of the ASAP Program and the ASAP Enterprise, and conspired with Express Scripts to inflate the prices and limit distribution of Acthar in violation of § 1962(c).

552. Defendants knew and adopted the criminal purpose of the ASAP Enterprise. Mallinckrodt communications reflect an express illegal agreement between Defendants to limit the distribution of Acthar in order to charge inflated prices.

553. Additionally, Mallinckrodt's conduct in sending e-mails, faxes and other communications to Express Scripts to direct the exclusive distribution, sale and reimbursement of Acthar through ASAP is consistent with the existence of an agreement to carry out the scheme to inflate prices and maximize profits. Express Scripts, in turn, communicated Mallinckrodt's inflated prices to its clients, including Plaintiff, in its contract schedules and subsequent invoices for Acthar. These same prices were communicated to the other PBMs for inclusion in their contracts with payors.

554. Defendants actively furthered the goals of the ASAP Enterprise to defraud end payors, like the Plaintiff. Mallinckrodt changed its distribution scheme with Acthar with the intention that the changes would affect the prices of Acthar; it engaged in frequent discussions with all other Defendants about its plan to raise Acthar prices in the marketplace; it made requests that Express Scripts change the Acthar prices charged to its clients in conjunction with its price increases; and it publicly boasted about the effects of the scheme without disclosing its details.

555. Plaintiff and other members of the Class continue to be injured in their business or property because they have paid, and continue to pay, thousands of dollars in overpayments that

they would not have made had Defendants not conspired to engage in racketeering activity.

556. As co-conspirators, Trudeau, Russell, Carlucci, Carroll, Carter, Norton, Paya, Reed, Whitaker, Youngblood, O'Neill, Welch, the Mallinckrodt Entities, Cigna/Evernorth and AlixPartners are jointly and severally liable for all damage that is occurring as a result of their individual actions, and those of their co-conspirators respectively, in furtherance of the conspiracy to raise prices of Acthar. All Defendants are liable for all damages arising from Trudeau's, Russell's, Carlucci's, Carroll's, Carter's, Norton's, Paya's, Reed's, Whitaker's, Youngblood's, O'Neill's, Welch's, Mallinckrodt Entities', Cigna/Evernorth's, and AlixPartners' respective conduct in furtherance of the scheme.

557. Under the provisions of Section 1964(c) of RICO, Trudeau, Russell, Carlucci, Carroll, Carter, Norton, Paya, Reed, Whitaker, Youngblood, O'Neill, Welch, the Mallinckrodt Entities, Cigna/Evernorth and AlixPartners are jointly and severally liable to Plaintiff for three times the damages that Plaintiff has sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

    a. With respect to the individual Defendant Board Members, all twelve (12) can be individually responsible as a matter of well-settled Pennsylvania law for their knowing participation in the anti-competitive events set forth in detail above. In the Commonwealth of Pennsylvania, the Pennsylvania Supreme Court has clearly articulated that principals of a company, including its board of directors, can be responsible for a company's illegal conduct to the extent that the individual defendants participated in the illegal actions.

    b. In fact, the Supreme Court has also held that intentional and knowing inaction can be sufficient to support a participation theory liability against corporate

officers.

c. Under the participation theory, a court may impose liability upon the individual board of directors in their role as actors as opposed to as owners or directors of the corporate entity.  Furthermore, such liability is not predicated upon a finding that the corporation is a sham and a mere alter ego of the individual corporate officer; instead, liability attaches where the record establishes the individual's participation in the tortious activity.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT VII
## PLAINTIFFS v. ALL DEFENDANTS
## <u>FRAUD</u>

558.    Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

559.    Defendants' acts violate the common law against prohibitive against fraudulent conduct.

560.    In setting the prices for Acthar, which prices Plaintiff paid and continue to pay, the Defendants made material misrepresentations that those prices represented a calculation of real and fact-based prices for their drugs, and that they represented the actual value of the product in the marketplace.

561.    These representations were material to the transactions at hand in that Plaintiff and the Class used and relied upon these prices as the amount to pay and/or reimburse for Acthar.

562.     As set forth more fully above, these prices were artificial prices, unrelated to any actual, reasonable price in the marketplace, or actual value of Acthar, but created and manipulated by the Defendants for the purpose of generating exorbitant revenue, thus constituting false representations which the Defendants knew or, in the absence of recklessness, should have known to be false.

563.     The Defendants made these false representations about the prices of Acthar with the intent of misleading Plaintiff and the Class into relying on the prices as real and fact-based prices, rather than artificially inflated prices.

564.     Plaintiff and the Class justifiably relied upon these false misrepresentations in purchasing and/or reimbursing Acthar at the amount charged by Express Scripts and CVS Caremark based on the price set by Mallinckrodt.

565.     Plaintiff's and the Class' contracts with Express Scripts all provide for "cost containment" and all provide for discounted prices for specialty drugs at varying rates, intended to reflect the efforts of Express Scripts to provide cost containment.  The prices for Acthar set forth in such contracts were prices set by Mallinckrodt and set forth by Express Scripts in its contracts.  As such, all Defendants communicated these false prices directly to Plaintiff and the Class for the Acthar sold.

566.     As a direct and proximate result of the false representations of the Defendants, as set forth above, Plaintiff and the Class were harmed in that they were unaware of the artificial, inflated prices of Acthar, would not have paid and/or reimbursed the artificially inflated prices for Acthar had they known of the false representations and, in fact, overpaid for the Acthar because of the false representations.

a.   With respect to the individual Defendant Board Members, all twelve (12) can

be individually responsible as a matter of well-settled Pennsylvania law for their knowing participation in the anti-competitive events set forth in detail above. In the Commonwealth of Pennsylvania, the Pennsylvania Supreme Court has clearly articulated that principals of a company, including its board of directors, can be responsible for a company's illegal conduct to the extent that the individual defendants participated in the illegal actions.

b. In fact, the Supreme Court has also held that intentional and knowing inaction can be sufficient to support a participation theory liability against corporate officers.

c. Under the participation theory, a court may impose liability upon the individual board of directors in their role as actors as opposed to as owners or directors of the corporate entity. Furthermore, such liability is not predicated upon a finding that the corporation is a sham and a mere alter ego of the individual corporate officer; instead, liability attaches where the record establishes the individual's participation in the tortious activity.

d. In the instant case, each of the Defendants participated in the following wrongful acts:

    i. Actively establishing and continuing Mallinckrodt's conspiratorial agreement with Express Scripts for the purpose of manipulating the price of Acthar to the exorbitant amounts set forth herein;

    ii. Actively promoting the payment schemes set forth above between Mallinckrodt and Express Scripts, especially with respect to the reimbursement rates charged by Mallinckrodt;

129

iii. Actively participating in a scheme to grossly inflate revenue from its direct involvement in coordinating all aspects of the Plaintiff's receipt of and payment for Acthar;

iv. Continuing to extract exorbitant revenue from the Plaintiff and the Class described above beyond what Mallinckrodt (and Express Scripts) could have received in the absence of the unlawful conduct described herein;

v. Actively promoting, agreeing with, and creating policies which advanced and encourages, including each of the averments set forth above in paragraphs 270, 272, 273, 275 and 276.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT VIII**
**PLAINTIFF v. ALL DEFENDANTS**
**CONSPIRACY TO DEFRAUD/CONCERTED ACTION**

567. Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

568. As set forth more fully above, beginning at least as early as 2007, the exact date being unknown to Plaintiff, and continuing thereafter until the present, Defendants and other unnamed co-conspirators, between and among themselves and others, entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud and deceive Plaintiffs and the Class by causing them to pay more for Acthar than they otherwise would have paid in the absence of the Defendants' conspiracy and concerted action.

569. Pursuant to the unfair and deceptive scheme to distribute, market and sell Acthar to derive substantial profits, and the conspiracy alleged herein, and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to deceive Plaintiff and the Class, and acted or took substantial steps in furtherance of the conspiracy. Those acts include the following:

a. discussing and agreeing among themselves and with their co-conspirators that they would directly control the price at which Plaintiff and the Class paid for Acthar after the filing of Mallinckrodt's bankruptcy petition on October 12, 2020 and continuing through the present;

b. discussing and agreeing among themselves and with their co-conspirators that they would increase the price at which Plaintiff and the Class paid for Acthar after the filing of Mallinckrodt's bankruptcy petition on October 12, 2020 and continuing through the present;

c. discussing and agreeing among themselves and with their co-conspirators that they would directly control the ASAP program materials and website which enrolled patients into an exclusive distribution network for the administration of Acthar, allowing Defendants to conduct their unfair pricing scheme for Acthar after the filing of Mallinckrodt's bankruptcy petition on October 12, 2020 and continuing through the present;

d. discussing and agreeing among themselves and with their co-conspirators that they would directly control the exclusive distribution network for Acthar through the ASAP Program after the filing of Mallinckrodt's bankruptcy petition on October 12, 2020 and continuing through the present;

e. discussing and agreeing among themselves and with their co-conspirators that they would rely on employees to promote the ASAP Program through the marketing alleged herein, and through use of the mail and the wires after the filing of Mallinckrodt's bankruptcy petition on October 12, 2020 and continuing through the present;

f. discussing and agreeing among themselves and with their co-conspirators that they would participate in the affairs of the ASAP program by using a fraudulent scheme to market and sell Acthar at inflated prices after the filing of Mallinckrodt's bankruptcy petition on October 12, 2020 and continuing through the present; and

g. discussing and agreeing among themselves and with their co-conspirators that they would conceal and suppress the truth about the Acthar inflated prices, the

monies earned from payors, like Plaintiff and the Class, and their exclusive arrangement to maintain and enhance Mallinckrodt's monopoly power as alleged herein after the filing of Mallinckrodt's bankruptcy petition on October 12, 2020 and continuing through the present.

570.    In addition to the specific facts set forth above, it is alleged the Defendants and their co-conspirators engaged in conspiratorial meetings, among the purposes of which meetings were to discuss the importance of controlling the direct distribution, marketing, sale and administration of Acthar to Plaintiff and the Class, and deriving substantial profits from these activities.

571.    The Defendants performed the conspiratorial acts set forth herein intending to injure payors of Acthar, like Plaintiff and the Class, by causing them to pay inflated prices so that the Defendants could derive substantial profits.

572.    The Defendants performed the acts alleged herein in furtherance of the common plan or design for the conspiracy with intent and/or with knowledge of the injury and damage it would cause to the Plaintiff and the Class, and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

  a.  With respect to the individual Defendant Board Members, all twelve (12) can be individually responsible as a matter of well-settled Pennsylvania law for their knowing participation in the anti-competitive events set forth in detail above.  In the Commonwealth of Pennsylvania, the Pennsylvania Supreme Court has clearly articulated that principals of a company, including its board of directors, can be responsible for a company's illegal conduct to the extent that the individual defendants participated in the illegal actions.

  b.  In fact, the Supreme Court has also held that intentional and knowing inaction can be sufficient to support a participation theory liability against corporate

officers.

    c.    Under the participation theory, a court may impose liability upon the individual board of directors in their role as actors as opposed to as owners or directors of the corporate entity. Furthermore, such liability is not predicated upon a finding that the corporation is a sham and a mere alter ego of the individual corporate officer; instead, liability attaches where the record establishes the individual's participation in the tortious activity.

573.    As a direct and proximate result of the Defendants' conspiracy as alleged herein, Plaintiff and the Class have been injured and damaged, and the Defendants are jointly and severally liable for such injuries and damages.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT IX**
**PLAINTIFF v. MALLINCKRODT ENTITIES**
**UNJUST ENRICHMENT**

574.    Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

575.    This Count alleges unjust enrichment against the Mallinckrodt Entities.

576.    Plaintiff's covered beneficiaries received direct shipments of Acthar from Mallinckrodt via its exclusive distribution mechanism established with Express Scripts. In exchange for such Acthar, Plaintiff made payments to Express Scripts (via the exclusive specialty pharmacy network) for the benefit of Mallinckrodt. Indeed, such payments were transferred by the specialty pharmacy to Mallinckrodt pursuant to an understanding between the

two that the total amount would be forwarded to Mallinckrodt, less a certain amount previously agreed to by Mallinckrodt and the SP. The amount charged by Mallinckrodt for the Acthar was the amount paid by Plaintiff, pursuant to its agreement with SP.

577. These payments, along with the tens of millions in payments for Acthar made each month by members of the Class, were collected by Mallinckrodt ARD and then re-distributed among the Mallinckrodt Entities as described herein.

578. Only discovery will reveal the nature and extent of such transfers to each such Mallinckrodt Entity for purpose of this unjust enrichment claim.

579. The amounts paid by Plaintiff were valuable to Mallinckrodt, and the Mallinckrodt Entities, and Mallinckrodt and its related entities were unjustly enriched by such payments, in that, the reimbursement rates charged by Mallinckrodt at extremely high prices were valuable and beneficial to Mallinckrodt and its entities.

580. By engaging in the conduct described in this Class Action Complaint, Mallinckrodt has knowingly obtained and continues to obtain benefits from Plaintiff and the Class, namely grossly inflated revenue from its direct involvement in coordinating all aspects of Plaintiff's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for Mallinckrodt to retain such benefits.

581. By engaging in the unlawful conduct described herein, Mallinckrodt has been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market and what it could have charged if it had engaged in appropriate cost containment measures.

582. By maintaining and enhancing its monopoly, and its exercise of monopoly power through increasing prices over a decade, and engaging in other unlawful acts and practices,

134

Mallinckrodt was able to extract exorbitant revenue from Plaintiff and the Class beyond what it could have received in the absence of such unlawful conduct. This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Pennsylvania and other states and, as such, interfered with the legally protected interests of Plaintiff and the Class.

583. Plaintiff and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Mallinckrodt, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT X**
**PLAINTIFF v. MALLINCKRODT OFFICERS AND DIRECTORS**
**UNJUST ENRICHMENT**

584. Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

585. This Count alleges unjust enrichment against the Mallinckrodt officers and directors named as Defendants herein..

586. Plaintiff's covered beneficiaries received direct shipments of Acthar from Mallinckrodt via its exclusive distribution mechanism established and maintained with Cigna/Evernorth/Express Scripts by the Mallinckrodt officers and directors. In exchange for such Acthar, Plaintiff made payments to Mallinckrodt (via the exclusive specialty pharmacy network) for the benefit of Mallinckrodt, and its officers and directors. Indeed, such payments were transferred by the specialty pharmacy to Mallinckrodt, and then on to officers and directors

in the form of compensation, benefits and remuneration.

587.    The tens of millions in payments for Acthar made each month by members of the Class, were collected by Mallinckrodt ARD and then re-distributed among the Mallinckrodt Entities as described herein, and then further distributed to Mallinckrodt's officers and directors in the form of compensation, benefits and remuneration.

588.    Only discovery will reveal the nature and extent of such transfers to each such Mallinckrodt officer and director for purpose of this unjust enrichment claim.

589.    The amounts paid by Plaintiff were valuable to Mallinckrodt's officer and directors, and they were each unjustly enriched by such  payments, in that, the reimbursement rates charged by Mallinckrodt at extremely high prices were valuable and beneficial to Mallinckrodt officers and directors.

590.    By engaging in the conduct described in this Class Action Complaint, Mallinckrodt's officers and directors have knowingly obtained and continue to obtain benefits from Plaintiff and the Class, namely compensation, benefits and other remuneration from their direct involvement in coordinating all aspects of Plaintiff's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for them to retain such benefits.

591.    By engaging in the unlawful conduct described herein, Mallinckrodt's officers and directors have been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market and what it could have charged if it had engaged in appropriate cost containment measures.

592.    By maintaining and enhancing its monopoly, and its exercise of monopoly power through increasing prices over a decade, and engaging in other unlawful acts and practices, Mallinckrodt's officers and directors were able to extract exorbitant revenue from Plaintiff and

136

the Class beyond what it could have received in the absence of such unlawful conduct. This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Pennsylvania and other states and, as such, interfered with the legally protected interests of Plaintiff and the Class.

593.     Plaintiff and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Mallinckrodt's officers and directors, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT XI
## PLAINTIFF v. CIGNA/EVERNORTH/EXPRESS SCRIPTS
## UNJUST ENRICHMENT

594.     Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

595.     This Count alleges unjust enrichment against Cigna/Evernorth/Express Scripts.

596.     As the exclusive agent of Mallinckrodt for the distribution of Acthar, Cigna/Evernorth/Express Script received payments for Acthar which were valuable to them and they were unjustly enriched by such payments, in that, the prices for Acthar charged by the Defendants were valuable and beneficial to Cigna/Evernorth/Express Scripts.

597.     By engaging in the conduct described in this Class Action Complaint, Cigna/Evernorth/Express Scripts have knowingly obtained benefits from Plaintiff and the Class, namely grossly inflated revenue from its direct involvement in coordinating all aspects of

Plaintiff's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for Express Scripts to retain such benefits.

598.    By engaging in the unlawful conduct described herein, Cigna/Evernorth/Express Scripts has been knowingly enriched by the amount charged for Acthar over and above what could have been charged and should have been charged in a competitive market, wherein Cigna/Evernorth/Express Scripts would use its market power to extract lower prices from Mallinckrodt for Acthar.

599.    By assisting Mallinckrodt in maintaining and enhancing its monopoly, and its exercise of monopoly power through increasing prices over a decade, and engaging in other unlawful acts and practices, Cigna/Evernorth/Express Scripts was able to extract exorbitant revenue from Plaintiff and the Class beyond what it could have and should have received in the absence of such unlawful conduct.  This conduct continues to violate the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Pennsylvania and other states and, as such, interferes with the legally protected interests of Plaintiff and the Class.

600.    Plaintiff and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and in favor of the Class, and against Cigna/Evernorth/Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class request the Court to enter the following relief:

a.      Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and denominate Plaintiff as an adequate representative for the Class and its undersigned counsel as counsel for the Class;

b.      Declare unlawful the acts and practices alleged herein, enjoin the Defendants from committing the acts alleged herein, and restore the status quo before the unlawful conduct took place;

c.      Enter judgment against all Defendants for the violations alleged herein;

d.      Award the actual damages incurred by Plaintiff and the members of the Class as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

e.      Award statutory damages set forth herein under the statutory claims alleged;

f.      Award treble damages or multiple damages by operation of law;

g.      Award punitive damages;

h.      Award Plaintiff the costs of this action, including reasonable attorneys' fees, and, where applicable, expert fees; and

i.      Award such other and further relief as the Court may deem just and appropriate.

## **JURY DEMAND**

Plaintiff and the Class demand a trial by jury of all issues so triable in this cause.

Respectfully submitted,

By:  */s/Peter J. Flowers*
Peter J. Flowers, Esquire
(IL Attorney ID No. 06210847)
*pjf@meyers-flowers.com*
Meyers & Flowers, LLC
3 North Second Street, Suite 300
St. Charles, IL 60174
Phone: (630) 232-6333
Fax:    (630) 845-8982

Donald E. Haviland, Jr.
(*Pro hac vice pending*)
*haviland@havilandhughes.com*
William H. Platt, II
(*Pro hac vice pending*)
*platt@havilandhughes.com*
Haviland Hughes
201 South Maple Avenue
Suite 110
Ambler, PA 19002
Phone: (215) 609-4661
Fax:    (215) 392-4400

Dion G. Rassias
(*Pro hac vice pending*)
*dgr@beasleyfirm.com*
Jillian E. Johnston
(*Pro hac vice pending*)
*Jill.johnston@beasleyfirm.com*
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA  19107
Phone: (215) 592-1000
Fax:    (215) 592-1523

Daniel K. Astin
(*Pro hac vice pending*)
*dastin@ciardilaw.com*
CIARDI & ASTIN
1204 North King Street

Wilmington, DE  19801
Phone: (302) 658-1100
Fax: (302) 658-1300

Albert A. Ciardi
(*Pro hac vice pending*)
*aciardi@ciardilaw.com*
Walter W. Gouldsbury, III
(*Pro hac vice pending*)
*wgouldsbury@ciardilaw.com*
CIARDI & ASTIN
1905 Spruce Street
Philadelphia, PA  19103
Phone: (215) 557-3550
Fax: (215) 557-3551

James Bartimus
(*Pro hac vice pending*)
*jb@bflawfirm.com*
Anthony DeWitt
(*Pro hac vice pending*)
*aldewitt@bflawfirm.com*
BARTIMUS FRICKLETON,
ROBERTSON, RADAR, PC
11150 Overbrook Road, Suite 200
Leawood, KS  66211
Phone: (913) 266-2300
Fax: (913) 266-2366

*Attorneys for Plaintiff and the Class*